IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ——————————————————————— ) | |
| BROWN HELICOPTER, INC., UNITED ) | |
| AERONAUTICAL CORP., and ASSOCIATED ) | |
| AIRCRAFT MFG. & SALES, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) Civil Case No. 06-840 (JR) | |
| UNITED STATES DEPARTMENT OF DEFENSE, ) | |
| ) | |
| Defendant. ) | |
| ——————————————————————— ) | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to LCvR 65.1 and the Court's Order issued on May 9, 2006, plaintiffs Brown

Helicopter, Inc. ("Brown"), United Aeronautical Corp. ("UAC") and Associated Aircraft Mfg. &

Sales, Inc. ("Associated") respectfully move for a preliminary injunction prohibiting defendant

United States Department of Defense, through its underlying agency Defense Reutilization &

Marketing Service ("DRMS"), from proceeding with the sale and destruction of certain military

surplus equipment located at Davis Monthan Air Force Base in Arizona.  The points and

authorities demonstrating that a preliminary injunction is appropriate are set forth in plaintiffs'

memorandum filed herewith.  A proposed order is also filed herewith.

For the reasons set forth in the accompanying memorandum, plaintiffs respectfully request

that their motion for a preliminary injunction be granted and that the Court grant plaintiffs' the

relief sought in their memorandum.

Respectfully submitted,


_____/s/_____
John J. Fausti
D.C. Bar No. 349811
Fausti & Associates, LLC
4301 Connecticut Avenue, NW
Suite 453
Washington, DC  20008
(202) 237-0505 (phone)
(202) 237-7566 (fax)
jfausti@faustilaw.com


Of counsel:

Lisa Studtmann
Fausti & Associates, LLC
4301 Connecticut Avenue, NW
Suite 453
Washington, DC  20008
(202) 237-0505 (phone)
(202) 237-7566 (fax)
lstudtmann@faustilaw.com

Kevin R. Garden
DC Bar No. 426745
THE GARDEN LAW FIRM, P.C.
901 N. Pitt Street
Suite 325
Alexandria, VA 22314
Telephone:   (703) 535-5565
Facsimile:   (703) 997-1330
Email: kevin@gardenlawfirm.com


Dated:  May 23, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                            )
BROWN HELICOPTER, INC., UNITED              )
AERONAUTICAL CORP., and ASSOCIATED          )
AIRCRAFT MFG. & SALES, INC.,                )
                                            )
            Plaintiffs,                     )
                                            )
      v.                                    )
                                            )  Civil Case No. 06-840 (JR)
UNITED STATES DEPARTMENT OF DEFENSE,        )
                                            )
            Defendant.                      )
_____)
```

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs Brown Helicopter, Inc. ("Brown"), United Aeronautical Corp. ("UAC") and

Associated Aircraft Mfg. & Sales, Inc. ("Associated") hereby submit this memorandum in support

of their motion for a preliminary injunction prohibiting defendant United States Department of

Defense, through its underlying agency the Defense Reutilization and Marketing Service

("DRMS"), from proceeding with the sale and destruction of certain government property as

described below.  The property includes military surplus aircraft, which plaintiffs number over

1,000 and which are located at Davis-Monthan Air Force Base in Arizona.  The defendant's

impending sale and destruction of the aircraft[1] violates law and will result in irreparable harm to

the plaintiffs, as well as cause harm to the public interest due to the loss of significant revenues

_____

[1] The sale at issue, which is being offered pursuant to an auction, had previously been scheduled
for sale in a bidding process that was to end on May 8, 2006.  *See* Declaration of Brian Cole at ¶
13 (Att. A)(attached hereto as Exh. 1).  Pursuant to this Court's Order dated May 9, 2006
reflecting the parties' agreement, that sale has been stayed pending resolution of this preliminary

significant revenues and valuable aircraft parts.  For these reasons, the issuance of a preliminary injunction is necessary at this time.

## A.    Factual Background

Pursuant to a delegation of authority from the General Services Administration, DRMS sells military aircraft when they are determined to no longer be needed by the government.  40 U.S.C. §542; 41 C.F.R. Part 102-36.  In fact, the federal government has been selling military surplus aircraft to private industry since shortly after World War II.  Exh. 1 at ¶ 7.  As stated in the Defense Materiel Disposition Manual,[2] which is applicable to all elements of the DoD and their subordinate agencies and addresses the sale of surplus property:

> Personal property (including scrap) shall be disposed of in a manner that ensures maximum use to satisfy valid needs, permits authorized donations, obtains optimum monetary return to the U.S. Government for property sold, protects the environment, and minimizes the need for abandonment or destruction (A/D).

Exh. 2, Att. C (at 2).[3]  In addition, the Defense Materiel Disposition Manual states that DRMS has

---

injunction proceeding.
[2] Pertinent excerpts from the Defense Materiel Disposition Manual are attached as Attachment C to the Declaration of John H. Lane, which is attached hereto as Exhibit 2.

[3] Some items at issue in this matter are included on the United States Munitions List, and the Defense Materiel Disposition Manual states that "[s]pecific guidance for property identified as Munitions List Items (MLI)/Strategic List Items (SLI) is found in DoD 4160.21-M-1, Defense Demilitarization and Trade Security Control Manual."  DoD 4160.21-M at 1-1 (Att. C attached to

has the responsibility of promoting the "maximum reuse of excess, surplus and FEPP [Foreign Excess Personal Property]" as well as the "optimum monetary return to the Government for all property sold." *Id.* (at 8 and 9).

As the above statements from the Defense Materiel Disposition Manual demonstrate, the sales of military surplus aircraft achieve two primary results. First, they provide funds to the federal treasury by avoiding wasteful destruction of property which the government no longer needs. Second, they provide private industry with critical parts for use in various industries, such as forest fire suppression, logging and construction, and for meeting the needs of friendly nations which use these aircraft and parts from these aircraft for their own security and routinely need parts to keep them usable. Exh. 1 at ¶ 9; Exh. 2 at ¶¶ 4-5. Also, at times the United States government will also purchase surplus parts when they have a shortage of such parts on hand. Exh. 1 at ¶ 10; Exh. 2 at ¶ 9. These re-purchases result from the fact that the government cannot retain all of its surplus material, but at times (often many years later) it will have a need for replacement parts it no longer has in stock. *Id.* Because plaintiffs and others like them retain such parts, the government saves significant expenses by purchasing these items from surplus dealers rather than having to obtain them at significantly higher prices from the original equipment manufacturers. Exh. 1 at ¶ 11.

---

to Exh. 1).

Plaintiffs are in the business of purchasing surplus government property, which includes many of the exact same types of military aircraft and components which are to be destroyed in the sale at issue in this matter. Exh. 1 at ¶ 3 : Exh. 2 at ¶ 3. Plaintiffs routinely resell parts from those aircraft to qualified entities for various uses. Exh. 1 at ¶ 3; Exh. 2 at ¶ 3. For example, plaintiff UAC, or its predecessor, Consolidated Aeronautics, has been purchasing usable aircraft at Davis Monthan Air Force Base since 1968, and over that period has paid the government approximately $7.5 million for the aircraft which it has purchased. Exh. 1 at ¶ 6. UAC has purchased C-130 and A4 aircraft from the federal government, and would be interested in the purchase of S-3 and H-53 aircraft. *Id.* Additionally, over more than thirty-five (35) years, UAC, or its predecessor, has purchased C-130, A-4, S-3, F-14, H-53, T-34 and C-141 parts from the government. *Id.* at ¶ 7.[4] Specifically, UAC has spent roughly $500,000 for C-130 parts; $2 million for A-4 parts; $200,000 for S-3 parts; $250,000 for F-14 parts; $200,000 for H-53 parts; and $100,000 for T-34 and C-141 parts in mixed lots during the past twenty-five (25) years alone. *Id.*

Plaintiff Brown has been purchasing aircraft components from the federal government since 1978. Exh. 2 at ¶ 6. In 2005 alone, Brown spent $10.3 million in purchasing surplus aircraft and component parts, of which $7 million was paid to the federal government for usable parts. *Id.* In 2004, Brown spent approximately $7.4 million for surplus aircraft property, and in 2003 that total was $7.2 million. *Id.* In 2002, Brown spent $8.2 million and in 2001 spent $5.2 million in purchasing surplus aircraft parts. *Id.*

Recently, Brown has purchased usable aircraft components from the federal government such as C-130 propellers ($350,000), C-130 nose and main landing gear ($64,000), C-130 rudder

---

[4]These seven aircraft are the approximately 1,000 aircraft scheduled for destruction in the sale at

servos ($36,000), C-130 engine gearboxes ($30,000), H-53 rotor heads (($40,000), helicopter turbine engines ($850,000), as well as entire helicopters ($1,600,000).  *Id.* at ¶ 7.

During the past ten (10) to fifteen (15) years, Brown has made over one thousand (1,000) purchases of C-141 parts for a total of roughly $1 million; over one-thousand (1,000) purchases of C-130 parts for a total of roughly $10 million; over one-hundred (100) purchases of T-34 parts for a total of roughly $100,000; over five-thousand (5,000) purchases of H-53 parts for a total of roughly $15 million; over one-thousand (1,000) purchases of F-18 parts for a total of roughly $5 million; and over one-thousand (1,000) purchases of F-4 parts for a total of roughly $1 million. *Id.*

These entities which plaintiffs sell these parts to include companies which use military surplus aircraft in various industries, such as the forest fire suppression, logging and construction industries.  Exh. 1 at ¶ 4.  In addition, plaintiffs also sell parts to friendly nations, when approved by the United States government, to help preserve those nations' security.  Exh. 1 at ¶ 5; Exh. 2 at ¶ 5.  The seven models of aircraft at issue in this matter are in limited supply and their availability is critical to plaintiffs' continued viability, as well as being critical to those which purchase these parts through plaintiffs.  Exh. 1 at ¶ 12; Exh. 2 at ¶ 10.

issue in this matter.  *See* Exh. 1 at Att. A.

DRMS has entered into a contract with Government Liquidation, LLC ("Government Liquidation") to conduct surplus military aircraft sales pursuant to online bidding processes. *See Government Scrap Sales*, B-295585, 2005 WL 596778 (March 11, 2005).[5] When a military aircraft or a component of the aircraft is deemed to have a potential military use, that aircraft or component may be required to be "demilitarized" before or as a condition of being sold, which means that any military capability of the aircraft or specific component must be destroyed. 41 C.F.R. § 102-36.40, 102-36.430. However, in many situations, military aircraft or components of military aircraft are not required to be destroyed and can be sold "as is." *See* Exh. 1 at ¶ 14. As stated in the Defense Demilitarization Manual, which is referenced in 41 C.F.R. §101-42.1102-8, "[i]n some cases, demilitarization may not be necessary, while in other cases, limited demilitarization may be necessary only for certain parts of components having military characteristics." Exh. 2 at Att. B (at 7)(paragraph E.2.).

DRMS is required by regulation to utilize the appropriate Demilitarization Code ("DEMIL Codes") assigned to components of surplus property when selling those components. 41 C.F.R. §§ 101-42.1102-8, 102-36.435. These DEMIL Codes, which are set forth in Appendix 3 attached to the Defense Demilitarization Manual (also referred to as the DOD Demilitarization and Trade Security Control Manual, DOD 4160.21-M-1), describe whether and what manner of demilitarization is required. Exh. 2 at Att. B (at 14-15). The DEMIL Codes include codes "A" and "B," which indicate that a part may be sold by the government "as is" as surplus for commercial resale and does not need to be demilitarized by the government. *Id.* (at 14). The

---

[5] Notwithstanding its contract with Government Liquidation, DRMS is still required to ensure that the contractors conform with applicable laws in any sale of surplus property. 41 C.F.R. § 102-36.50. This requirement would include ensuring that the equipment is assigned its proper DEMIL Code, as discussed *infra*.

DEMIL Codes also include other codes that require only limited destruction of items to demilitarize them, and only one code (Code "D") requires complete destruction.  *Id.*

As demonstrated by the past sales of many of the very same seven types of aircraft and related components at issue here, often a military aircraft can be demilitarized by destroying just certain specific components of the aircraft without the entire aircraft being destroyed. Exh. 1 at ¶ 15.  In 1997, the Department of Defense (DoD) Inspector General concluded that "[i]naccurate demilitarization coding occurs" by DRMS which results in entire aircraft being unnecessarily destroyed.  *See* Exh. 1 at ¶ 16 and Att. B thereto (DoD Inspector General' Office, "Audit Report on Coding Munitions List Items," Report No. 97-130, dated April 16, 1997).  The IG also noted that in many instances DRMS relies on the manufacturer of the aircraft to determine whether or not the aircraft or its components should be destroyed.  *Id.*  However, the aircraft manufacturers have a self-serving financial interest in having the aircraft completely destroyed once the government no longer has a need for the item so that the used parts cannot be resold by other entities.   Exh. 1 at ¶ 17.  This unnecessary destruction results in the entities which need such parts being required to either purchase them from the manufacturer, at much higher prices, or purchase new aircraft from the manufacturer.  *Id.*  The then-named General Accounting Office (now Government Accountability Office or GAO) has also issued a report that concluded that DRMS was needlessly destroying military aircraft parts.  *See* Exh. 1 at ¶ 18 and Att. C thereto (GAO Report, October 2, 1997 at 5).

Consistent with these findings, plaintiffs are also aware of DRMS having previously and improperly downgraded surplus military components and labeled them as scrap in violation of the applicable DEMIL code that should be assigned to the item. Exh. 2 at ¶ 10.  It is plaintiffs' understanding that this mislabeling has occurred in the past because it is easier for government

employees to move surplus material out of the government and off agency books by simply selling it as scrap. *Id.*

DRMS is currently offering as part of a single sale, through Government Liquidation, the following types of aircraft to which DRMS retains title: C-141, C-130, S-3, A-4, F-14, T-34, and H-53. *See* Att. A attached to Exh. 1. These aircraft are currently in the possession of the United States Air Force and are located at Davis Monthan Air Force Base in Arizona. The aircraft at issue, which plaintiffs estimated to include over 1,000 aircraft, total 27,000,000 pounds in weight. *Id.*

The aircraft contain parts and components the vast majority of which are properly coded as "A" or "B" under the DEMIL Codes. Exh. 1 at ¶ 19; Exh. 2 at ¶ 12; Exh. 2 at Att. B (at 14-15). This coding means that the parts can be sold for commercial resale. Exh. 1 at ¶ 19. In fact, the Defense Materiel Disposition Manual explicitly states that C-130, C-141, H-53 and T-34 aircraft can be sold or exchanged for commercial use when they have not been specifically modified for combat purposes. *See* Exh. 2 at Att. C (at 22-25)(ATT. 1 to Chapter 4). These aircraft, especially the C-130, are rarely modified for combat purposes. Exh. 1 at ¶ 19; Exh. 2 at ¶ 14. In addition, the sale of these C-130 parts for subsequent resale would result in significant revenue to the government. Exh. 1 at ¶ 20.[6]

Plaintiffs have purchased many of these same types of aircraft, such as the C-130 and A-4, from the government in the past as well as components from these same types of aircraft, thus demonstrating that the aircraft are suitable and appropriate for resale and use in other industries.

---

[6] In assessing the propriety of the impending sale, counsel for plaintiffs contacted Mr. Jack Blackway, who is the retired former manager for demilitarization at DRMS. Mr. Blackway informed counsel that DRMS has historically and consistently designated and sold C-130, C-141, T-34 and H-53 aircraft for commercial resale. Plaintiffs intend to pursue the deposition testimony of Mr. Blackway in the further proceedings before this Court.

Exh. 1 at ¶ 21.  In fact, plaintiffs have also purchased entire C-130 aircraft from the General

Administration Services.  Exh. 2 at ¶ 12.

However, DRMS is requiring that these aircraft be completely destroyed by the purchaser

as a condition of the sale and used solely for scrap purposes.  Exh. 1 at ¶ 22.[7]  The destruction is to

be accomplished by physically shredding the aircraft using a commercial shredder.  *Id.*  The

shredding will permanently destroy the aircraft's use for purposes of spare parts or other useable

commercial purposes.  *Id.*

**B.**     **Legal Standard for Issuance of a Preliminary Injunction**

The Court's legal analysis related to issuance of a preliminary injunction is a four-prong

test.  *See Raymen v. United Senior Association, Inc*., 2005 WL 607916 (sl. op. March 16,

2005)(D.D.C. 2005).  Under this test, the Court is required to evaluate (1) whether the plaintiffs

have demonstrated that there is a substantial likelihood that they will prevail on the merits on one

of their claims; (2) whether the plaintiffs have shown that they will sustain irreparable harm if

injunctive relief is not awarded; (3) whether the issuance of injunctive relief will not "substantially

harm" the other parties; and (4) whether awarding relief is in the public interest.  *Mova*

*Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

---

[7] The government is prohibited by law from destroying government property unless it has no
commercial value or the cost of continuing to hold it exceeds the proceeds which would be
obtained if it were sold.  40 U.S.C. § 527.  By requiring any purchaser of the aircraft to destroy all
of the aircraft, some of which can be sold commercially for higher revenue, the government is
essentially accomplishing the very act which is precluded under 40 U.S.C. § 527.

As this Court has found, "[p]laintiffs are not required to prevail on each of these factors. Rather, under [*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 843 (D.C. Cir. 1989)], the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78, *quoting CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

In addition, "an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury. . . Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors." *Blackman*, 277 F. Supp. 2d at 78.

"In sum, an injunction may be issued 'with either a high probability of success and some injury, or vice versa.'" *Id.* (citations omitted).

**C.      There is a substantial likelihood that plaintiffs will succeed on the merits of their claim that the government has violated applicable regulations by requiring the destruction of the government property at issue as a condition of its sale.**

The government is required to properly classify surplus property to ensure that it is sold for appropriate use and that it provides appropriate revenue to the United States. 40 U.S.C. § 524. Specifically, the government is required to properly assign demilitarization requirements to all property which has potential military use for the same reasons. 41 C.F.R. §§ 101-42.11-2-8, 102-

102-36.430, 102-36.435.[8]  In addition, any entity which purloins or commits any depredation against property of the United States commits a criminal act.  18 U.S.C. §§ 641, 1361.  These laws were intended to protect against government waste and unnecessary loss of government resources.

In the present case, DRMS has failed to properly classify the components on most of the aircraft at issue as capable of being sold without their being completely destroyed.  *See* Exh. 1 at ¶ 19; Exh. 2 at ¶ 12.  DRMS identifies and establishes the terms for the sale of military surplus equipment pursuant to 41 C.F.R. §§ 101-42.1102-8, 102-36.430, and 102-36.435, as well as the Defense Materiel Disposition Manual (DoD 4160.21-M)[9] and the Defense Demilitarization Manual (DoD. 4160.21-M-1).[10]  The only DEMIL Code which requires the total destruction of the item being sold is Code D.  *See* Exh. 2 at Att. C (at 14).  As demonstrated below, a vast majority of the items in this case fall within Codes A or B, but most importantly do not fall within Code D. The fact that the very same components and aircraft have previously and repeatedly been sold by DRMS for decades for commercial resale demonstrates this fact.

The Defense Materiel Disposition Manual provides specific guidance for military surplus property, and for items found on the United States Munitions List (MLI), the manual states that specific guidance is found in the Defense Demilitarization and Trade Security Control Manual,

---

[8] Furthermore, DRMS is required to comply with the Defense Materiel Disposition Manual, DOD 4160.21-M, pursuant to 41 C.F.R. § 102-36.340(a)(4), and with the Defense Demilitarization Manual, DOD 4160.21-M-1, pursuant to 41 C.F.R. § 102-36.435.

[9] Attached to Exh. 2 at Att. C.

[10] Attached to Exh. 2 at Att. B.

also titled the Defense Demilitarization Manual.  DRMS is responsible for ensuring

demilitarization in accordance with these manuals.  Exh. 2 at Att. B (at 1)(at paragraph B.2.).

    The Defense Demilitarization Manual provides that materiel that requires demilitarization

shall be controlled and/or demilitarized to the extent necessary to eliminate its functional or

military capabilities.  *Id*.  To carry out this obligation, DoD assigns a proper DEMIL Code to each

item following guidelines provided in Appendix 3 of the Defense Demilitarization Manual.  *Id.* (at

14-15).  According to Appendix 3 of the Manual, there are nine (9) DEMIL Codes, and the specific

code assigned to an item determines what type of demilitarization, if any, is required when the

item is sold.  *Id.*  For example, items assigned DEMIL Code "A" or "B" do not require any

demilitarization.  *Id.*  Items that are assigned Code "C" only require that certain "key points" of the

item be demilitarized, leaving the rest available for sale.  *Id.*  Only items that are assigned DEMIL

Code "D" require total destruction of the item and components so as to preclude restoration or

repair to a usable condition.  *Id.*

    Appendix 3 also includes step-by-step guidance for the assignment of DEMIL Codes.  Exh.

2 at Att. B (at 16-18).  Specifically, the first question set out in the Manual asks "Is the item

commercially available and not been specifically designed, modified or configured for military

use?"  *Id.* (at 16).  Most of the aircraft at issue in this matter are commercially available (such as

the C-130, C-141, T-34 and H-53) (Exh. 2 at ¶ 14), but some particular aircraft included in the sale

may have been modified or configured for military use.  For those aircraft that are commercially

available and which have not been modified or configured for military use, they have to be

assigned a DEMIL Code ("A" or "Q") that does not require that they be destroyed.  Exh. 2 at Att.

B (at 14-15).

    In fact, the Defense Materiel Disposition Manual explicitly states that C-130, C-141, H-53

12

53 and T-34 aircraft can be sold or exchanged for commercial use when they have not been specifically modified for combat purposes. *See* Exh. 2 at Att. C (at 22-25). These aircraft, especially the C-130, are rarely modified for combat purposes. Exh. 1 at ¶ 19; Exh. 2 at ¶ 14.

If the items are commercially available but they have been specifically designed, modified or configured for military use (which is unlikely, especially with regard to the C-130 aircraft)(Exh. 2 at ¶ 13), the Manual then asks if the item is on, or if the item is part of any item that is on, the U.S. Munitions List ("USML") or if the item has an offensive or defensive capability. Exh. 2 at Att. B (at 16). If the items meet these criteria, a determination must be made regarding whether the items are classified, or whether the item is AEDA, which includes ammunition, explosives and dangerous articles. *Id.* If the answer to these subsequent questions is no, which is the case with most of the aircraft at issue in this case, then the Manual directs the reader to Appendix 4 to further determine the proper DEMIL Code. *Id.*

Appendix 4 of the Defense Demilitarization Manual includes general instructions for assigning DEMIL Codes to USML items. Exh. 2 at Att. B (at 19-24). This appendix is designed to both assist in the assignment of DEMIL Codes, and to provide instructions regarding the method and degree of that process. *Id.* Each category listed in this appendix corresponds to the same category on the USML, and each category is further delineated by paragraphs A, B, C, D or E to show whether items require total destruction, whether they require "Key Point" destruction, or some other method of or process for demilitarization. *Id.* "Key Points" are defined as the parts, components, alignment points, attachment fittings or areas which, when demilitarized, cannot feasibly be repaired, restored, replaced, improvised or commercially procured and which are necessary factors in restoring the next higher assembly to design capability. *Id.* (at 22).

13

Specifically, paragraph "A" within each category of items in Appendix 4 includes items that are identified on the USML as Significant Military Equipment ("SME"), and which require total destruction. *Id.* (at 19). These items are assigned DEMIL Code "D". *Id.* The paragraph "B" within each category of items includes items which are identified on the USML as SME, and which require only "key point" destruction. *Id.* These items are to be assigned a DEMIL Code "C". *Id.*

Within Appendix 4, Category VIII specifically addresses military aircraft. *Id.* (at 21). Paragraph "A" of Category VIII, which assigns Code D to items and which requires total destruction, lists military aircraft engines, but does not include full aircraft. *Id.* Therefore, there is no requirement for the full demilitarization of entire aircraft under this Manual provision. Paragraph "B" of Category VIII, which as noted above lists the items which require "key point" demilitarization, and a DEMIL Code "C", does include aircraft which are specifically designed, modified, or equipped for military purposes, and developmental and experimental aircraft which have significant military applicability, as well as specific parts for these types of aircraft. *Id.* (at 21-22). Therefore, for these aircraft, a DEMIL Code "C" is appropriate, which requires "key Point" demilitarization, not the full destruction of the aircraft. *Id.* (at 14).

Thus, DRMS could not have properly assigned a DEMIL Code (*i.e.,* Code D) to the aircraft at issue that required them and all of their components to be destroyed. Furthermore, the fact that Code D does not apply to the aircraft currently being offered for sale is conclusively demonstrated by the fact that the same type of aircraft have regularly and repeatedly been offered for sale in the past for decades with no requirement that they be destroyed. Exh. 1 at ¶ 20. Moreover, UAC itself has purchased many of these same exact types of aircraft without being required to shred the aircraft. Exh. 1 at ¶ 6, 20. By improperly imposing a requirement that the aircraft be destroyed,

aircraft be destroyed, DRMS is arbitrarily wasting government resources because the scrap value of the aircraft is far less than their value if they were allowed to be resold.  Exh. 1 at ¶ 20; Exh. 2 at ¶ 15.

Therefore, DRMS's actions constitute a violation of 41 C.F.R. §§ 102-36.430, 102-36.435. Because the impending sale will also result in the sale of government property at far less than its actual value, the action further constitutes a violation of the criminal statutes prohibiting the illegal sale or depredation of government property.  18 U.S.C. §§ 641, 1361.

The fact that the sale to the public is being administered by Government Liquidation pursuant to a contract with DRMS is irrelevant given DRMS holds the title to the aircraft and it is DRMS's ongoing responsibility to ensure that military surplus property is assigned the proper code for purposes of its sale.  41 C.F.R. § 102-36.50.

**D.    Plaintiffs have shown that they will sustain irreparable harm if injunctive relief is not awarded because the aircraft which they seek to purchase will be permanently destroyed absent injunctive relief.**

Most of the aircraft at issue in this matter are in limited supply and their availability from the government is critical to plaintiffs' continued viability, as well as being critical to the companies which purchase these parts through plaintiffs.  Exh. 1 at ¶ 11.  Plaintiffs regularly buy and sell parts from these types of aircraft, and many of their clients rely upon them to supply them with parts in order to keep existing aircraft in use.  *Id.* at ¶¶ 3-6.  These aircraft perform many critical functions for various industries as well as foreign countries and the United States government as well.  *Id.* at ¶¶ 4-6, 9-10.

Under the terms of the original sales contract for the sale of the aircraft at issue, the contract was to be awarded on Tuesday, May 9, 2006 at 12:00 AM Eastern Time.  Att. A to Exh.

1.  While defendant has agreed not to transfer possession of the aircraft at issue until resolution of this matter on June 5, 2006, at that time, DRMS will be able to turn over possession of the aircraft to the successful bidder and the aircraft will be destroyed.  *Id.*  Once destroyed, the particular and approximately 1,000 aircraft at issue will no longer be of any use for their parts.  Exh. 1 at ¶ 21.  In addition, at that point, the Court will not be able to provide the plaintiffs with the relief they seek.

Similarly, DRMS' determination that such types of aircraft will not be sold for use in supplying commercial parts will critically harm plaintiffs' businesses, in addition to the ability of plaintiffs' clients to continue with the services they provide using the types of aircraft at issue.  *See* Exh. 1 at ¶ 8.  Given these facts, the plaintiffs will be irreparably harmed by DRMS allowing the destruction of the aircraft at issue, rather than allowing parties to resell their parts.

**E.    The issuance of injunctive relief will not substantially harm any other parties and awarding injunctive relief is in the public interest.**

The Court's issuance of an injunction preventing DRMS with destroying the aircraft at issue will not cause any substantial harm to any other parties.  Preserving the aircraft in their current condition poses no health or safety risks.  Nor are plaintiffs aware of any critical need by any parties of the scrap material from the aircraft.  Furthermore, delaying the currently scheduled sale and destruction of the aircraft will not cause any irreparable harm to the government.  In addition, awarding injunctive relief will preserve the government's ability (as well as Government Liquidation's ability) to obtain significantly greater prices for the aircraft at issue as compared to the aircraft's scrap value.[11]  Also, injunctive relief will protect the interests of the government

---

[11] Government Liquidation receives 20% percent of the overall price from each sale in addition to

government itself which often re-purchases parts from plaintiffs when it is need of parts for its currently flying aircraft.  For these reasons, injunctive relief is clearly in the public interest.

**F.      Conclusion**

For the reasons set forth above, plaintiffs Brown Helicopter, Inc., United Aeronautical Corp. and Associated Aircraft Mfg. & Sales, Inc. respectfully request that the Court grant their motion for a preliminary injunction and issue an injunction prohibiting the government from proceeding with the sale, transfer and destruction of the aircraft at issue in this matter until such time as the aircraft have been offered for sale pursuant to the condition that they may be sold for resale.

Respectfully submitted,

_____/s/_____
John J. Fausti
D.C. Bar No. 349811
Fausti & Associates, LLC
4301 Connecticut Avenue, NW
Suite 453
Washington, DC  20008
(202) 237-0505 (phone)
(202) 237-7566 (fax)
jfausti@faustilaw.com

Of counsel:

Lisa Studtmann
DC Bar No. 494632
Fausti & Associates, LLC
4301 Connecticut Avenue, NW

---

to being compensated to cover its expenses in operating the sale.  *Government Scrap Sales*, B-295585, 2005 WL 596778 (March 11, 2005).  Therefore, Government Liquidation would also benefit if the aircraft at issue were not required to be destroyed by the purchaser.

Suite 453
Washington, DC  20008
(202) 237-0505 (phone)
(202) 237-7566 (fax)
lstudtmann@faustilaw.com

Kevin R. Garden
DC Bar No. 426745
THE GARDEN LAW FIRM, P.C.
901 N. Pitt Street
Suite 325
Alexandria, VA 22314
Telephone:   (703) 535-5565
Facsimile:   (703) 997-1330
Email: kevin@gardenlawfirm.com

Dated:  May 23, 2006