Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BROWN HELICOPTER, INC., UNITED )
AERONAUTICAL CORP., and ASSOCIATED )
AIRCRAFT MFG. & SALES, INC., )
)
      Plaintiffs, )
)
    v. )
) Civil Case No. 06-CV-840 (JR)
UNITED STATES DEPARTMENT OF DEFENSE, )
)
      Defendants. )
_____)

## DECLARATION OF BRIAN G. COLE

I, Brian G. Cole, declare as follows:

1.     I am currently the Vice President of United Aeronautical Corp. ("UAC") and

have held that position since 1985. UAC is located at 7360 Laurel Canyon Boulevard,

North Hollywood, California.

2.     I have personal knowledge of the assertions set forth below based on my

experience in working for UAC.

3.     UAC is in the business of purchasing surplus government property, which

includes the exact same types of military aircraft and components at issue in this matter.

UAC then sells parts from those aircraft to qualified entities for various uses.

4.      UAC's clients include companies which use the same types of aircraft at issue in the forest fire suppression, logging and construction industries.

5.      In addition, UAC has sold parts to friendly nations, when approved by the United States government, to help preserve those nations' national security

6.      UAC and its predecessor, Consolidated Aeronautics, have been purchasing aircraft at Davis Monthan Air Force Base since 1968 and over that period they have provided the government with approximately $7.5 million for the aircraft which it has purchased. UAC has purchased entire C-130 and A-4 aircraft, and would be interested in the purchase of S-3 and H-53 aircraft. In fact, UAC has also purchased C-130 aircraft from the General Services Administration as well as from the Department of Defense.

7.      Additionally, over the past twenty-five (25) years, UAC, or its predecessor, has purchased C-130, A-4, S-3, F-14, H-53, T34 and C-141 parts. Specifically, UAC has spent roughly $500,000 for C-130 parts; $2 million for A-4 parts; $200,000 for S-3 parts; $250,000 for F-14 parts; $200,000 for H-53 parts; and $100,000 for T-34 and C-141 parts in mixed lots during the past twenty-five (25) years.

8.      Since shortly after World War II, the federal government has been selling surplus or outdated government military aircraft to private industry.

9.    As mentioned above, these sales provide UAC with critical parts for use in various industries and for meeting the needs of friendly nations which use these aircraft for their own security and routinely need parts to keep them usable.

10.    The United States government also purchases parts from UAC and other surplus parts dealers when the government has a shortage of such parts on hand.  This results from the fact that the government cannot retain all of its surplus material, but at times (often many years later) it will have a need for replacement parts it no longer has in stock.

11.    Because UAC and other surplus parts dealers retain such parts, the government saves significant expenses by purchasing these items from surplus dealers rather than having to obtain them from the original equipment manufacturers.

12.    The aircraft at issue in this matter are in limited supply and their availability is critical to UAC's continued viability, as well as being critical to those companies which purchase these parts from UAC.

13.    It is my understanding that the Department of Defense, through the Defense Reutilization and Marketing Service (DRMS), implements a contract it has entered into with Government Liquidation, Inc. to conduct sales of surplus parts pursuant to online bidding processes.  A copy of the notice of the sale of the aircraft at issue in this matter is

attached hereto as Attachment A. Based on my experience in the surplus parts industry, it is my understanding that the government originally purchased the aircraft which are being sold by Government Liquidation for many, many millions of dollars.

14.    It is my experience that, as part of the process of selling surplus property, DRMS applies a demilitarization code (also referred to as the "DEMIL Code") to components of surplus property.  These codes, which are set forth in the DOD Demilitarization and Trade Security Control Manual, include codes "A" and "B," which indicate that a part may be sold "as is" as surplus for commercial resale and does not need to be demilitarized.

15.    As demonstrated by DRMS's past sales of the very same aircraft at issue here, often a military aircraft can be demilitarized by destroying certain specific components of the aircraft without the entire aircraft being destroyed.

16.    In 1997, the Department of Defense Inspector General (IG) issued a report entitled "*Audit Report on Coding Munitions List Items*" which addressed issues related to the government's sale of surplus property.  A copy of that report is attached hereto as Attachment B.

17.    The IG also noted that in many instances DRMS relies on the manufacturer of the aircraft to determine whether or not the aircraft or its components should be destroyed. However, the aircraft manufacturers have a self-serving financial interest in having the

aircraft destroyed so that the used parts cannot be resold by other entities. This unnecessary destruction results in the entities which need such parts to either purchase them from the manufacturer, at much higher prices, or purchase new parts from the manufacturer.

18.    The General Accounting Office (GAO) also issued a report that concluded that DRMS was needlessly destroying military aircraft parts. A copy of that report is attached hereto as Attachment C.

19.    Most of the components on the aircraft which are included in the Government Liquidation sale at issue in this matter contain parts and components which should be coded as "A" or "B" under the DEMIL Code. This coding means that the parts can be sold for commercial resale. Specifically, the C-130 aircraft are rarely if ever modified for combat purposes, thus I am unaware of any reason why the specific C-130 aircraft being sold by Government Liquidation would have to be demilitarized. In addition, it is my understanding that even if such aircraft had been modified at one time, those modification would be removed once the aircraft had been shipped to Davis-Montham.

20.    If parts from these aircraft were sold for subsequent resale, they would result in significantly more revenue to the government than by selling them for their scrap value only.

21.    UAC has purchased these same types of aircraft, as well as components from such

aircraft, from the government in the past. If the aircraft being sold by Government

Liquidation in the sale at issue were offered for sale and the parts could be resold, rather

than the aircraft being destroyed, UAC would bid on such a sale.


22.     However, DRMS is requiring that these aircraft be completely destroyed by the

purchaser as a condition of the sale and used solely for scrap purposes. The destruction

is to be accomplished by physically shredding the aircraft using a commercial shredder.

The shredding will permanently destroy the aircraft's use for purposes of spare parts or

other useable commercial purposes.


I declare under penalty of perjury that the foregoing is true and correct.

**23 MAY 2006**                    Brian G. Cole
Date                                       Brian G. Cole

Attachment A

LOGIN
REGIS
Contac

| Home | Find Items | Event Calendar | Locations | About Us | Help | MY ACCC |

**Search** 

BY KEYWORD | BY STATE | | BY MANUFACTURER |

Any State | | Any

**NEW VISITOR?** Start Here

ADVANCED SEARCH FOR MILITARY SURPLUS

## 6079 - Demil BQ Scrap Aircraft Term Contract @ Tucson, AZ - DEMIL as a Condition of Sale - BID DEPOSIT REQUIRED

 View Event Info, Bid Package

This is a list of all lots in event **6079**.
Dollar amounts shown may not reflect up to the minute bid pricing. Click on individual lot titles for current bid price, as well as additional lot information.

Click for Excel Spreadsheet

View Today's Closing Events

## Current Lots

Displaying **1 - 1** of **1** per page.  Check / Uncheck All ☐

  Click to add selected lots to your Watchlist

< < Previous  | | Next > >

To re-sort the page, c
a column heading

| | Event | Lot | Lot Title | Qty. | Lot Price | Location | Opening | Closing |
|---|---|---|---|---|---|---|---|---|
| ☐ | **6079** | 1 | LOT (27, 000, 000 LBS) SCRAP AIRCRAFT TERM CONTRACT LOCATED AT DAVIS MONTHAN AFB, AMARC AREA. AIRCRAFT TYPES INCLUDE; C141, SOME WITH ENGINES, C130, S3, A4, F14, T34, H53, TITAN MISSLES STAGE 1 AND 2 WITH SLEEVES AND TARGET DESIGNATORS. NO PARTS REMOVAL. AIRCRAFT REQUIRE OFF-SITE DEMILITARIZATION. AIRCRAFT CAN BE REDUCED IN SIZE ON BASE FOR EASE OF TRANSPORT. DEMILITARIZATION TO BE ACCOMPLISHED BY COMPLETELY DESTROYING WITH HAMMERMILL OR SHREDDER. DEMILITARIZATION MUST BE ACCOMPLISHED WITH IN A 25 MILE RADIUS OF DAVIS MONTHAN AFB. ATTACHED SURVEILLANCE PLAN APPLIES. BUYER MUST ATTEND A START OF WORK MEETING AT CDC TUCSON, DAVIS MONTHAN AFB PRIOR TO BEGINNING WORK. TERM CONTRACT FOR ONE YEAR. A $50, 000. 00 BID DEPOSIT IS REQUIRED TO PARTICIPATE IN THIS EVENT. IN ADDITION, A DOWN PAYMENT OF $250, 000 MUST BE PAID WITHIN 5 BUSINESS DAYS OF THE EVENT'S CLOSING. PREVIEW WILL BE HELD ON FRIDAY, APRIL 28, 2006 AT 9:30 AM. | 1 | - Sealed Bid - | AZ, **Davis Monthan AFB**  PREVIEW INFO... LOADOUT INFO... | 05/02/2006 | 05/08/200 08:00 PM |

Attachment A

Case 1:06-cv-00849-JR   Document 8-2   Filed 05/29/2006   Page 10 of 80

CALL TO SCHEDULE
APPOINTMENT: (520)519-
8251.



---

ADD TO WATCHLIST
< < Previous   |  |  Ne:

**Legend**
Go to Top

🎥 Lot Has Pictures

❶ DEMIL B/Q Bidding Restrictions Apply

❶ FDA Bidding Restrictions Apply

◇ Tax Exemption Form for Lot

🔥 Featured Lot

♻ Exchange Sale Lot

🚚 Shipping Information

When downloading forms, you will need to have Adobe Acrobat Reader
installed on your computer. Please click the icon on the right to
download Acrobat Reader from Adobe.com to your computer.



Home | New Visitor? | Bidder's Corner | Search | Calendar | Locations | FSC Codes | My Account | Register | Help | About Us

Terms and Conditions         Contact Us
Privacy Policy              Shipping

Copyright © 2001-2006 Government Liquidation, LLC., a subsidiary of Liquidity Services, Inc. All rights reserved.
goWholesale  |  Liquidation.com  |  UKsurplus

Attachment A

LOGIN
REGIS
Contac

| Home | Find Items | Event Calendar | Locations | About Us | Help | MY ACC( |

**S**earch    BY KEYWORD    BY STATE    BY MANUFACTURER

NEW VISITOR? Start Here    Any State    Any

ADVANCED SEARCH FOR MILITARY SURPLUS

Home >> FSC Codes >> 0001 - Uncategorized >>

**Lot Details — Event Id 6079 — Lot Number 1**

    

**LOT (27, 000, 000 LBS) SCRAP AIRCRAFT TERM CONTRACT LOCATED AT DAVIS MONTHAN AFB, AMARC AREA. AIRCRAFT TYPES INCLUDE; C141, C130, S3, A4, F14, T34, H53, AND TARGET DESIGNATORS. NO PARTS REMOVAL. AIRCRAFT REQUIRE OFF-SITE DEMILITARIZATION. AIRCRAFT CAN BE REDUCED IN SIZE BASE FOR EASE OF TRANSPORT. DEMILITARIZATION TO BE ACCOMPLISHED B' COMPLETELY DESTROYING WITH HAMMERMILL OR SHREDDER. DEMILITARIZATION MUST BE ACCOMPLISHED WITH IN A 25 MILE RADIUS OF DAVIS MONTHAN AFB. ATTACHED SURVEILLANCE PLAN APPLIES. BUYER MUS' ATTEND A START OF WORK MEETING AT CDC TUCSON, DAVIS MONTHAN AFB PRIOR TO BEGINNING WORK. TERM CONTRACT FOR ONE YEAR. A $50,000.00 I DEPOSIT IS REQUIRED TO PARTICIPATE IN THIS EVENT. IN ADDITION, A DOW PAYMENT OF $250,000 MUST BE PAID WITHIN 5 BUSINESS DAYS OF THE EVEI CLOSING. PREVIEW WILL BE HELD ON FRIDAY, APRIL 28, 2006 AT 9:30 AM. C/ TO SCHEDULE APPOINTMENT: (520)519-8251.**

**Click Here For Surveillance Plan**

SPECIAL TERMS OF SALE:
- A $50,000.00 deposit is required to participate in this event.
- Bidding privileges will be activated upon receipt of full deposit.
- Payment methods include: Cashier's Check, Money Order and Wire Transfer
  and should be made payable to DOD Surplus, LLC.
- Please reference Sale Event 6079 and lot number 1.
- NO Personal / Company Checks or Credit Cards Accepted
- If you have any questions, please contact: Customer Service at (480) 367-1300
  or email questions to: info@govliquidation.com

**{ BID NOW! }**

    There are more lots like this at the same location...    View No

 **View similar items**     **View Other Listing At this location**    **Event Information, Bid Package & Maps**     **Email this Listing to a Friend**     **Add This Listing to your Watchlist**    P \ V(

**Auction Summary**

**Auction Type:** Internet Auction    **Quantity In Lot:** 1 (View Details)

Attachment A    Bid Now

**Open Time:** 05/02/2006 12:00AM Eastern Time
**Close Time:** 05/08/2006 08:00PM
**Award Time:** 05/09/2006 12:00AM Eastern Time
**Time Left:** 3 days 8 hours and 53 minutes
**Current Bid:** $1,000.00 (per lot)

**First Bid:** $50.00
**Photo:**  **Click for Slide Show**

## Item Location & Contact Information

Bid Now

**Item Location:** 7030 E. Irvington Rd.
Davis-Monthan Air Force Base
Tucson, AZ 85707
**Facility Manager:** Site Manager
**Facility Email:** info@govliquidation.com

**Country of Origin:** United States of America
**Contact Phone:** 1 (520) 519-8251
**Contact Fax:** 1 (520) 519-8253
**Location Map:** Click for Map

**Shipping Info:** (click for more info)

1 Information contained in the Item Manifest is third-party information that has been provided by an additional source. This information is deemed reliable but is not guaranteed by Government Liquidation. It is not intended to be used as the sole ba for bidding, and should not be taken in lieu of buyer's own due diligence.
2 DRMS Federal Condition Codes. Click on code for more information.
3 The Acquisition value shown represents the original price paid by the government for the item(s) listed. This data is provide the government and should be considered only as reference of the original purchase price for this item(s).

## Item Manifest

Bid Now

| FSC: | NSN:[1] | Units: | Cond:[2] | Acq Value:[3] | Description:[1] |
|------|---------|--------|----------|---------------|-----------------|
| 1. 1 | | 1 LB | | $0.00 | Scrap Place Holder BQ |
| **Total:** | | 1 | | $0.00 | |

## Location Information:

Bid Now

**Preview Arrangements:** Mon - Thurs: 8.5 to 2.5 / by appt only No Customer Escorting Available For Preview.

**Loadout Procedures:** By appt only. Mon - Thurs: 8.30 to 2.30

**Secu Procedu**

## Bidding Restrictions

Bid Now

 **EUC Certificate Required:**
All winning bids in this sale require an End-Use-Certificate (EUC).
No lots will be sold to any foreign country or any foreign national.
You will need Adobe Acrobat to view this form.

### Place Bid          Help? ▶▶

**Your bid is a contract.**
Place a bid only if you're serious about making the purchase. You will be entering into a legally binding contract if you are the winning bidder. Please review our Terms and Conditions.

Let Government Liquidation place your maximum bid automatically with Auto Bidding.

**Current High Bid:** 1,000.00
**Lowest You May Bid:** 1,100.00 US$ (per lot)
**Your Bid:**                              US$
**Auto-bid?** ☑

SUBMIT BID

### Additional Information:

**A 10% Buyer's Premium Applies to All ite in this sale.**

**Forms Applicable for Arizona**

Tax Forms for this State

If applicable, please review the Licensing and Titling notice.

If you need assistance please review our Frequently Asked Questions

If this is your first time bidding, please review Terms and Conditions

If you would like more information on shippin these items, please click HERE

Attachment A

When downloading forms, you will need to have <u>Adobe Acrobat Reader</u> installed on your computer. Please click the icon on the right to download Acrobat Reader from Adobe.com to your computer.



Home | <u>New Visitor?</u> | Bidder's Corner | <u>Search</u> | Calendar | Locations | FSC Codes | My Account | Register | Help | About Us

<u>Terms and Conditions</u>          Contact Us
<u>Privacy Policy</u>                    Shipping

Copyright © 2001-2006 Government Liquidation, LLC., a subsidiary of <u>Liquidity Services, Inc.</u> All rights reserved.
<u>goWholesale</u> | <u>Liquidation.com</u> | <u>UKsurplus</u>

Attachment A

Attachment B







# OFFICE OF THE INSPECTOR GENERAL

**CODING MUNITIONS LIST ITEMS**

Report No. 97-130                    April 16, 1997

# Department of Defense

**Additional Copies**

To obtain additional copies of this audit report, contact the Secondary Reports Distribution Unit of the Analysis, Planning, and Technical Support Directorate at (703) 604-8937 (DSN 664-8937) or FAX (703) 604-8932.

**Suggestions for Future Audits**

To suggest ideas for or to request future audits, contact the Planning and Coordination Branch of the Analysis, Planning, and Technical Support Directorate at (703) 604-8939 (DSN 664-8939) or FAX (703) 604-8932. Ideas and requests can also be mailed to:

> OAIG-AUD (ATTN: APTS Audit Suggestions)
> Inspector General, Department of Defense
> 400 Army Navy Drive (Room 801)
> Arlington, Virginia 22202-2884

**Defense Hotline**

To report fraud, waste, or abuse, contact the Defense Hotline by calling (800) 424-9098; by sending an electronic message to Hotline@DODIG.OSD.MIL; or by writing the Defense Hotline, The Pentagon, Washington, D.C. 20301-1900. The identity of each writer and caller is fully protected.

**Acronyms**

| | |
|---|---|
| DLA | Defense Logistics Agency |
| DRMS | Defense Reutilization and Marketing Service |
| FLIS | Federal Logistics Information System |
| ICP | Inventory Control Point |
| MLI | Munitions List Item |

**INSPECTOR GENERAL**
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-2884



April 16, 1997

MEMORANDUM FOR DEPUTY UNDER SECRETARY OF DEFENSE
(LOGISTICS)
DIRECTOR, DEFENSE LOGISTICS AGENCY

SUBJECT: Audit Report on Coding Munitions List Items (Report No. 97-130)

We are providing this report for review and comment. The overall audit was requested by the former Director, Defense Logistics Agency. This report is one in a series of reports dealing with the controls over the reutilization, transfer, donation, and sales of munitions list items. Management comments on a draft of this report were considered in preparing the final report.

DoD Directive 7650.3 requires that all recommendations be resolved promptly. We request that the Deputy Under Secretary of Defense (Logistics) reconsider his position on the report's recommendation. We request that additional comments on the report be provided by June 16, 1997.

We appreciate the courtesies extended to the audit staff. Questions on the audit should be directed to Mr. James L. Kornides, Audit Program Director, or Mr. Stuart D. Dunnett, Audit Project Manager, at (614) 751-1400. See Appendix E for the report distribution. The audit team members are listed inside the back cover.

Robert J. Lieberman
Assistant Inspector General
for Auditing

## Office of the Inspector General, DoD

**Report No. 97-130**
(Project No. 5FJ-5024.03)

**April 16, 1997**

## Coding Munitions List Items

## Executive Summary

**Introduction.** This is one in a series of reports resulting from our audit of the Controls Over the Reutilization, Transfer, and Donation of Munitions List Items (Project No. 5FJ-5024). The Director, Defense Logistics Agency, requested the audit because he was concerned that munitions list items might be released outside DoD without proper controls. Appendix B summarizes the results of the first two reports, which concern the Navy's management of the transfer of reclaimable aircraft to museums and Army controls over the disposition of excess helicopters and parts. A report concerning the disposal of munitions list items in the possession of Defense contractors will be issued as well.

Munitions list items are military articles that require special handling at disposal to prevent their unauthorized use by domestic or foreign purchasers. Special handling instructions are provided by means of assigning a demilitarization code to each item at the time the item is accepted into the DoD inventory. Munitions list items can range from major weapon systems (tanks) to key components (spring mechanisms in firearms) of the related weapon systems. The Military Departments control munitions list items in their possession at disposal through demilitarization or by following trade security policies. Demilitarization controls are intended to destroy or render useless the military characteristics of certain types of munitions list items, while trade security controls are designed to reduce the possibility of illegal exports of munitions list items.

**Audit Objectives.** The overall audit objective was to evaluate whether the Defense Reutilization and Marketing Service and the Defense Contract Management Command were appropriately reutilizing, transferring, donating, and selling munitions list items. For this part of the audit, we evaluated the adequacy of DoD demilitarization and trade security coding policies pertaining to the munitions list items the Defense Logistics Agency organizations disposed of. We also reviewed the adequacy of the Defense Logistics Agency management control program as it related to the audit objectives.

**Audit Results.** The policies governing the coding of munitions list items were adequate. However, DoD organizations did not follow these policies and assigned inaccurate codes to more than half of the items we reviewed. Our random statistical sample indicated that from October 1994 to May 1995, DoD Components assigned inaccurate demilitarization codes to 1,380 (52 percent) of the 2,658 randomly sampled items that required strict controls at disposal. Decentralization of the demilitarization coding process made it difficult to adequately train personnel and ensure consistent application of demilitarization policies. As a result of assigning inaccurate demilitarization codes, DoD may have incurred unnecessary demilitarization costs and sensitive military hardware may have been sold or advertised for sale without demilitarization controls. Improvements in the assignment of demilitarization codes are essential as anti-terrorism, overall security, and property management measures.

Recommendations in this report should improve the effectiveness of the controls over coding by ensuring that policies on demilitarization and trade security coding are followed. See Appendix A for a discussion of our review of the management control program and the material control weaknesses indicated by the audit.

**Summary of Recommendation.** We recommend that the Deputy Under Secretary of Defense (Logistics) assign one office the responsibility of assigning, challenging, and maintaining demilitarization codes.

**Management Comments.** The Deputy Under Secretary of Defense (Logistics) partially concurred with the recommendation, suggesting that it would be more effective if it were modified to indicate that the Deputy Under Secretary of Defense (Logistics) should give strong consideration to centralized coding during the ongoing study on overall improvement of the DoD demilitarization program. The Deputy Under Secretary of Defense (Logistics) questioned specific statements in the report. Part I contains a summary of management comments and Part III contains the complete text of management comments.

**Audit Response.** Management comments were not responsive. Decentralized management of the coding process has not been successful and drastic reengineering of the process is necessary. We believe that further study is unlikely to produce a better alternative than centralized management of the coding process.

The wording of the report was adjusted where appropriate based on management comments. We ask that the Deputy Under Secretary of Defense (Logistics) reconsider his position and provide additional comments by June 16, 1997.

# Table of Contents

**Executive Summary** i

## Part I - Audit Results

    Audit Background 2
    Audit Objectives 3
    Assignment of Demilitarization Codes 4

## Part II - Additional Information

    Appendix A.  Audit Process
      Audit Scope 14
      Statistical Sampling Methodology 14
      Organizations and Individuals Visited or Contacted 15
      Management Control Program 15
    Appendix B.  Prior Audits and Other Reviews 17
    Appendix C.  Demilitarization Codes 19
    Appendix D.  United States Munitions List 20
    Appendix E.  Report Distribution 21

## Part III - Management Comments

    Deputy Under Secretary of Defense (Logistics)
    Comments 24

# Part I - Audit Results

# Audit Background

This is one in a series of reports resulting from our audit of the Controls Over the Reutilization, Transfer, and Donation of Munitions List Items (Project No. 5FJ-5024). The former Director, Defense Logistics Agency, requested the audit because he was concerned that munitions list items (MLIs) might be released outside DoD without proper controls. Appendix B summarizes the first two reports, which concern the Navy's management of the transfer of reclaimable aircraft to museums and Army controls over the disposition of excess helicopters and parts. A report concerning the disposal of MLIs in the possession of Defense contractors will be issued as well. A future report is in draft regarding exchange transactions at the U.S. Center for Military History involving MLIs.

MLIs are military articles that require special handling at disposal to prevent their unauthorized use. MLIs can range from major weapon systems (tanks) to key components (spring mechanisms in firearms) of the related weapon systems.

Special handling instructions are provided by assigning a demilitarization code to each MLI at the time it is accepted into the DoD inventory to prevent unauthorized use by domestic or foreign purchasers at the time of disposal. MLIs in the possession of the Military Departments are controlled at disposal through demilitarization or by following trade security policies. Demilitarization controls are intended to destroy or render useless the military characteristics of certain types of MLIs, while trade security controls are designed to reduce the possibility of illegal exports of MLIs. The main distinction between the two types of controls is that demilitarization prevents the unauthorized use of military hardware, while trade security controls prevent the unauthorized export of MLIs not requiring demilitarization.

The Military Department organizations establish demilitarization controls when assigning a national stock number to an item. The demilitarization code is used to identify whether an item should be classified as an MLI and to convey the corresponding level of control required at disposal. Appendix C provides a list of the demilitarization codes.

The Defense Logistics Agency (DLA) is responsible for the disposal of MLIs. MLIs are disposed of by 184 Defense Reutilization and Marketing Service (DRMS) offices worldwide. The following overall DoD disposal goals minimize the need for abandonment or destruction of excess DoD property.

    o Reutilize excess DoD property from one DoD organization to satisfy valid needs of another DoD organization. Reutilization within DoD is intended to preclude concurrent procurement and disposal. DoD does not have restrictions on the reutilization of MLIs within DoD. Organizations, such as military museums and law enforcement organizations, were eligible to obtain MLIs, including those requiring demilitarization, as a result of authorizations from Congress. However, those MLIs were subject to demilitarization and trade security controls upon final disposal.

o Donate and transfer excess DoD property to other Federal, State, and local organizations. There are no restrictions placed on Government organizations obtaining non-MLIs (demilitarization code A).

o Obtain optimum monetary return for excess DoD property sold.

## Audit Objectives

The overall audit objective was to evaluate whether the DRMS and the Defense Contract Management Command were appropriately reutilizing, transferring, donating, and selling munitions items. Specifically, we evaluated the adequacy of DoD demilitarization and trade security coding policies pertaining to the MLIs that DLA organizations disposed of. We also reviewed the adequacy of the DLA management control program as it related to the audit objectives. See Appendix A for a discussion of the scope, methodology, and the review of the management control program. See Appendix B for a summary of prior audits and other reviews.

# Assignment of Demilitarization Codes

The policies governing the coding of MLIs were adequate, and, if followed, should result in the proper disposal of MLIs through the DRMS. However, DoD organizations did not follow the policies and assigned inaccurate codes to more than half of the items (1,380 of 2,658 items) we reviewed. Policies were not followed because the coding process was too decentralized, making it difficult to train personnel and to ensure compliance with DoD policies. In addition, although DoD organizations challenged demilitarization coding, inventory control points had not responded to 93 percent of 4,522 challenges as of February 1996. Unless the response rate is improved, it would take the inventory control points 500 years to purge the system of the existing obsolete demilitarization codes assigned. As a result, items such as cannon tubes and guided missile acquisition units were sold or advertised for sale by the DRMS without demilitarization controls. Improvements are essential as anti-terrorism overall security and property management measures.

## Identifying and Controlling Munitions List Items

Section 38 of the Arms Export Control Act of 1976 allows the President to restrict exports of military goods and services for national security and foreign policy purposes. Executive Order 11958 delegated the President's statutory authority to establish export controls to the Department of State.

The Department of State, with concurrence by the DoD, identified 21 categories of weapon systems and military articles (see Appendix D) that are subject to export controls because they:

    o have been specifically designed, developed, configured, adapted, or modified for a military application;

    o have significant military or intelligence applicability; and

    o have no predominant civil application or performance equivalent.

Code of Federal Regulations, title 22, "International Traffic in Arms Regulation," implements the Arms Export Control Act. Weapon systems and essential weapon system parts, components, and attachments in the 21 categories are called MLIs. The International Traffic in Arms Regulation defines the MLIs, specifies procedures for obtaining export licenses, and prescribes penalties for violating the Arms Export Control Act.

**DoD Policy on Assigning Demilitarization Codes.** DoD 4160.21-M-1, "Defense Demilitarization Manual," October 1991, contains DoD policies on assigning demilitarization codes. DoD 4160.21-M-1 directs the authority to

4

assign demilitarization codes to inventory and technical managers at the inventory control points (ICPs). DoD 4160.21-M-1 also provides guidance for assigning the proper code.

DoD uses demilitarization codes to identify MLIs and to convey the level of demilitarization or trade security control required at disposal. Inventory and technical managers at the military component ICPs are responsible for assigning demilitarization codes during initial provisioning or when items are purchased for supply and maintenance purposes. A demilitarization code becomes part of the item's record in the Federal Logistics Information System (FLIS). DoD designated about 20 percent of the items in the FLIS as MLIs requiring some level of control at disposal. The levels of control range from total destruction for code D MLIs to trade security controls for code B MLIs.

**Defense Logistics Agency Responsibilities.** DLA has primary responsibility for disposing of MLIs, updating policies pertaining to the coding process in DoD 4160.21-M-1, and managing the challenge program. The challenge program is designed to validate questionable demilitarization codes and to correct them as needed. DLA has trade security investigators to help enforce demilitarization and trade security policies.

## Assignment of Demilitarization Codes

From April through October 1994, DLA evaluated the assigned demilitarization codes for 11.6 million items. As a result of the evaluation, the demilitarization codes of 3.2 million (28 percent) items were changed. However, despite the efforts to correct the erroneous demilitarization codes, DoD organizations continued to assign inaccurate demilitarization codes.

To evaluate the effectiveness of the demilitarization coding process at the military component ICPs, we took a statistical sample of 122 items from a universe of 60,607 items added to the FLIS from October 1, 1994, through May 3, 1995. The sample represented the entire universe of items added to the FLIS during the stated period that were managed by the Military Departments and DLA. The 122 items were in two groups (see Appendix A). Group I included 70 items that we did not examine extensively because they do not require strict controls. (Group I consists of demilitarization code A items, such as common hardware and demilitarization code B items, such as chemical suits.) Group II consisted of 52 MLIs that required strict controls and were assigned a code that required demilitarization.

To determine whether items were correctly coded for demilitarization, we requested that personnel with expertise from the cognizant ICPs evaluate the accuracy of the codes they assigned. The results of their analysis for the 52 items in Group II (items that require demilitarization) are shown in the figure below.

Assignment of Demilitarization Codes



**Analysis by ICP Personnel of the 52 Sample Items Requiring Demilitarization**

The military component ICPs disagreed with 27 of 52 codes that were assigned to Group II. Projecting the results, we estimated that the ICPs would have disagreed with 1,380 of 2,658 (51.9 percent) Group II MLIs.

The analysis results showed that the ICPs assigned incorrect codes. Although DLA completed an extensive recoding effort in 1994, the problem of assigning incorrect codes was not corrected.

# Process of Assigning Codes

Inaccurate demilitarization coding occurs because the coding process is too decentralized, making it difficult to train personnel involved in coding and to ensure that DoD policies are consistently followed. DLA estimated that more than 3,000 personnel were involved in some aspect of assigning demilitarization codes DoD-wide. All the personnel involved in the coding process had not received the specialized training needed to ensure compliance with demilitarization policies. In addition, personnel responsible for assigning codes often did not have access to information needed to select the appropriate code. As a result, ICP personnel did not comply with policy when assigning demilitarization codes.

**Training Personnel Responsible for Assigning Demilitarization Codes.** Item managers, equipment specialists, and provisioning personnel at the ICPs assigned demilitarization codes as part of their job function, but it was not a primary duty. Recognizing the need for trained personnel to assign proper

codes, the DoD Demilitarization Program Office requested that the Army Logistics Management College develop a 1-week course on demilitarization. In FY 1995, 624 personnel, primarily from the ICPs and the DRMS, attended the course.

To assess the effectiveness of the course, we asked personnel at the sites we visited to evaluate their ability to assign demilitarization codes after being trained. The consensus was that the course provided only general awareness of the demilitarization program and did not provide the specific details necessary to make prudent decisions on selecting the appropriate codes. ICP demilitarization coordinators stated that specialized training on all aspects of the demilitarization process would be required to be able to assign a code that would ensure the appropriate level of control over final disposal.

We believe that this training effort could be minimized by centralization of the coding process. Training a small number of personnel in a central office would be more efficient than training an estimated 3,000 item managers currently responsible for the assignment of accurate demilitarization codes.

**Compliance with Policy.** Not all ICP personnel responsible for assigning demilitarization codes understood demilitarization policies or adapted readily to changes in those policies. Some examples follow.

o  DoD issued a change to DoD 4160.21-M-1 on February 14, 1995, that reduced the number of demilitarization codes from 15 to 9. Although the policy was issued in the midst of the sample selection period, ICP personnel still assigned one or more of the six obsolete codes after the change was issued because item managers had not been informed of the change. For MLIs requiring demilitarization (MLIs other than codes A, B, or Q), in the January 1996 FLIS, 168,663 (33 percent) of the MLIs were assigned an obsolete demilitarization code.

o  Personnel at the Navy ICP assigned a demilitarization code of H to national stock number 5975-01-412-3449 on April 17, 1995. They also assigned a demilitarization code of N to national stock number 2840-01-410-6740 on March 9, 1995. Both codes were obsolete as of February 14, 1995, because of issuance of Change 1 to DoD 4160.21-M-1.

**Selecting Appropriate Demilitarization Codes.** Decentralization affected the selection of appropriate demilitarization codes. ICP personnel responsible for assigning codes frequently assigned codes without knowing about the military capability of a weapon system or of the risk to national security interests as a result of improper release of controlled items.

**Military Capability.** According to DoD 4160.21-M-1, the purpose of demilitarization is to destroy the military offensive or defensive advantages inherent in certain types of equipment or material. Information about the military capability of a weapon system is needed to identify the components, parts, and accessories that are essential to operate and maintain the weapon system. Technical data about the weapon system must be available and considered before selecting a demilitarization code. Technical data are

especially important as weapon systems become more advanced and as more critical technology is used in computer circuit boards, software, and other areas where it is difficult to identify lethal or sensitive capabilities.

Program management offices of major weapon system programs, such as the F-16 aircraft, Bradley Fighting Vehicle, Abrams Tank, and the Multi-Launch Rocket System, could not identify the key components that required demilitarization in those weapon systems. For example, at Wright-Patterson Air Force Base in Dayton, Ohio, personnel responsible for approving the release of F-16 parts from contractor facilities referred us to the contractor for a list of the parts requiring demilitarization. The ICP personnel from the Tank, Automotive, and Armaments Command could not provide lists of sensitive parts for the Abrams Tank or the Bradley Fighting Vehicle and stated that DLA might have such lists. However, the DLA ICPs stated that they often do not receive technical data from the Military Departments. The technical data on a particular weapon system are necessary to make an informed decision about demilitarization.

**Rationale for Demilitarization Decisions.** ICP personnel who assigned codes were not required to document the rationale for their decisions. ICP personnel used subjective factors to assign demilitarization codes. Three ICPs visited had incorporated default criteria in their methods of assigning demilitarization codes. Default criteria incorporate the automatic assignment of a demilitarization code based on specific data, such as Federal supply class (for example, all items in Federal supply class 5680, miscellaneous construction materials, were assigned demilitarization code A at the Defense Construction Supply Center). When the ICP used default criteria, the rationale for the assigned code was not known and the codes were likely to be challenged, because they were not based on criteria such as military capability and risk.

For example, the Defense Electronics Supply Center in Dayton, Ohio, assigned demilitarization code A or D to electronic microcircuits, depending on whether the item could be identified to a weapon system. The ICP equipment specialists responsible for assigning the demilitarization codes stated that they frequently did not know the item's end use at the time the demilitarization code was assigned. ICP personnel disagreed with the codes assigned to 9 of the 20 electronic microcircuits included in the sample of 40 items at the Defense Electronics Supply Center. The ICP personnel could not provide documentation to support the reasons for the codes assigned.

# Reliance on Challenge Program

DoD organizations relied on the DoD challenge program to correct coding errors and to update obsolete codes. Although not intended for that purpose, the DRMS demilitarization challenge program was relied on as the primary means to correct obsolete and erroneous demilitarization codes.

**Challenge Program.** DRMS personnel receive demilitarization code challenges primarily from DRMS offices worldwide. Receiving personnel at the Defense Reutilization and Marketing Offices review the demilitarization code assigned to property. If the receiver believes the assigned demilitarization code is inaccurate, the Defense Reutilization and Marketing Office can submit a challenge to DRMS headquarters. DRMS headquarters personnel review the challenge, and if they believe that the challenge is warranted, it is submitted to the item manager at the cognizant ICP. The item manager is then responsible for authorizing any changes to the FLIS and for notifying DRMS of the decision based on the challenge.

**Effectiveness of Challenge Program.** The challenge program was not effective because the DRMS had not established procedures to ensure that the challenged items were evaluated by the ICPs. From December 1994 through February 1996, the DRMS forwarded 4,522 demilitarization code challenges to the ICPs. However, the ICPs provided no response for 4,192 (93 percent) of the challenge requests, and the DRMS had no procedures to follow up on them.

Other problems identified with the challenge program included the following.

   o DRMS offices were reluctant to use the demilitarization challenge process because of slow responses from the ICPs.

   o DoD relied on challenges to remove obsolete codes. At the FY 1995 rate of 330 challenges responded to by the ICPs per year, it would take about 500 years to purge the system of the 168,663 obsolete codes in the January 1996 FLIS.

   o DLA trade security investigators stated that inaccurate demilitarization codes accounted for 95 percent of their work load and that they believed miscoding or failing to challenge items that are miscoded could represent a violation of United States Code, title 18, section 793. That law covers gathering, transmitting, or losing defense information and makes it a crime if that information willfully or through gross negligence causes injury to the United States. The investigators gave us a list of 377 items that were identified with erroneous codes. However, DRMS did not receive the list.

**Effects of Miscoding.** When items are properly coded, the DRMS has adequate procedures in place to ensure that proper demilitarization techniques are applied at disposal. However, when items are miscoded, there is a high probability that items will be either overdemilitarized or underdemilitarized.

   **Overdemilitarization.** Overdemilitarization occurs when costs are incurred to demilitarize excess DoD property not requiring demilitarization. Demilitarization procedures are time consuming and often require additional costs for capital investments or for paying contractors to perform the demilitarization. In addition, because demilitarization is designed to render an item useless for its intended purpose, the item's reutilization and sales value are lessened. For example, more than 10,000 tools at a DoD contractor facility required demilitarization based on codes assigned by the system program office. The contractor estimated that it would cost about $9.5 million to demilitarize the

9

tools as prescribed by DoD. When presented with the estimated cost to demilitarize the items, the system program office decided that only about 200 of the tools actually required demilitarization.

DLA trade security investigators said that they believed personnel responsible for miscoding items tended to require overdemilitarization because of the threat of criminal prosecution under United States Code, title 18, section 793. However, DLA trade security investigators could not provide evidence that a criminal prosecution had ever taken place due to miscoding. Having documentation available to support the coding decision is the best way to ensure that only relevant factors are considered when assigning codes.

**Underdemilitarization.** Underdemilitarization occurs when items subject to control are assigned a code that does not require the appropriate demilitarization technique. Underdemilitarization increases the likelihood that sensitive material will be inadvertently sold or transferred from DoD control without adequate demilitarization. Accurate demilitarization codes are essential to prevent internal terrorist organizations and undesirable foreign countries from obtaining sensitive material. For example, improper codes caused MLIs, such as cannon tubes (national stock number 1010-01-246-9930), cruise missile radio receivers (5820-01-174-8062), a radar set group (5840-00-890-6510), small arms armor (1560-00-145-3294), a coder-decoder interface (5895-00-653-4225), and guided missile acquisition units (1430-00-133-2540) to be sold or advertised for sale by the DRMS without demilitarization.

# Summary

Our sample indicated that more than 50 percent of the items assigned a demilitarization code that requires demilitarization were inaccurately coded. Because the demilitarization coding process is too decentralized, it is difficult to train personnel and disseminate policy changes. Additionally, DoD organizations relied heavily on an ineffective challenge process to correct coding errors. The ICPs responded to only 7 percent of the challenges from December 1994 through February 1996. At that rate, it would take 500 years to purge the system of all the obsolete demilitarization codes.

The DoD Demilitarization Program Office is consolidating the responsibilities for assigning and maintaining the demilitarization codes for all items managed by the DLA ICPs. The new consolidated office will also be responsible for the demilitarization challenge program and for all training related to the DoD demilitarization program. Given the failure of the existing process, we believe that the assignment of the demilitarization code for items managed by the Military Department ICPs should also be the responsibility of the new consolidated office.

# Recommendation, Management Comments, and Audit Response

We recommend that the Deputy Under Secretary of Defense (Logistics) consolidate the responsibility to assign, challenge, and maintain demilitarization codes into a single office; staff the office with individuals responsible for all aspects of demilitarization; and include all items managed by the Defense Logistics Agency and the Military Department inventory control points.

**Management Comments.** The Deputy Under Secretary of Defense (Logistics) (the Deputy) partially concurred with the recommendation. The Deputy suggested that the recommendation would be more effective if it were modified to indicate that strong consideration should be given to centralized coding in the overall improvement of the DoD Demilitarization program currently under review. The Deputy stated that he is in the process of developing an action plan addressing the overall demilitarization program, which may include establishing a working group of Federal agencies to address changes to their role in the demilitarization process and legislative changes. Although he agrees that coding consolidation may be the best approach, he also stated that other alternatives and factors must be considered. The Office of the Deputy Under Secretary of Defense (Logistics) is now implementing long- and short-term initiatives to improve the DoD demilitarization program. The Deputy also stated that several areas in the draft report did not fully support the recommendation.

**Audit Response.** We stand by our recommendation. Our audit and previous studies of the coding process provided compelling evidence that the current decentralized coding process has not been effective. Office of the Deputy Under Secretary of Defense (Logistics) personnel indicated, at the beginning of the audit, that they wanted the audit to make specific recommendations for improving the DoD demilitarization program and not to recommend further study or conduct another recoding exercise. We agree that establishing working groups for evaluating overall improvements in the DoD demilitarization program will be helpful in solving the various problems related to the program. However, we believe our report clearly shows that the necessary corrective measure for improving the coding problem is to centralize the process. We request that the Deputy Under Secretary of Defense (Logistics) reconsider his position and provide additional comments to the final report.

# Part II - Additional Information

# Appendix A.  Audit Process

## Audit Scope

DoD releases munitions list items (MLIs) through public sales; through transfers and donations to Federal, State, and local activities; and through foreign military sales and assistance programs.  DoD relies on the demilitarization codes assigned by the military component inventory control points (ICPs) to identify MLIs and to convey the level of demilitarization or trade security control required at disposal.  To test the effectiveness of the coding process, we took a statistical sample (discussed below) of items assigned a national stock number from October 1, 1994, through May 3, 1995.  We interviewed item managers at the ICPs and obtained supporting documentation for the demilitarization codes assigned.  In addition, we reviewed prior audits and other reviews, evaluated results of Defense Logistics Agency (DLA) trade security investigations, talked with cognizant personnel, and reviewed selected exchange, transfer, and sales transactions.

**Use of Computer-Processed Data.**  We used computer-processed data provided by the Defense Logistics Services Center.  To the extent that we reviewed the computer-processed data, we concluded that the data were sufficiently reliable to be used in meeting our objectives.  We did not audit the systems that produced the data.

**Audit Period and Standards.**  We performed this program audit from April 1995 through February 1996 in accordance with auditing standards issued by the Comptroller General of the United States, as implemented by the Inspector General, DoD.  We included tests of management controls considered necessary.

## Statistical Sampling Methodology

**Sampling Purpose.**  The purpose of the statistical sampling plan was to determine whether the process of assigning demilitarization codes had improved since the DoD demilitarization code review effort was completed in September 1994.

**Universe Represented.**  The universe consisted of national stock numbers in the Defense Logistics Services Center's Federal Logistics Information System that had been assigned and managed by a Military Component ICP.  We sampled from a universe consisting of the following groups that were based on the demilitarization code assigned.

## Sampling Universe

|  | Demilitarization Code | Universe | Sampled | ICP Disagreed |
|---|---|---|---|---|
| Group I | A,B | 57,949 | 70 | 6 |
| Group II | C,D,E,H,J,K,L,M,N | 2,658 | 52 | 27 |

We did not examine the Group I items extensively because they do not require strict controls at disposal. We elected not to project the results of Group I.

**Sampling Design.** A stratified random sampling design was used to determine whether the demilitarization codes were assigned correctly. We selected 70 national stock numbered items from the Group I universe of 57,949 items, and we selected 52 national stock numbered items from the Group II universe of 2,658 items. We tasked the Military Component ICP personnel to evaluate the 122 sample items and determine whether they agreed with the assigned codes.

**Sample Results.** The Military Component ICPs disagreed with 27 of 52 codes originally assigned to Group II items. Projecting the results with a 95 percent confidence level, we estimated that the ICPs would have disagreed with from 995 to 1,764 of the originally assigned demilitarization codes. The point estimate for items the ICPs would have disagreed with from Group II was 1,380.

# Organizations and Individuals Visited or Contacted

**Contacts During the Audit.** We visited or contacted individuals and organizations within the DoD and the Departments of State and the Treasury. Further details are available on request.

# Management Control Program

DoD Directive 5010.38, "Internal Management Control Program," April 14, 1987,[*] requires DoD organizations to implement a comprehensive system of management controls that provides reasonable assurance that programs are operating as intended and to evaluate the adequacy of the controls.

---

[*]DoD Directive 5010.38 has been revised as "Management Control Program," August 26, 1996. The audit was performed under the April 1987 version of the directive.

**Scope of Review of Management Control Program.**  We reviewed the management control procedures specified in DoD 4160.21-M-1, "Defense Demilitarization Manual," October 1991, regarding the assignment of demilitarization codes.  We also reviewed self-evaluations of those controls that DLA originally performed in 1991.

**Adequacy of Management Controls.**  We identified continuing material management control weaknesses, as defined by DoD Directive 5010.38, related to the assignment of inaccurate demilitarization codes.  Although in the draft report we attributed those weaknesses to the DLA management control structure, after further consideration we suggest that they be characterized as a DoD-wide problem and so reported by the Deputy Under Secretary of Defense (Logistics).

**Adequacy of Management's Self-Evaluation.**  In the DLA FY 1995 Annual Statement of Assurance, the DoD demilitarization program manager identified two material management control weaknesses related to the demilitarization program.  Both control weaknesses had also been identified in prior years.  The weaknesses related to the inaccurate assigning of demilitarization codes and the inadequate Military Component regulations identifying the responsibilities for the demilitarization program within the Services and DLA.  The DoD has not met the target dates for planned corrective actions relating to the previously identified weaknesses, has reestablished target dates, and has not yet corrected those weaknesses.

# Appendix B.  Prior Audits and Other Reviews

This is the fourth in a series of reports resulting from our audit of controls over munitions list items.   The audit was requested by the Director, Defense Logistics Agency (DLA).  The first two reports are summarized below.

**Inspector General, DoD, Report No. 96-143, "Transfer and Exchange of a Navy P-3A Aircraft," June 5, 1996.**   The objective of this portion of the overall audit was to determine whether the Navy effectively managed the transfer of reclaimable aircraft to museums.

The Navy planned to transfer a P-3A aircraft, with usable parts valued at $1.7 million to $4.1 million, to the Smithsonian's National Air and Space Museum.  The museum, in turn, planned to exchange the P-3A for a historically significant business aircraft valued at $245,000.  As a result of our audit, the Navy conducted further research and canceled the transfer.   The Navy confirmed that it had current requirements for parts on the P-3A.  In addition, the planned exchange was not in the best interest of the Government. Management actions resulted in monetary benefits of $1.7 million to $4.1 million.  The report made no recommendations.

**Inspector General, DoD, Report No. 96-229, "Disposition of Excess Army Helicopters      and      Flight-Safety-Critical      Helicopter      Parts," September 24, 1996.**   The objective of this portion of the audit was to determine whether the Army had effective controls over the redistribution and disposition of excess helicopters and helicopter parts.

The Aviation and Troop Command did not give the Defense Reutilization and Marketing   Service   (DRMS)   correct   instructions   for   disposing   of flight-safety-critical parts that were released to the public without safety inspections.   Consequently, $37.5 million of flight-safety-critical parts were released to the public without safety inspections, and $153.1 million of salable parts were incorrectly coded for demilitarization.  We recommended that the Commander, Aviation and Troop Command, modify the Component Tracking System to provide complete disposition instructions on flight-safety-critical parts by work-unit code.  We also recommended that the Commander, Aviation and Troop Command, coordinate with the Defense Reutilization and Marketing Service and the Regional Logistics Support Offices to modify the Component Tracking   System   to   provide   complete   disposition   instructions   on flight-safety-critical parts by work-unit code; provide retroactive instructions for disposing of previously reutilized, transferred, donated, or exchanged flight-safety-critical parts; and research the history of the flight-safety-critical parts already on hand at Defense Reutilization and Marketing Offices and national inventory control points before the parts are released.

The Aviation and Troop Command transferred 170 helicopters to the U.S. Army Center of Military History for exchange purposes, although the helicopters were not historic property.   The Center of Military History incorrectly exchanged 86 of the helicopters for other historic property or contractor services.  The helicopters that were exchanged were not properly

valued, and the exchanges were not reported to the Internal Revenue Service as required.  The Center of Military History's actions did not comply with DoD policies on exchanges and valuation requirements of 10 U.S.C. 2572.  The exchanges increased the risk that flight-safety-critical helicopter parts on the helicopters were released outside DoD without the necessary safety inspections. We recommended that the Army Chief of Staff dispose of the 84 helicopters that were transferred to the Center of Military History in accordance with DoD and Army disposal policies; identify the 86 helicopters exchanged between the public and the Center of Military History to determine whether flight-safety-critical parts that were released should be recalled for inspection; and improve policies, procedures, and controls for implementing exchange provisions of DoD policies and 10 U.S.C. 2572.

DRMS did not reimburse the Aviation and Troop Command for the sale of excess helicopters and related parts.  As a result, the Army's Defense Business Operations Fund will not receive approximately $60 million from the sale of helicopters and $10 million from the sale of helicopter engines.  Redirecting these funds will give the Army the incentive to maximize proceeds on the sale of excess helicopters and related parts.  We recommended that the Under Secretary of Defense (Comptroller) approve reimbursement to the Army of 80 percent of the proceeds from the sale of excess helicopters and related parts.

We also recommended the Deputy Under Secretary of Defense (Logistics) ask the DLA and the Services to identify and provide the status of any efforts they have made to comply with a DoD policy memorandum issued by the Assistant Deputy Under Secretary (Materiel and Resource Management) "Surplus Helicopters," July 25, 1995.  Management nonconcurred with several of the recommendations.  The report has been referred for mediation.

# Appendix C.  Demilitarization Codes

On February 14, 1995, DoD reduced the number of authorized demilitarization codes from 15 to 9.  Those nine codes and their definitions are defined below.

**A**    Non-MLI/nonstrategic list item.  Demilitarization not required.

**B**    MLI (nonsignificant military equipment).  Demilitarization not required, trade security controls should be applied.

**C**    MLI (significant military equipment).  Remove and/or demilitarization installed key points.

**D**    MLI (significant military equipment).  Total destruction of items and components to prevent restoration or repair to a usable condition.

**E**    MLI (nonsignificant military equipment).  Additional critical items/materiel determined to require demilitarization, either key point or total destruction. Demilitarization instructions to be furnished by the DoD Demilitarization Program Office.

**F**    MLI (significant military equipment).  Demilitarization instructions to be furnished by the item/technical manager.

**G**    MLI (significant military equipment).  Demilitarization required--ammunition, explosives, and dangerous articles. Demilitarization and, if required, declassification will be accomplished prior to physical transfer to a Defense Reutilization and Marketing Office.

**P**    MLI (significant military equipment).  Security classified item. Declassification and any additional demilitarization and removal of sensitive markings will be accomplished prior to accountability or physical transfer to a Defense Reutilization and Marketing Office.

**Q**    Strategic list item.  Demilitarization not required.

# Appendix D.  United States Munitions List

1. Firearms

2. Artillery and projectors

3. Ammunition

4. Launch vehicles, guided missiles, ballistic missiles, rockets, torpedoes, bombs, and mines

5. Explosives, propellants, incendiary agents, and their constituents

6. Vessels of war and special naval equipment

7. Tanks and military vehicles

8. Aircraft, spacecraft, and associated equipment

9. Military training equipment

10. Protective personnel equipment

11. Military and space electronics

12. Fire control, range finder, optical and guidance and control equipment

13. Auxiliary military equipment

14. Toxicological agents and equipment and radiological equipment

15. Spacecraft systems and associated equipment

16. Nuclear weapons design and test equipment

17. Classified articles, technical data, and Defense services not otherwise enumerated

[18. and 19.  Reserved for future use]

20. Submersible vessels, oceanographic and associated equipment

21. Miscellaneous articles

20

# Appendix E.  Report Distribution

## Office of the Secretary of Defense

Under Secretary of Defense (Acquisition and Technology)
    Deputy Under Secretary of Defense (Industrial Affairs and Installations)
    Deputy Under Secretary of Defense (Logistics)
    Director, Defense Procurement
    Director, Defense Logistics Studies Information Exchange
Under Secretary of Defense (Comptroller)
    Deputy Chief Financial Officer
    Deputy Comptroller (Program/Budget)
Under Secretary of Defense for Policy
Assistant to the Secretary of Defense (Public Affairs)

## Department of the Army

Auditor General, Department of the Army

## Department of the Navy

Assistant Secretary of the Navy (Financial Management and Comptroller)
Auditor General, Department of the Navy

## Department of the Air Force

Assistant Secretary of the Air Force (Financial Management and Comptroller)
Auditor General, Department of the Air Force

## Other Defense Organizations

Director, Defense Contract Audit Agency
Director, Defense Investigative Service
Director, Defense Logistics Agency
    Director, Defense Contract Management Command
    Commander, Defense Reutilization and Marketing Service
Director, National Security Agency
    Inspector General, National Security Agency
Inspector General, Defense Intelligence Agency

# Part III - Management Comments

# Deputy Under Secretary of Defense (Logistics) Comments



OFFICE OF THE UNDER SECRETARY OF DEFENSE

3000 DEFENSE PENTAGON
WASHINGTON DC 20301-3000

0 3 MAR 1997

(L/MDM)

MEMORANDUM FOR ACTING DIRECTOR, FINANCE AND ACCOUNTING
DIRECTORATE, OFFICE OF THE INSPECTOR GENERAL

SUBJECT:  Audit Report on Coding Munitions List Items (Project
No. 5FJ-5024.03)

Our comments on the subject draft report are provided below
in response to your memorandum of December 12, 1996.

RECOMMENDATION:  We recommend that the Deputy Under Secretary of
Defense (Logistics) consolidate the responsibility to assign,
challenge, and maintain demilitarization codes into a single
office; staff the office with individuals responsible for all
aspects of demilitarization, and include all items managed by the
Defense Logistics Agency and the Military Department inventory
control points.

ODUSD(L) COMMENT:  Partially concur.  We suggest that the
recommendation would be more effective if it were modified to
indicate that the Deputy Under Secretary of Defense (Logistics)
should give strong consideration to centralized coding in the
overall improvement of the DoD demilitarization program.  This
suggestion is based on the following:

• While we may agree that coding consolidation may be the best
  approach, there are alternatives and other factors that must
  be considered.  This office is in the process of implementing
  both long and short term initiatives designed to improve the
  overall demilitarization program as opposed to one area
  (coding).  We have already tasked the Military Services and
  the Defense Logistics Agency (DLA) to conduct critical reviews
  of the demilitarization coding process.  We are in the process
  of developing an action plan addressing the overall
  demilitarization program which may include establishment of a
  working group of pertinent federal agencies to address changes
  to their role in the demilitarization process and legislative
  changes.  The plan may also involve a Department of Defense
  (DoD) work group to address improvements to the present
  process within DoD.  We plan to monitor progress of these
  groups through the DoD Materiel Management Steering Group
  which includes top level logistics leaders in DoD.



**Deputy Under Secretary of Defense (Logistics) Comments**

Final Report
Reference

- One of the improvements we are considering is the consolidation of the coding function. However, this has not been proven to be the best approach and the financial, availability and maintainability of technical knowledge, and operational aspects of such a consolidation are major considerations to be addressed in the final decision process. Establishing a central office would require considerable financial and personnel commitment with no guaranty that it would work any better than the present system.

- Although DLA has indicated that they are in favor of centralized coding (primarily based on the fact that nothing else has worked), the Military Services have voiced strong opposition (primarily based on concern that technical expertise is, and must remain, within the Service). We would need a strong selling point to override the opposition. This is not apparent now, but may be during our re-engineering project.

- There are several areas in the draft report that do not fully support the recommendation.

  - The new coding policy, dated February 14, 1995, was not distributed when the statistical sample was taken addressing the degree of coding inaccuracy, the draft is not specific as to who/how the sample determined that the items sampled were inaccurate.

    Revised p.7

  - The draft report does not provide proof to demonstrate that inaccurate coding is DoD-wide or limited to a single component or ICP.

    Revised p.5

  - The predominant part of the sample involved DLA vs. Military Service managed items, perhaps indicating that DLA should centralize coding.

    Revised p.5

  - Page I, Executive Summary, Audit Results: The statement that DoD components assigned inaccurate codes to 52 percent of items requiring controls, resulting in sensitive military hardware being offered/sold without demilitarization, is misleading. The chart on page 6 of the draft report shows that most of the miscoded items were overcoded; i.e., coded demilitarization required, when, in fact, the items did not require demilitarization. That condition would not result in sensitive military hardware being offered/sold without demilitarization. Instead, it would result in an unnecessary expenditure of resources to demilitarize items that do not actually require demilitarization.

    Revised p.i

## Deputy Under Secretary of Defense (Logistics) Comments

Final Report
 Reference

Revised
p.5

- Page 5, Assignment of Demilitarization Codes, first paragraph, last sentence, is incorrect. The implication is that the recoding effort was an attempt to correct the demilitarization coding process. However, the recoding effort was an attempt to correct demilitarization coding for selected items in the existing inventory. It was not designed to correct the coding process.

Revised
p.5

- The draft report does not indicate whether the assigning and reviewing Inventory Control Point (ICP) were the same, nor whether the person making the final coding determination had the appropriate knowledge to make such a determination. The draft indicates that ICP personnel with coding responsibility are doing so without weapon system knowledge. It would appear that there would be less specific knowledge in a centralized function.

Revised
p.7

- Consolidated coding may reduce the demilitarization training problem. However, it would create another problem in technical weapon system training in a central office.

John F. Phillips
Deputy Under Secretary
   of Defense (Logistics)

26

# Audit Team Members

This report was prepared by the Finance and Accounting Directorate, Office of the Assistant Inspector General for Auditing, DoD.

F. Jay Lane
James L. Kornides
Stuart D. Dunnett
Tim F. Soltis
Kevin Currier
Nancy Cipolla
Deborah Curry

Attachment C

United States General Accounting Office

# GAO

Report to the Chairman, Committee on
National Security, House of
Representatives

October 1997

# DEFENSE INVENTORY

## Management of Surplus Usable Aircraft Parts Can Be Improved




GAO

United States
General Accounting Office
Washington, D.C. 20548

National Security and
International Affairs Division

B-276828

October 2, 1997

The Honorable Floyd D. Spence
Chairman, Committee on National Security
House of Representatives

Dear Mr. Chairman:

As requested, we reviewed selected aspects of the Department of
Defense's (DOD) disposal process. When the military services no longer
need aircraft parts, they turn them over to the Defense Logistics Agency,
which manages DOD's disposal process. As one option within the disposal
process, the Agency can either sell the parts intact to the public or destroy
the parts and sell them as scrap. Also, if for some reason a military service
later determines there is a new need for parts still in the disposal process,
it can request their return. This report addresses whether (1) DOD
destroyed usable aircraft parts during the disposal process that did not
have military technology and flight safety implications and (2) the military
services recalled aircraft parts from the disposal process to preclude
unnecessary purchases or repairs. We will report separately on whether
DOD properly destroyed aircraft parts with military technology and safety
implications.

In fiscal year 1996, DOD sold about 3.3 million usable aircraft parts to the
public through the disposal process' surplus sales program. These parts
had an acquisition value of over $2.3 billion. Our review focused on a
judgmentally selected sample of 271 surplus items at three disposal
offices. These offices handle some of the largest volumes of surplus
aircraft parts within the disposal process. The scope and methodology of
our work are described in appendix I.

## Background

The Federal Property and Administrative Services Act of 1949, as amended
(40 U.S.C. 471-486), places responsibility for the disposition of government
real and personal property with the General Services Administration. The
General Services Administration delegated disposal of DOD personal
property to the Secretary of Defense, who in turn delegated it to the
Defense Logistics Agency. The Defense Reutilization and Marketing
Service, a component of the Defense Logistics Agency, carries out the
disposal function. The complexity of DOD's disposal process is
characterized by the massive volumes of surplus property. In fiscal year
1996, DOD disposed of millions of items with a reported acquisition value

B-276828

(the amount originally paid for the items) of almost $24 billion. The focus of this report, aircraft parts, represents $2.3 billion of this total.

## Aircraft Parts Disposal Process

DOD provides overall guidance for determining if aircraft parts should be disposed of. The military services and the Defense Logistics Agency determine if specific parts for which they have management responsibility are excess to their needs. Once the military services or the Defense Logistics Agency declares aircraft parts excess to their needs, they enter the disposal process. These parts are sent to one of 170 worldwide Defense Reutilization and Marketing Offices (DRMO), or disposal yards. Upon receipt, DRMO personnel inspect the parts for condition, acquisition value, and special handling requirements such as those for military sensitive items. DRMOs, consistent with legislative requirements, have disposition priorities to make the excess parts available for reutilization within DOD or transfer to other federal agencies. Parts that remain are designated as surplus and can be donated to eligible entities such as state and local governments, among many others. After these priorities have been served, parts that remain may be sold to the general public. Figure 1 shows the usual process for disposing of aircraft parts.

**Figure 1: Usual Process for Disposing of Aircraft Parts**



Surplus aircraft parts can generally be divided into four categories of condition: (1) new; (2) worn, but still working; (3) broken, but repairable; and (4) scrap. In this report, we refer to the first three categories of parts as potentially usable, since they can be repaired or used as is. The fourth category—scrap—refers to those parts that DOD does not intend to reuse and sells for their basic material content value.

B-276828

## Military Technology and Flight Safety Considerations

Because of concerns about safeguarding military technology and maintaining flight safety, DOD has specific policies and procedures relating to the disposal of aircraft parts. For parts that have military technology involving weapons, national security, or military advantages inherent in them, DOD requires the parts to be demilitarized so that the technology remains within DOD. Demilitarization makes the parts unfit for their originally intended purpose, either by partial or total destruction, before or as a condition of sale to the public. For parts that could cause an aircraft to crash if the parts fail during a flight, DOD components have local policies requiring the destruction of certain used parts with flight safety implications to prevent the parts from reentering the DOD supply system or being made available to the civil aviation industry. In our 1994 report,[1] we cited concerns from the Federal Aviation Administration and the Department of Transportation's Inspector General that DOD aircraft parts, sold as scrap, reentered civil aviation as usable. As a result, in July 1995, DOD initiated a departmentwide program to identify and prevent parts with potential flight safety risks from being sold intact through DRMOs. The services and the Defense Logistics Agency began identifying parts with flight safety characteristics so they could destroy the parts before they were sold.

Some usable aircraft parts DOD sells as surplus fit only on military aircraft but have no military technology implications. These parts are called "nonsignificant military unique" parts. Examples include bolts, fuel controls, engine parts, and airframe parts that have been strengthened to withstand rigorous military use. Companies buy military unique parts on the speculation that DOD may need these parts at a future date. Other usable aircraft parts DOD sells as surplus have applications to aircraft used in civil aviation or by other government agencies and foreign countries. These parts are called commercial-type parts. Examples include the Air Force's KC-135 air refueling tanker that has many of the same parts as a commercial Boeing 707 aircraft; the Air Force's C-130 cargo plane that has many of the same parts as a Lockheed 382 Hercules aircraft used by 49 foreign countries; and the Army's UH-1 Huey utility helicopter that has many of the same parts as a commercial Bell 205 helicopter. Companies buy commercial-type parts on the speculation that they can resell the parts to civil aviation, foreign countries, or DOD.

---

[1] Commercial Practices: Opportunities Exist to Enhance DOD's Sales of Surplus Aircraft Parts (GAO/NSIAD-94-189, Sept. 23, 1994).

B-276828

## Results in Brief

Management of the aircraft parts disposal process can be improved. DOD destroyed some usable aircraft parts and sold them as scrap. These parts were in new or repairable condition and did not have military technology or flight safety implications. The parts could possibly have been sold intact at higher than scrap prices. This situation occurred for several reasons. For example, disposal offices destroyed parts because the demilitarization codes the military services had assigned to the parts were inaccurate. The codes indicated the parts contained military technology when they did not. Our work showed that the Oklahoma City disposal office destroyed 62 of 71 sample items, even though they did not have technology implications, because the assigned codes required their destruction. Personnel responsible for assigning and reviewing the codes had not been sufficiently trained and guidance was not adequate. In addition, policies and practices designed to prevent the inadvertent or unauthorized release of parts with military technology and flight safety implications did not distinguish between parts with or without such implications. Parts without military technology and flight safety concerns were destroyed along with parts that had these characteristics.

Our work also showed that DOD could have purchased or repaired fewer aircraft parts if it would have recalled the needed parts from the disposal process. For example, the Army could have reduced current and planned purchases by about $200,000 by using Cobra helicopter parts scheduled for destruction. DOD regulations require the military services to know which parts they have placed in the disposal process. However, interface problems between service and disposal office computer systems precluded the services from knowing what parts were at the disposal offices. The military services had not instituted alternative ways to obtain this information on a routine basis.

Problems with the disposal process are likely not unique to the three disposal yards we visited because DOD, military service, and Defense Logistics Agency policies and procedures generally apply to activities being performed at all locations. Our past reviews and DOD internal studies have identified similar problems at these and other locations over the past 10 years and earlier.

## Management of Surplus Aircraft Parts Can Be Improved

DOD could have avoided destroying certain usable aircraft parts that were in the disposal process. The parts were destroyed because (1) the military services improperly coded parts without military technology as having military technology implications and (2) policies and practices intended to

B-276828

prevent an inadvertent sale of military technology or flight safety items did not adequately exclude parts without military technology or flight safety implications. Until DOD improves the accuracy of assigned demilitarization codes, adopts better management policies and practices, and moves to use private sector techniques, such as identifying highly marketable parts, some usable parts will be unnecessarily destroyed during the disposal process.

## Assigned Demilitarization Codes Are Not Accurate

The three DRMOs we visited destroyed usable parts because the demilitarization codes the military services had assigned were inaccurate. For example, we evaluated 71 sample items at the Oklahoma City DRMO. We selected these items because they were commercial-type items but, at the time of selection, the military services had coded the parts as having military technology implications. We found usable quantities for 10 of our sample items that were marked for destruction at the DRMO. Records showed that the DRMO had previously destroyed quantities of the other 61 sample items.

We met with Air Force and Navy equipment specialists and policy officials and questioned the demilitarization codes assigned to each of the 71 items. The policy officials told us that they require equipment specialists to periodically review the demilitarization codes for accuracy and that equipment specialists had recently corrected the codes on nine items. The equipment specialists did not agree on the need to change the codes on the remaining 62 items until we pointed out that these were commercial-type parts. The equipment specialists confirmed that the assigned demilitarization codes—requiring the parts to be destroyed due to military technology content—were incorrect for each of the 62 sample items. The specialists revised each of the demilitarization codes to identify the parts as having no military technology implications.

At the San Antonio DRMO, the assigned demilitarization codes were inaccurate for 22 of 27 sample items because the parts had no military technology implications. Similarly, at the Corpus Christi DRMO, the assigned demilitarization codes were inaccurate for 13 of 17 sample items. Each of the military services and the Defense Logistics Agency were responsible for sample items with assigned codes that were inaccurate. Examples of parts destroyed because the assigned codes were wrong can be found in appendix II.

B-276828

| | |
|---|---|
| **Inaccurate Coding Is a Long-standing Problem** | DOD has had problems with the accuracy of assigned demilitarization codes for many years. In 1987, the Deputy Secretary of Defense directed the military services and the Defense Logistics Agency to review the assignment of demilitarization codes. The Deputy Secretary was concerned because a partial audit of seven weapon systems revealed that 43 percent of the items checked had been coded incorrectly. In 1994, the Defense Logistics Agency found that 28 percent of the assigned demilitarization codes it reviewed were incorrect. DOD officials told us that historically they assigned demilitarization codes to parts the first time the parts were purchased for a new weapon system. They said that for expediency purposes, they often assigned codes that showed military technology content for all parts on new weapon systems rather than evaluating individual items. |

Recognizing the need for trained personnel to assign proper codes, DOD developed a course on demilitarization. Despite such efforts to correct the erroneous codes, in April 1997, the DOD Inspector General reported[2] that 52 percent of the demilitarization codes assigned to parts for new weapon systems it reviewed were incorrect. The Inspector General reported that training was not adequate for personnel responsible for assigning and reviewing demilitarization codes and that documentation showing the rationale for their decisions did not exist. According to the Inspector General, DOD's training course provided only general awareness of the demilitarization program and did not provide the specific details necessary to make decisions on selecting the appropriate demilitarization codes.

**Guidance Could Be Improved**

Our review shows that DOD could improve the accuracy of assigned demilitarization codes by providing its personnel with guidance on how to make prudent decisions on selecting the appropriate codes. For our sample items at Oklahoma City, the Air Force equipment specialists completed a demilitarization code assignment worksheet. The worksheet is a draft document the Air Force is developing for the equipment specialists to follow to identify the proper code and to document the rationale they use in assigning the code. We found that the draft worksheet was a useful tool that provided a step-by-step process in determining the correct demilitarization code. The worksheet also provided documentation supporting how the equipment specialist arrived at the demilitarization code. Moreover, the worksheet proved useful to equipment specialists that had not received recent training. Until DOD provides its personnel with the specific details necessary to make prudent decisions on selecting the appropriate demilitarization codes, inaccurate

---

[2]Coding Munitions List Items (DOD Inspector General Audit Report No. 97-130, April 16, 1997).

B-276828

codes will continue to cause the unnecessary destruction of usable aircraft parts.

## Policies and Practices Are Not Adequate

Policies and practices intended to prevent an inadvertent sale of military technology or flight safety items did not adequately exclude parts without military technology or flight safety implications. The policies and practices in question dealt with the destruction of usable parts categorized as (1) scrap when the parts were usable, (2) sensitive items when the parts were not sensitive, (3) flight safety items when the parts had no flight safety implications, and (4) causing a storage space problem when there was no storage space shortage.

## Some Scrap Parts Are Usable

In 1994, the Defense Reutilization and Marketing Service directed the DRMOs to destroy all parts categorized as scrap or downgraded to scrap. The reason usable parts were destroyed involved DOD's categorization of parts as scrap. DOD defines scrap parts as material that has no value except for its basic material content, whereas DOD defines usable parts as material that has value greater than its basic material content and has potential to be used for the originally intended purpose. Commercial company officials told us that some parts that DOD considers scrap have value beyond basic material content and are repairable and reusable in the commercial sector. For the most part, this situation occurs because DOD labels containers of parts it does not want to repair for economic reasons as scrap. On the basis of their experience and independent analyses, commercial companies frequently did not agree with DOD's economic determinations. In such cases, the companies wanted to buy the used parts, repair them, and resell them for a profit.

For example, DOD pays the manufacturer $866 each for first stage turbine vanes used on the T-56 engine. Because DOD's cost to repair a turbine vane is $750, or 87 percent of the cost of a new vane, DOD considers the vane uneconomical to repair and categorizes it as scrap when worn or broken. However, the manufacturer sells the same first stage turbine vane to commercial customers for $2,020 each. Because of the higher commercial acquisition cost, commercial users can justify the repair cost, which is 37 percent of the commercial acquisition cost.

DRMO officials told us that usable parts without military technology were destroyed because of the policy to destroy items categorized as scrap. After receiving complaints from potential buyers and DRMOs that usable parts were needlessly destroyed, the Defense Reutilization and Marketing

B-276828

Service revised its policy in June 1996 to state that only those items categorized both as scrap and as sensitive items are to be destroyed. The Service considers aircraft parts to be sensitive items if the assigned stock number corresponds to 1 of 18 federal supply classes or groups that frequently contain military technology. The classes or groups include weapons, rocket engines, and communication equipment. DRMOs destroyed items considered sensitive property when the items were received as scrap or downgraded to scrap, irrespective of whether the assigned demilitarization codes indicated the parts had military technology implications.

DOD officials stated that due to the time and resources required to destroy and document the destruction of material, it is not in DRMOs' best interest to destroy parts that do not contain military technology. However, the officials said destruction was necessary to prevent an inadvertent release of parts with military technology implications. We recognize the need for DOD to prevent the inadvertent sale of parts with military technology implications. However, DOD management policies and practices resulted in the destruction of commercial-type parts and nonsignificant military unique parts that did not have technology and safety implications.

We previously reported[3] that DOD could increase proceeds from the sale of surplus aircraft parts—not by destroying them—but by adopting private sector practices. Specifically, we stated that DOD should use techniques to enhance the marketability of its aircraft parts, including identifying highly marketable commercial-type parts that would yield the greatest benefits at the minimum cost. We pointed out that some commercial airlines identify parts that have a high demand or command a high price and place them on a special listing for marketing purposes. This review shows that DOD has not implemented similar procedures.

**Parts Not on the Sensitive Items List**

DRMO personnel also destroyed parts, even though they were not on the sensitive items list. According to DRMO officials, the personnel did this to increase sales proceeds. They explained that historically DRMOs received scrap value for usable parts. They stated that by destroying usable parts, surplus parts dealers would get what they paid for and nothing more. The officials reasoned that once surplus dealers realized that DRMOs destroyed the parts, they would be willing to buy the usable parts before they were destroyed and would pay higher than scrap value for them. As a result, sales proceeds would increase.

---

[3]Commercial Practices: Opportunities Exist to Enhance DOD's Sales of Surplus Aircraft Parts (GAO/NSIAD-94-189, Sept. 23, 1994).

B-276828

We reviewed 83 sample items at the San Antonio DRMO that were not on the sensitive items list and that the disposal histories showed were categorized as scrap or downgraded to scrap after receipt. Our analysis identified instances where the DRMO offered usable parts for sale but did not sell them because bids did not exceed scrap value. The DRMO subsequently destroyed the parts and sold them as scrap. Some of the parts were worth more than scrap value and should have been held for another sale as usable parts. An example of parts destroyed because of the DRMO practice of destroying scrap not on the sensitive items list can be found in appendix II.

**Flight Safety Parts**

As a result of our 1994 report, DOD initiated a departmentwide program to identify and prevent parts with potential flight safety risks from being sold intact through DRMOs. The military services and the Defense Logistics Agency began identifying parts with flight safety characteristics so they could destroy the parts before they were sold. However, our review showed that aircraft parts were destroyed as flight safety risks when the parts had no flight safety implications. This destruction occurred because DRMO practices intended to prevent the inadvertent sale of parts with flight safety implications also caused the planned destruction of parts without these implications.

For example, in response to a potential buyer's complaint on September 20, 1996, that the San Antonio DRMO was destroying usable blades for the T-56 engine, the San Antonio Air Logistics Center investigated. The Center found 7,018 blades, originally costing $1.06 million, that the Air Force had incorrectly categorized as scrap because of a breakdown in inspection procedures and had sent them to the DRMO. San Antonio DRMO officials said the destruction was to prevent an inadvertent sale of flight safety items. However, Center officials said that these parts were incorrectly sent to the DRMO and did not have to be destroyed for flight safety reasons. DRMO officials said they preferred to err on the side of safety. We recognize the need for DRMOs to prevent the inadvertent sale of parts with flight safety implications. However, DRMO practices resulted in the planned destruction of commercial-type parts and nonsignificant military unique parts that did not have flight safety implications. An additional example of parts being unnecessarily destroyed as flight safety risks is in appendix II.

An interim Army Aviation and Troop Command instruction to destroy all parts with flight safety implications also resulted in the destruction of some helicopter parts without such implications. According to DRMO and

B-276828

Army records, for example, on February 5, 1997, a potential buyer witnessed the destruction of between 200 and 300 UH-1 helicopter gear shafts and 10 turbine rotors at the Texarkana, Texas, DRMO. The destroyed parts were new, were in the original equipment manufacturer's boxes, had a manufacturer's list price totaling about $1 million, and were categorized as flight safety critical parts. After the buyer complained, the Army agreed that the parts were new and should not have been destroyed.

According to DRMO officials, the interim instruction resulted in the destruction of large quantities of new, unused parts that had no flight safety risks. After receiving complaints from DRMOs and potential buyers that new parts were being destroyed, the Command revised its instructions and authorized the sale of flight safety critical parts under certain conditions, such as when the parts are new and unused. To determine if the procedural change was working, we reviewed a sample of 73 items at the Corpus Christi DRMO that the Army had identified as having flight safety implications and that DRMO records indicated were new. Our analyses showed that the DRMO either offered each sample item for sale or had already sold it. We concluded that no unnecessary destruction of new parts occurred on the transactions we reviewed. Examples of flight safety items properly sold can be found in appendix II.

## Storage Space

At the Corpus Christi DRMO, we observed quantities of 157 different usable parts for the AH-1 Cobra helicopter scheduled for destruction (see fig. 2). Specifically, we noted that there was a total of 1,972 usable, mostly new, helicopter parts in a DRMO warehouse. The parts originally cost $6.9 million. According to the DRMO Chief, these parts were to be destroyed beginning May 3, 1997, to free up storage space. We contacted the Defense Reutilization and Marketing Service and advised it of our concern with the scheduled destruction because the assigned demilitarization codes indicated no military technology was associated with 155 of the 157 different parts and because there were sufficient amounts of warehouse storage space for the parts.

B-276828

**Figure 2: Cobra Helicopter Parts Stored at Corpus Christi DRMO**



Defense Reutilization and Marketing Service officials said that in February 1996, they placed a prohibition against selling Cobra parts at DRMOs because the Army-assigned demilitarization codes were inaccurate. The property disposal specialist responsible for the prohibition said the Army planned to review and validate the demilitarization codes for the Cobra helicopter parts and he wanted to be sure the codes were accurate before proceeding with a sale or destruction action. He said the Army had not completed its demilitarization code review. The specialist said he also instructed the DRMOs to destroy the parts if they started experiencing a storage impact. After a meeting with the Chief of the Corpus Christi DRMO, the Defense Reutilization and Marketing Service issued a memorandum directing the DRMOs not to destroy any Cobra parts unless they are in a scrap condition and to hold usable parts in storage until the Army completes the demilitarization code review.

Army Aviation and Troop Command officials who are responsible for reviewing and validating demilitarization codes for Cobra helicopter parts told us they were waiting to complete the demilitarization code review

B-276828

until after Army headquarters makes a decision on whether or not to sell disarmed, surplus Cobra helicopters to the public for use in such purposes as fighting forest fires. In our opinion, accurate code assignments are required regardless of whether the helicopters are sold to the public.

## DOD Components Needed Some Surplus Parts

The military services' inventory managers did not have adequate information on aircraft parts located in DRMOs. DOD Materiel Management Regulation 4140.1-R requires inventory managers to have information on parts transferred to DRMOs, to recall parts for reutilization to prevent concurrent procurement and disposal, and to prevent the repair of unserviceable items when serviceable items are available. However, we found that they did not have the needed information and that DRMOs destroyed quantities of parts DOD components needed.

For example, at the Corpus Christi DRMO, we compared the 157 different usable Cobra helicopter parts scheduled to be destroyed by the DRMO with Army budget and procurement records. The records showed that the Army needed quantities for 22 of the 157 parts, totaling $196,500. We discussed our findings with the Defense Reutilization and Marketing Service, which notified the Army Aviation and Troop Command of the need to return the parts to the DOD supply system. The Command had not responded to this notification at the time our field work was completed. Additional examples of parts needed by DOD components can be found in appendix II.

Air Force and Army officials said that, despite the requirements of the DOD regulation, they did not have adequate visibility over parts in DRMOs. They stated that interface problems between military service and DRMO computer systems precluded the services from knowing what parts were in DRMOs. Since the services did not have adequate visibility over parts in DRMOs, the DRMOs were destroying the same parts the services were purchasing or repairing. DOD headquarters officials commented that DOD was working to correct the computer interface problem as part of a Total Asset Visibility program, but it would be several years before the problem is fixed. The officials stated that DOD had neither established milestones for correcting the computer interface problem nor instituted alternative ways to obtain the needed information on a routine basis. For example, aircraft parts available at DRMOs can be identified by telephone calls, the Internet, or physical inspections.

B-276828

## Conclusions and Recommendations

The conditions described in this report result in an unnecessary expenditure of resources to destroy parts that do not actually require destruction. In some instances, the government also loses the increased revenue that could be derived from the sale of usable parts to prospective buyers and the opportunity to return usable parts to the DOD supply system to avoid unnecessary procurements or repairs. Accordingly, we recommend that the Secretary of Defense take the following actions to prevent the destruction of usable aircraft parts.

- Provide guidance on selecting appropriate demilitarization codes that includes the specific details necessary to make appropriate decisions. The guidance could take the form of the draft demilitarization code assignment worksheet being used by the Air Force.
- Exclude commercial-type parts and nonsignificant military unique parts that do not have military technology and flight safety implications from policies and practices intended to prevent an inadvertent sale of parts with these implications. Work closely with the private sector to identify and list commercial-type aircraft parts and nonsignificant military unique parts the private sector needs and require the DRMOs to check this list before destroying parts.
- Require the Army to complete its validation of the demilitarization codes assigned to Cobra helicopter parts so commercial-type parts and nonsignificant military unique parts can be sold.
- Establish milestones for correcting computer interface problems that preclude the military services from having visibility of parts located in DRMOs and from following regulations that require parts to be returned to the supply system when needed to prevent unnecessary procurements or repairs. In the interim, institute alternative ways to obtain this information on a routine basis. For example, aircraft parts available at DRMOs can be identified by telephone calls, the Internet, or physical inspection.

## Agency Comments and Our Evaluation

DOD generally agreed with the report and stated that the concepts presented appear to be beneficial to the disposal of aircraft parts (see app. III). Concerning our first recommendation, DOD agreed that a code assignment sheet may be useful in assigning demilitarization codes and stated that it would work with the military services and the Defense Logistics Agency to determine the feasibility of departmentwide use of the Air Force, or a similar, worksheet. In response to our second recommendation, DOD agreed that, when properly coded by item managers, usable parts that do not have military technology and flight safety implications do not have to be destroyed. DOD noted that challenge

B-276828

programs are available if parts are miscoded. With regard to our recommendation that the Army complete its validation of the demilitarization codes assigned to Cobra helicopter parts, DOD stated that it is monitoring the Army's validation process. The validation, which will determine which parts are commercially available and can be sold, is expected in November 1997.

DOD partially agreed with our recommendation that it work closely with the private sector to identify and list parts the private sector needs and require the DRMOs to check this list before destroying parts. DOD stated that it previously attempted to obtain private sector input but the response was minimal. DOD also stated that the identification of commercial-type aircraft parts should be incorporated into an existing database rather than utilizing a separate list. DOD added that, although it is DOD policy that DRMOs destroy parts only when demilitarization is required or they are identified as having flight safety implications, inaccurate information does occur and use of all available data to reduce unnecessary destruction should be used by the DRMOs.

We continue to believe that DOD should work closely with the private sector because DOD's previous inquiries were limited to the original equipment manufacturers. Officials from the companies we contacted, including the National Association of Aircraft and Communication Suppliers, told us that, although they are buyers of large quantities of aircraft parts at DRMO sales, DOD had not asked them for input to identify commercial-type aircraft parts. Our report documents examples where DRMOs destroyed usable parts that did not have military technology or safety implications. Because the current system for identifying commercial-type and nonsignificant military unique parts the private sector needs is not working, we also continue to believe that DOD needs to list these parts separately.

DOD also partially agreed with our recommendation that it establish milestones for correcting the computer interface problems that preclude the military services from having visibility of parts located in DRMOs and, in the interim, institute alternative ways to obtain this information on a routine basis. DOD stated that the interface problems are addressed as they arise and that a joint Total Asset Visibility office is working with the military services to finalize a functional description for automated visibility of disposal assets to prevent unnecessary buys and repairs. Once finalized, milestones for implementation will be developed based on the complexity of the information system changes required. DOD stated that

B-276828

the earliest projected date for development of milestones is the first quarter of fiscal year 1998. DOD also stated that, in the interim, many other sources are available to the military services that provide visibility of parts at the DRMOs, including the Internet, an Interrogation Requirements Information System, and formal and informal contacts between DRMOs and item managers.

While we agree that the long-term solution rests with implementation of the Total Asset Visibility program, we continue to be concerned that routine interim procedures do not exist. Although DOD acknowledges that many other sources are available to the military services that provide visibility of parts in DRMOs, our report shows that DOD guidance is needed because the military services are not routinely checking with these sources.

We are sending copies of this report to the appropriate congressional committees; the Secretaries of Defense, the Army, the Navy, and the Air Force; the Director, Defense Logistics Agency; and the Director, Office of Management and Budget.

Please contact me at (202) 512-8412 if you or your staff have any questions concerning this report. The major contributors to this report are listed in appendix IV.

Sincerely yours,

David R. Warren
Director, Defense Management Issues

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| **Appendix I** **Scope and** **Methodology** | | 18 |
| **Appendix II** **Examples of Selected** **Aircraft Parts** | Parts Assigned Inaccurate Demilitarization Codes | 20 |
| | | 20 |
| | Parts That Are Not Sensitive | 23 |
| | Parts Without Flight Safety Implications | 23 |
| | Flight Safety Parts Properly Sold | 23 |
| | Parts Needed by DOD Components | 25 |
| **Appendix III** **Comments From the** **Department of** **Defense** | | 26 |
| **Appendix IV** **Major Contributors to** **This Report** | | 30 |
| **Figures** | Figure 1: Usual Process for Disposing of Aircraft Parts | 2 |
| | Figure 2: Cobra Helicopter Parts Stored at Corpus Christi DRMO | 11 |
| | Figure II.1: Engine Combustion Chamber | 20 |
| | Figure II.2: Nozzle Rings | 22 |
| | Figure II.3: Turbine Rotor Blades in Manufacturer's Original Packaging | 24 |

**Abbreviations**

DOD    Department of Defense
DRMO   Defense Reutilization and Marketing Office

Appendix I

# Scope and Methodology

We reviewed policies, procedures, disposal histories, transaction histories and related records obtained from the Defense Reutilization and Marketing Offices (DRMO) and item managers and documented disposal practices. We interviewed policy officials, disposal office personnel, item managers, and equipment specialists. To determine the Department of Defense's (DOD) policies and practices for destroying aircraft parts during the disposal process, we held discussions and performed work at the Office of the Deputy Under Secretary of Defense (Logistics), Washington, D.C.; the Army, the Navy, and the Air Force Headquarters, Washington, D.C.; the Defense Logistics Agency, Fort Belvoir, Virginia; and the DOD Inspector General, Washington, D.C. and Columbus, Ohio.

To obtain information on how surplus parts are received and processed for sale, we documented procedures and practices at three DRMOs located in Oklahoma City, Oklahoma; San Antonio, Texas; and Corpus Christi, Texas. According to DOD officials, the Oklahoma City and San Antonio DRMOs handle the largest volumes of surplus aircraft parts. Since these DRMOs handle surplus parts used mostly on Air Force and Navy aircraft, we also selected the Corpus Christi DRMO, which handles large quantities of surplus parts used mostly on Army aircraft. We also collected budget, procurement, inventory, weapon system application, and disposal information from item managers, equipment specialists, and policy officials at the Oklahoma City Air Logistics Center, Tinker Air Force Base, Oklahoma; the San Antonio Air Logistics Center, Kelly Air Force Base, Texas; the Corpus Christi Army Depot, Corpus Christi, Texas; the Army's Aviation and Troop Command, St. Louis, Missouri; and the Naval Inventory Control Point, Philadelphia, Pennsylvania.

We also visited and collected data from members of the National Association of Aircraft and Communication Suppliers, Inc., Alamo Aircraft Supply, Inc., and Dixie Air Parts Supply, Inc., San Antonio, Texas; Jet Reclamation, Inc., Bulverde, Texas; and Rick's Mfg. and Supply, Choctaw, Oklahoma to identify specific problems they were having with DOD's disposal practices.

We judgmentally selected 271 surplus items for review to determine the adequacy of DOD's policies and procedures for ensuring that aircraft parts without military technology and flight safety implications are not unnecessarily destroyed. We selected 83 items at the San Antonio DRMO involving the disposal of usable parts as scrap material and 27 items involving the accuracy of assigned demilitarization codes; 73 items at the Corpus Christi DRMO involving flight safety and 17 items involving the

**Appendix I**
**Scope and Methodology**

accuracy of assigned demilitarization codes; and 71 items at the Oklahoma City DRMO involving the accuracy of assigned demilitarization codes. We selected these items because they were commercial-type parts or nonsignificant military unique parts that were either coded for destruction due to military technology content or alleged by the Association to have been unnecessarily destroyed. We also reviewed the results of prior DOD internal studies.

To determine whether parts being destroyed at the three DRMOs were needed by the military services, we compared selected sample items with the services' budget stratification databases and requirements computations. We checked to see if there were current or future buy and repair requirements for the items. We informed the military services of any sample items that had current or planned requirements so the parts could be recalled from the DRMOs.

We performed our review between January 1997 and June 1997 in accordance with generally accepted government auditing standards.

# Examples of Selected Aircraft Parts

## Parts Assigned Inaccurate Demilitarization Codes

The Air Force decided that 184 TF-33 engine combustion chambers (Stock No. 2840008285214RV) (see fig. II.1) used on the KC-135 aircraft were surplus and sent them to the Oklahoma City DRMO. The parts originally cost $452,352. On April 15, 1997, the DRMO destroyed the 184 parts, although the parts were repairable. The DRMO destroyed the parts because the Air Force had assigned a demilitarization code to the parts requiring total destruction to protect military technology. The DRMO estimated that it spent $211 to destroy the parts and sold them as scrap for $3,450. After we pointed out that this was a commercial-type item, the Air Force equipment specialist said the assigned demilitarization code was incorrect because the parts contained no military technology. As a result, the DRMO destroyed parts that the private sector could have used. The equipment specialist corrected the demilitarization code.

**Figure II.1: Engine Combustion Chamber**



Appendix II
Examples of Selected Aircraft Parts

On April 9, 1997, we observed the destruction with a cutting torch of 20 nozzle rings (Stock No. 2840011611133RV) (see fig. II.2) used on the KC-135 aircraft engine. These parts originally cost $94,400. The Oklahoma City DRMO destroyed the parts because the Air Force had assigned a demilitarization code that required total destruction to protect military technology. According to the equipment specialist, the Air Force replaced the parts with a newer version. He said that the parts sent to the DRMO, although usable, were no longer needed by the Air Force. After we pointed out that this was a commercial-type item, the equipment specialist said the assigned demilitarization code was incorrect because the part contained no military technology. He also said the destroyed parts were usable on commercial Boeing 707 aircraft in the private sector. As a result, the DRMO destroyed parts that the private sector could have purchased. The equipment specialist corrected the demilitarization code.

Appendix II
Examples of Selected Aircraft Parts

**Figure II.2: Nozzle Rings**



On April 14, 1997, the Corpus Christi DRMO destroyed 53 circuit card assemblies (Stock No. 5998013370963) used on the UH-60 helicopter. The parts originally cost $54,392. The DRMO destroyed the parts because the Army had assigned a demilitarization code to the parts requiring total destruction to protect military technology. After we questioned if military technology was involved with this part, the Army equipment specialist said the assigned demilitarization code was incorrect because the part, although military unique, was nonsignificant and contained no military technology that needed to be protected. As a result, the DRMO destroyed

Appendix II
Examples of Selected Aircraft Parts

parts that the private sector could have purchased. The equipment specialist corrected the demilitarization code.

During fiscal year 1996, the San Antonio Air Logistics Center sent six usable support assemblies (Stock No. 2840011932157RW) used on the C-130 aircraft engine to the DRMO because the parts were no longer needed. The parts originally cost $19,660. The San Antonio DRMO destroyed the six parts because the Navy had assigned a demilitarization code to the part requiring total destruction to protect military technology. After we pointed out that this was a commercial-type item, the Navy equipment specialist said that the assigned demilitarization code was incorrect because the part contained no military technology. He said the destroyed parts were usable on commercial aircraft in the private sector. As a result, the DRMO destroyed parts that the private sector could have purchased. The equipment specialist corrected the demilitarization code.

## Parts That Are Not Sensitive

On February 26, 1996, the San Antonio DRMO downgraded to scrap 13 nozzle assemblies (Stock No. 2840010668071RW) used on the T-56 engine and destroyed them. The parts were destroyed to prevent surplus dealers from buying usable parts at scrap prices. The parts originally cost $15,953. These parts did not appear on the Defense Logistics Agency's sensitive item list and had no military technology or safety implications. The destroyed parts sold for about $2 each. By contrast, on August 20, 1996, the DRMO sold 24 usable nozzle assemblies intact for $1,183, or over $49 each.

## Parts Without Flight Safety Implications

The San Antonio Air Logistics Center considered 72 turbine vanes (Stock No. 2840004262571RW) for the T-56 engine not usable because they were worn and cracked and sent them to the DRMO for disposal. These parts originally cost $200,000. The San Antonio DRMO Chief said that he decided to destroy these parts at his own management discretion strictly for flight safety reasons. He said that he would not want parts in such poor condition to be refurbished and installed on an aircraft that he or anyone else was a passenger on. However, Center officials said these parts had no safety implications. After reviewing this matter, the Center's Commander told the DRMO to sell the parts intact.

## Flight Safety Parts Properly Sold

On October 7, 1996, the Corpus Christi DRMO received 1,101 turbine rotor blades (Stock No. 2840001523806) (see fig. II.3) used on the CH-47

helicopter for disposal. Since the Army had assigned demilitarization code F to the parts, indicating that they had flight safety implications, the DRMO requested disposition instructions from the Army Aviation and Troop Command. The Command instructed the DRMO to destroy the part unless it was (1) unused, (2) in serviceable condition, (3) physically marked with the manufacturer's code, and (4) in the manufacturer's original packaging. The DRMO decided that the parts met this exception and offered them for sale. DRMO records showed that the turbine rotor blades were sold in a lot with another turbine rotor blade for $13,796.

**Figure II.3: Turbine Rotor Blades In Manufacturer's Original Packaging**



On September 29, 1996, the Corpus Christi DRMO received notice that six transmission cartridge assemblies (Stock No. 1615011167083) used on the UH-1 helicopter were no longer needed by the Army. These parts originally cost $36,774. Since the Army had assigned demilitarization code F to the parts, the DRMO requested disposition instructions from the Army Aviation and Troop Command. On December 12, 1996, the Command instructed the DRMO to destroy the part unless it was (1) unused, (2) in serviceable condition, (3) physically marked with the manufacturer's code, and (4) in

the manufacturer's original packaging. The DRMO determined that these parts met this exception and on May 29, 1997, prepared a notice for the assemblies to be listed for sale in the International Sales Office catalog. At the completion of our fieldwork, the sales office had not set the date of sale.

## Parts Needed by DOD Components

At the Oklahoma City DRMO, we observed two nozzle rings (Stock No. 2840009911048RV) for the TF-33 engine being destroyed with a cutting torch. The two nozzle rings, originally costing $7,000, were being destroyed at the discretion of a DRMO employee. We obtained documents that showed these parts were in usable condition and that the Air Force needed the parts and had recently placed orders to buy 107 new nozzle rings. After we pointed this situation out to the Oklahoma City Air Logistics Center, the Center implemented new procedures to prevent usable engine nozzle rings and other needed parts from being destroyed. The procedures require equipment specialists to periodically inspect parts sent to the DRMO. Within a month, the Center identified and prevented the destruction of 200 additional usable parts that were at the DRMO.

In response to a potential buyer's complaint on September 20, 1996, that the San Antonio DRMO was destroying usable blades (Stock No. 2840011123776RW) for the T-56 engine, the San Antonio Air Logistics Center investigated. The Center found 7,018 blades, originally costing $1.06 million, that the Air Force had incorrectly categorized as scrap because of a breakdown in inspection procedures and sent them to the DRMO. San Antonio DRMO officials said the destruction was to prevent an inadvertent sale of flight safety items. However, Center officials said that these parts did not have to be destroyed for flight safety reasons and were needed to satisfy depot maintenance requirements. The DRMO returned the blades to the Air Force.

Appendix III
# Comments From the Department of Defense



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**

3000 DEFENSE PENTAGON
WASHINGTON, DC 20301-3000

ACQUISITION AND
TECHNOLOGY

**1 2 SEP 1997**

(L/MDM)

Mr. David R. Warren
Director, Defense Management Issues
National Security and International
  Affairs Division
U.S. General Accounting Office
Washington, DC 20548

Dear Mr. Warren:

This is the Department of Defense (DoD) response to the General Accounting Office (GAO) draft report, "DEFENSE INVENTORY: Management of Surplus Usable Aircraft Parts Can Be Improved," dated August 12, 1997 (GAO Code 709234/OSD Case 1435).  The DoD generally concurs with the draft report.

The concepts presented in the draft report appear to be beneficial to the disposal of aircraft parts.  However, practical considerations have caused the Department to present clarifications to some recommendations.

The DoD detailed comments are provided in the enclosure. The Department appreciates the opportunity to comment on the draft report.

Sincerely,

Roy R. Willis
Acting Deputy Under Secretary
  of Defense (Logistics)

Enclosure



Appendix III
Comments From the Department of Defense

GAO DRAFT REPORT--DATED AUGUST 12, 1997
(GAO CODE 709234) OSD CASE 1435

"DEFENSE INVENTORY:  MANAGEMENT OF SURPLUS USABLE AIRCRAFT PARTS
CAN BE IMPROVED"

DEPARTMENT OF DEFENSE COMMENTS

**RECOMMENDATION 1:**  The GAO recommended that the Secretary of
Defense provide guidance on selecting  appropriate
demilitarization codes that includes the specific details
necessary to make appropriate decisions.  The guidance could take
the form of the draft demilitarization code assignment worksheet
being used by the Air Force.  (p. 17/GAO Draft Report)

Now on p. 13.

**DOD RESPONSE:**  Concur.  The Department agrees that a code
assignment sheet may be useful in assigning demilitarization
codes.  The Air Force developed their worksheet as a tool to
assist equipment specialists in the code assignment decision
process and to provide a documented record of the rationale for
code assignment.  Although the form being used at the time of the
audit was in draft, it has now been refined and is projected to
be published during October 1997.  We will work with the Military
Services and the Defense Logistics Agency (DLA) to determine the
feasibility of Department-wide use of this, or a similar,
worksheet.  This matter is projected for completion during
January 1998.

**RECOMMENDATION 2:**  The GAO recommended that the Secretary of
Defense exclude commercial-type parts and nonsignificant
military-unique parts that do not have military technology and
flight safety implications from policies intended to prevent an
inadvertent sale of parts with these implications.  (pp. 17/GAO
Draft Report)

Now on p. 13.

**DOD RESPONSE:**  Concur.  When properly coded by the item managers,
commercial-type parts and nonsignificant military-unique parts
that do not have military technology and flight safety
implications do not require demilitarization or mutilation for
flight safety reasons.  Challenge programs are available in the
event of incorrect coding.

**RECOMMENDATION 3:**  The GAO recommended that the Secretary of
Defense should work closely with the private sector to identify
and list commercial-type aircraft parts and nonsignificant
military-unique parts the private sector needs, and require the

ENCLOSURE

Appendix III
Comments From the Department of Defense

Now on p. 13.

Defense Reutilization and marketing Offices (DRMOs) to check this list before destroying parts.  (p. 17/GAO Draft Report)

**DOD RESPONSE:**  Partially concur.  The Department previously attempted to obtain private sector input to identify commercial-type aircraft parts in connection with the joint DoD and Federal Aviation Administration process action team in 1995.  The response from the private sector was minimal.  However, the Department agrees that the identification of commercial-type aircraft parts should be performed during the provisioning process and should involve the prime contractor and will continue to consult with the private sector.  It should be noted that the identification decision should be based on DoD considerations as opposed to total acceptance of input from the contractor.  The resulting identifications should be incorporated into an existing database rather than utilizing a separate list.  It is DoD policy that the DRMO causes the destruction of parts only when demilitarization is required or they are identified as having flight safety implications.  However, inaccurate information does occur and use of all available data to reduce unnecessary destruction should be utilized by the DRMO.

Now on p. 13.

**RECOMMENDATION 4:**  The GAO recommended that the Secretary of Defense require the Army to complete its validation of the demilitarization codes assigned to Cobra helicopter parts so commercial-type parts and nonsignificant military-unique parts can be sold.  (p. 17/GAO Draft Report)

**DOD RESPONSE:**  Concur.  The Department is monitoring the Army's validation of demilitarization codes for the Cobra helicopter. The Army's validation process, which will determine which parts are commercially available and can be sold, is expected in November 1997.

Now on p. 13.

**RECOMMENDATION 5:**  The GAO recommended that the Secretary of Defense establish milestones for correcting computer interface problems that preclude the military services from having visibility of parts located in DRMOs and from following regulations that require parts to be returned to the supply system when needed to prevent unnecessary procurements or repairs.  In the interim, institute alternative ways to obtain this information on a routine basis.  For example, aircraft parts available at DRMOs can be identified by telephone calls, the Internet, or physical inspection.  (p. 17/GAO Draft Report)

**DOD RESPONSE:**  Partially concur.  Computer interface problems may impact visibility of parts, these are addressed as they arise. The joint Total Assets Visibility office is actively working with

Appendix III
Comments From the Department of Defense

the Military Services to finalize a functional description for
automated visibility of disposal assets to prevent unnecessary
buys and repairs.  Once finalized, milestones for implementation
will be developed based upon the complexity of the information
system changes required.  The earliest projected date for
development of milestones is during the first quarter of Fiscal
year 1998.  In the interim, many sources are available to the
Military Services that provide visibility of parts in the DRMO.
These include the Defense Reutilization and Marketing Service
Home Page on the Internet, the Interrogation Requirements
Information System, and both formal and informal contacts between
DRMOs and item managers.

Appendix IV

# Major Contributors to This Report

| | |
|---|---|
| **National Security and International Affairs Division, Washington, D.C.** | Charles Patton<br>James Murphy |
| **Dallas Field Office** | Roger Tomlinson<br>Jackie Kreithe<br>Bonnie Carter<br>Frederick Lyles |

### Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 37050
Washington, DC 20013

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (202) 512-6061, or TDD (202) 512-2537.

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone. A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

PRINTED ON RECYCLED PAPER

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

| Bulk Rate |
| Postage & Fees Paid |
| GAO |
| Permit No. G100 |

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**

