## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————————

BROWN HELICOPTER, INC., UNITED ) \
AERONAUTICAL CORP., and ASSOCIATED ) \
AIRCRAFT MFG. & SALES, INC., )

        **Plaintiffs,** )

        **v.** )    **Civil Case No. 06-0840 (JR)**

UNITED STATES DEPARTMENT OF DEFENSE, )

        **Defendant.** )

—————————————————————————————

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

    The Defendant, through counsel, the United States Attorney for the District of Columbia, hereby respectfully submits the following memorandum in opposition to Plaintiffs' application for a preliminary injunction. Defendant acted reasonably in classifying military aircraft as requiring destruction. Plaintiffs clearly cannot satisfy the familiar four-prong test supporting the award of preliminary injunctive relief.

### FACTUAL AND PROCEDURAL BACKGROUND

**Demilitarization Codes Assigned by AMARC Control Whether Aircraft are Destroyed**

    The Aerospace Maintenance and Regeneration Center (AMARC) (located at Davis-Monthan AFB, Arizona) is a joint service organization that provides for the storage, regeneration, reclamation, and disposal of aircraft and related aerospace items such as special tooling, special test equipment, engines, pylons, and miscellaneous airframe components. Declaration of Robert Foley (hereinafter "Foley Dec"), attached hereto as Exhibit A, at ¶ 1. AMARC is responsible for preparing aerospace vehicles from storage for surface shipment or flight withdrawal. Id. AMARC also reclaims

aerospace vehicles, engines, and critical aerospace parts for inventory replenishment or to satisfy urgent requirements. Id. AMARC operates as a working capital fund activity, in that, it charges its "customers" an hourly rate for services performed to offset operating costs. Id.

AMARC receives excess military aircraft from the Air Force, Army, Navy[1] and Coast Guard. Upon receipt, the aircraft will be placed in one of three storage categories; long term storage, reclamation for parts or full reclamation "excess." Foley Dec at ¶ 2. AMARC receives final disposition instructions for each aircraft from the owning service (Army, Air Force and Navy). When AMARC is required to "dispose" of aircraft equipment, various options are available, such as release through the General Services Administration (GSA), sale, donation, static display or destruction. Id. at ¶ 3. Once disposal of aircraft equipment has been approved, GSA first determines whether the equipment could be donated to another agency. Id. If GSA does not donate the aircraft, then it is released to AMARC for demilitarization, which usually involves destruction. Id.

AMARC is required to produce demilitarization instructions for each aircraft programmed for destruction. Foley Dec at ¶ 5. These instructions must be in compliance with applicable U.S. Department of Defense ("DoD") directives and manuals to ensure compliance with DoD Directive 4160.21-M, "DoD Personal Property Utilization and Disposal Program" and DoD 4160.21-M-1 "Defense Demilitarization Manual." Id. These manuals set forth DoD demilitarization policy, prescribe uniform procedures for assigning demilitarization codes to DoD property and direct methods for completing demilitarization. Id.

---

[1] The Marines is a branch of the Navy, and equipment therefor is disposed of under the auspices of the Navy.

"Demilitarization" refers to the act of destroying the military offensive or defensive advantages inherent in the equipment or material. Foley Dec at ¶ 6. The process can be accomplished by a variety of methods, including mutilation, dumping at sea, melting or other methods designed to prevent further use of the equipment or material for its originally intended military purpose. Id. Demilitarization codes are assigned to the aircraft and or the aircraft components. Id. at ¶ 7. For example, when a component is given a code "A" or "B," demilitarization is not required. Id. Code "C" requires the removal and demilitarization of the "key points," or lethal parts, components and accessories. Code "D" requires total destruction of the item. Id.

Demilitarization codes for aircraft received from the Air Force are typically assigned within AMARC. Foley Dec at ¶ 8. This restriction stems from the fact that Air Force aircraft equipment, like most military equipment, has military modifications distinguishing it from a strict commercially salable aircraft. Id. However, the Navy instructs AMARC to completely destroy the F-14 aircraft and all tooling related to the aircraft. Concerning C-141 aircraft, prior to the period of March through April of 2003 AMARC reviewed the aircraft components against various technical manuals and instructions to determine and prepare appropriate demilitarization instructions. Foley Dec at ¶ 9. Parts marked "C" or "D" would be removed and effectively destroyed. Id. Hazardous material was also removed from each aircraft, including approximately 500 pounds of depleted uranium. Id. Once this process was accomplished, the remaining aircraft components were sent to a contractor, who cut the wings, tails and other sections of the aircraft in accordance with the demilitarization instructions. Id. After this process, the aircraft were released to the Defense Reutilization and Marketing Service ("DMRS") in Tucson, Arizona for commercial sale. Id.

In 2002, officials reviewed AMARC's demilitarization of several C-141 aircraft. Foley Dec at ¶ 10.  Following this review, findings revealed errors in some of the demilitarization instructions.  Id.  Portions of the instructions were incomplete and others were simply incorrect. Id.  These findings prompted AMARC to review and analyze their demilitarization process for the C-141.  Id.at ¶ 11.  Distinct from the deviations noted in the demilitarization instructions was the glaring discovery of the high cost associated with the previously described process.  See id. and the Declaration of Robert Rohde (hereinafter "Rohde Dec"), attached hereto as Exhibit B.  As noted earlier, the C-141 aircraft components were assigned demilitarization codes.  Foley Dec at ¶ 12.  Approximately 130 components were assigned code "C" or "D." Id.  A far smaller number (approximately 70 or less) were assigned codes "A" or "B." Id.  Prior to releasing the aircraft from AMARC all "C" and "D" items were removed along with any hazardous material. Id.  This is an incredibly labor intensive and costly process.  See id.and Rohde Dec.

In the Spring of 2003, AMARC started requiring the "shredding" of C-141s programmed for destruction in an effort to implement a more cost effective demilitarization process. Foley Dec at ¶ 13.  "Shredding" is a process performed by government contractors that reduces aircraft equipment to very small pieces of metal.  Id.  AMARC is simply required to remove hazardous materials prior to release of the excess aircraft to the contractor for shredding.  Id.  Shredding achieves the demilitarization requirements of DoD regulations while saving additional possible costs associated with the disposition of the equipment. Id. at ¶ 14.  In addition, this method eliminates the possibility of incomplete or inaccurate demilitarization instructions.  Id.  Given obvious national security concerns, AMARC was and is reluctant to risk an inadvertent release of sensitive military components. Id.

4

Two specific incidents illustrate this concern. Foley Dec at ¶ 14.  First, at some point during this time frame F-18, F-4 and F-14 aircraft were listed for sale on E-Bay. Id.  Reportedly, the F-4 listed on E-Bay could be traced back to AMARC, as the tail number allegedly matched aircraft equipment previously held at the AMARC facility.  Id.  Later, a determination was made that the F-4 was not from AMARC and was not in the condition as advertised on E-Bay. Id.  A separate but contemporaneous event was the discovery of several A-4 aircraft in the possession of a private contractor.  Id.  Upon review, a determination was made that the contractor should not have had possession of these aircraft components. Id.  Understandably, high-level official inquiries were made concerning these circumstances. Id.  As a result, AMARC officials responsible for the disposition of surplus aircraft began to subject the release of military parts and equipment to a greater level of scrutiny. Id.  The pressure within AMARC for a heightened level of scrutiny was much more intense due to the proximity of the terrorist attack on the World Trade Center. Id.

AMARC's decision to shred C-141 aircraft is consistent with DoD regulations. Foley Dec at ¶ 15.  DoD 4160.21-M-1, Chapter 1 (General and Administrative) paragraph C.4 (Policy), in relevant part, states as follows:

> Defense Reutilization and Marketing Offices (DRMOs) on an individual basis can determine, in coordination with generating activities, the most appropriate and economical means for the disposal organization to properly demilitarize Munitions List Items.  Demilitarization should be accomplished by the most cost-effective method **consistent with adequate security** and surveillance by one of the following methods: …(b) by the DRMO … (d) under a service contractor, ….

Id. (Emphasis added).  AMARC's decision to shred C-141 aircraft is also consistent with DoD regulation 4160.21-M Chapter 4 (Property Requiring Special Processing). Id.  This Chapter states in relevant part as follows:

5

A. GENERAL. Some property, because of its peculiar nature, its potential influence on public health, safety, the environment, security, or private industry must be disposed of in other than normal fashion…

B.    LIST OF ITEMS REQUIRING SPECIAL PROCESSING.  Applicable to excess, surplus …

2.    Aircraft

(2) This policy applies to all aircraft; however, processing procedures may vary for aircraft located at AMARC, Davis Monthan AFB, Arizona.

Id.  This chapter continues by defining "Category C" aircraft as those configured for combat and deferring to the Military Service's internal procedures for processing complete aircraft for disposal. Id.

AMARC shreds C-130 aircraft programmed for disposal.  The authority and justification for this decision is the same as outlined above for C-141 aircraft. Foley Dec at ¶ 17.   AMARC also processes "tactical aircraft" for disposal. Id.  Tactical aircraft include the S3, A4, F14, and H53J planes.  Id.   Each of these "weapon systems" all have the following sub-systems: military communications systems; weapons systems; offensive and / or defensive capabilities. Id.  In addition, each aircraft is recognized by a mission design series "MDS" designator. Id.  For example, the "F" connotes a fighter aircraft; "S" signifies surveillance; "A" indicates attack.  It is common knowledge within the military community that all fighter, attack and surveillance weapon systems have combat capabilities.  When programmed for disposal, these aircraft are issued a demilitarization code "D" and shredded. Id.  Any other disposition would require the removal of numerous code "C" and "D" components, as well as wing and tail cuts. Id.

Within tactical aircraft, approximately 80 percent of all avionics components are coded "C" or "D." Foley Dec at ¶ 18.  Examples of such components include the air speed and altitude

indicators on fighter aircraft. Id. These examples represent components that would not obviously appear to be military specific and reveal the depth of military sensitivity of the aircraft. Id. Obvious military subsystems on these aircraft include target designators, missile guidance systems, crypto coded radio communication devices, and "friend or foe" identification capabilities. Id.

Coding these items as "C" and "D" prevents individuals outside the military from learning the specific capabilities of the aircraft. Foley Dec at ¶ 18. The "C" and "D" code of these components are required by DoD regulation 4160.21-M-1, and shredding is the most cost effective way to dispose of tactical aircraft. Id. For example, on fighter aircraft some wiring connector harnesses and component brackets are coded "C" and "D." Id. To remove these items, aircraft mechanics must remove several other components, panels or parts to simply reach the "C" or "D" items. Id. In addition to the actual removal, AMARC personnel must document each part removal process, all of which consumes valuable skills and resources. Id. Additional expenses were incurred for the services of the defense contractor who accomplished the wing, tail and other required cuts of the aircraft. Id.

Suggestions by the Plaintiffs that the subject aircraft equipment has not been modified for combat purposes are completely flawed. Plaintiffs rely on the Declarations of John H. Lane and Brian G. Cole. Foley Dec at ¶ 19. In paragraph 14 of Mr. Lane's declaration, referencing C-130, C-141, T-34 and H53 aircraft, he states, "Given their specific uses by the military, these aircraft are rarely modified for combat purposes. In the event they are, such modifications are easily removed so that the aircraft can be sold for commercial use." Id. Mr. Cole makes a comparable statement in paragraph 19 of his declaration: "Specifically, the C-130 aircraft are rarely if ever modified for combat purposes …." Id. Mr. Cole and Mr. Lane are simply wrong, as these aircraft do contain

demilitarization code "C" and "D" items and, therefore, are configured to support combat operations. Id. All of these aircraft types at AMARC have combat modifications. The C-130 and C-141 have chaff dispensers and military radio communications, along with classified encoders, all of which are combat modifications. Id. The H53J also has chaff dispensing equipment and aircraft warning indicators for combat support. Id. As such, and due to the inaccuracies in demilitarization code source information, AMARC has designated entire aircraft with demilitarization code "D" to ensure thorough and complete destruction of potentially sensitive equipment and material. Id. Under DoD regulation 4160.21-M, and DoD regulation 4160.21-M-1, AMARC has the authority to destroy all items with demilitarization codes "C" and "D." Id.

**DMRS Properly Followed Demilitarization Codes Assigned by AMARC**

The DRMS is a field activity of the Defense Logistics Agency ("DLA"). Declaration of Gregory E. Ortiz (hereinafter "Ortiz Dec"), attached hereto as Exhibit C, at 2 (1st ¶). DRMS is responsible for the disposition of surplus and excess property for the DoD and other approved property generators pursuant to delegation from the GSA. Id.

On June 9, 2005, DOD Surplus, LLC of Scottsdale, Arizona, was awarded a contract for the sale of all scrap property generated by DRMS. Ortiz Dec at 1 (1st ¶). The contract term is seven years and consists of non-hazardous scrap property located in the Continental United States with a demilitarization code of A, B, E or Q or that are subject to demilitarization as a condition of sale. Id. More particularly, the property to be delivered under the sales contract includes all scrap material and all items that are subject to demilitarization as a condition of sale of excess and surplus tactical and non-tactical aircraft generated by AMARC, Davis-Monthan AFB, AZ. Id.

Under this sales contract, DOD Surplus, LLC, is authorized to utilize the internet sales services of Government Liquidation (GL), a subchapter S corporation, formed under a separate commercial venture sales contract for the sale of DRMS usable property. Ortiz Dec at 1 (2nd ¶). It is a net-proceeds sharing sale, as the successful bidder is obligated to share the net proceeds obtained from the resale of this property after deducting the costs of managing, transporting, protecting, improving, and marketing the property. Id.   Property eligible for this contract must be declared excess to the needs of DoD and surplus to the needs of the Federal Government. Id. at 1 (3rd ¶). Title to demilitarization-required property sold under this contract vests in the purchaser only after complete demilitarization has been accomplished. Id.

On May 2, 2006, GL, opened bidding on Lot Number 1 of Event Id 6079. Ortiz Dec at 1 (4th ¶).  The item was offered as 27,000,000 pounds of scrap aircraft at Davis-Monthan AFB. Id. Property included for sale was C-141, C-130, S-3, A-4, F-14, T-34, H-53, and target designators. Id. The terms of the GL sale provided that the aircraft required complete destruction prior to resale and cannibalization of usable parts from any of the planes was not possible. Id. Demilitarization requirements were to be satisfied by the complete destruction of the aircraft through the use of a hammer mill or shredder off of Government premises.  Bidding was set to close on May 9, 2006. Id.

As a result of this law suit and pursuant to an agreement with Plaintiffs, DMRS effected the removal of Internet Auction (IA) Sale 6079 from the GL sales website on May 8, 2006, at about 2:00 pm (MT). Ortiz Dec at 1 (5th ¶).  At the time of withdrawal, 10 bidders, who had each submitted $50,000 cash bid deposits, had submitted bids. Id.  Government Liquidation reports that none of the parties in the instant action submitted the required $50,000 cash bid deposit and were therefore not

eligible to bid. Id., and Exhibit 2 at 3.[2]  Government Liquidation reports the high bid was just over $12,000,000 for a one-year term sales contract (or approximately 44 cents per pound) at the time of withdrawal and that they customarily experience intense bidding in the final hours of any auction, which would have caused the high bid to increase materially. Id. at 2 (residual text).  The sale has been held in abeyance pending a determination of the instant motion. Id.

Previously, DRMS had issued C-130 and C-141 aircraft to GL under a separate commercial venture awarded to Surplus Acquisition Venture, LLC (SAV). Ortiz Dec at 2 (2nd ¶).  The aircraft were eligible for sale under this commercial venture sales contract for usable items since they had a demilitarization code of "B." Id.  The Subchapter S corporation formed by SAV, GL, had prior sales of 143 C-130 and C-141 aircraft disposed of through Davis-Monthan AFB, which aircraft it was permitted to sell without a complete destruction requirement. Id.  Usable parts were permitted to be removed. Id.  The amount received for each airplane and other information is reflected on a spreadsheet attached to the Ortiz Dec as Exhibit 4. Id.

On March 16, 2005, DRMS issued two C-130 aircraft and two C-141 aircraft to GL with instructions to sell the airplanes with a demilitarization code B. Ortiz Dec at 2 (3rd ¶).  However, after issuance, but prior to GL reselling the aircraft, AMARC verbally notified DRMS that a demilitarization code of "B" was incorrect for these aircraft and that it should be demilitarization code "D." Id.  DRMS received an electronic mail from AMARC on March 28, 2005 confirming that "[s]ince AMARC cannot completely guarantee 100% removal of Demil C and D items off weapon systems, AMARC will code all aircraft D Demil." Ortiz Dec at Exh. 5.  Therefore, GL was notified

---

[2] This statement includes the additional Plaintiffs which joined the suit pursuant to the Amended Complaint filed on May 30, 2006.

of the demilitarization code change, and DRMS requested immediate return of the aircraft in accordance with the terms and conditions of the contract. Id. at 2 (3rd ¶). As a result of the reclassification, all airplanes disposed of at Davis Monthan AFB were required to undergo complete destruction prior to title transfer. Id.

No other C-130 or C-141 aircraft, or any other combatant or non-combatant aircraft, have been sold to commercial venture partners of DRMS, at DRMO Tucson, during the 2005-2006 time frame other than what is described as follows. Ortiz Dec at 2-3. In June 2004, DRMS had awarded a sales contract for scrap aluminum. Ortiz Dec at 2 (4th ¶) All tactical aircraft disposed of by AMARC were delivered to this scrap contractor. Id. A requirement of the sales contract was that all property had to be completely destroyed. Id. The awardee was Fritz Enterprise, Inc., of Trenton, Missouri. Id. Non-tactical aircraft, to include C-130s and C-141s, were also delivered under the DRMS's sales contract with Fritz. Id. DRMS's contract terminated on February 3, 2006. Id.

Further, in April 2006, DRMS delivered to DOD Surplus, LLC, the planes offered for sale on the GL sale and that are at issue in the instant action. Ortiz Dec at 2 (5th ¶). The property was turned over to DRMS by AMARC with the requirement that all aircraft must be completely destroyed. Id. DRMS received a March 2, 2006 letter from AMARC stating: "NO PARTS REMOVAL and complete "hammer mill" shred/mutilation of airframe and contents is required …". Id. and Ortiz Dec Exh. 6. Again, no other combatant or non-combatant aircraft have been sold to commercial venture partners at DRMO Tucson from 2005 to 2006. Ortiz Dec at 2-3.

## <u>IMPROPER VENUE OR LACK OF STANDING</u>

Plaintiffs here seek to have the Court review the process by which the military, specifically the Aerospace Maintenance and Regeneration Center (AMARC) and the Defense Reutilization and Marketing Service (DMRS) dispose of excess or surplus military aircraft and to review operations leading to public bidding on the property. Plaintiffs contend that Defendant has failed properly to comply with 40 U.S.C. § 527, prohibiting the destruction of government property with commercial value exceeding the cost of continuing to hold it, and the application of regulations concerning the proper assignment of demilitarization codes. Notwithstanding Plaintiffs' attempt to pass this case off as one simply involving administrative review, they are in truth advancing what is more in the nature of a bid protest, which is within the exclusive jurisdiction of the Federal Court of Claims. <u>Baltimore Gas And Elec. Co. v. U.S.</u>, 290 F.3d 734, 737 (4th Cir. 2002) (hereinafter "<u>BG&E</u>") (a sunset provision in the ADRA gives the Court of Claims exclusive general and appellate jurisdiction over all cases under the Administrative Dispute Resolution Act of 1996 (ADRA) (28 U.S.C. § 1491) filed on or after January 1, 2001). As stated by the Court in <u>Transatlantic Lines LLC v. United States</u>, 68 Fed.Cl. 48 (Fed. Cl. 2005), '[the Tucker Act] explicitly provides that [the Court of Claims] shall have bid protest jurisdiction "without regard to whether suit is instituted before or after the contract is awarded." ' <u>Id</u>. at 52, citing <u>Software Testing Solutions Inc. v. United States</u>, 58 Fed.Cl. 533, 535 (2003). Accordingly, this case should be dismissed or transferred to the Federal Court of Claims.

However, even if Plaintiffs had properly filed in the Court of Claims, Plaintiffs would still lack standing to advance this suit, since they are not properly considered "interested parties" under the ADRA. Plaintiffs are not actual or prospective bidders on the aircraft at issue in this case.

Following the reasoning of the Court in <u>BG&E</u>, Plaintiffs should be deemed interested parties only if they are "an actual or prospective bidder or offerer" on the solicitation in question. <u>BG&E</u>, 290 F.3d at 739.  Plaintiffs can only claim that they had bid on similar property in the past or that they would have been interested had property they were interested in been offered for sale. However, they are not actual or prospective bidders.  Accordingly, they should not be deemed to have standing to advance this suit.  The suit, therefore, should be dismissed.

Undoubtedly, Plaintiffs will claim jurisdiction under the Administrative Procedure Act, since they are not seeking monetary damages, only declaratory and injunctive relief.  However, as the Court in <u>Goodwill Industrial Services Corp. v. Committee for Purchase from People who are Blind or Severely Disabled</u>, 378 F.Supp.2d 1290 (D.Colo. 2005) states, "[t]he APA's waiver of sovereign immunity is limited because it does not confer 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.' " <u>Id</u>. at 1294, citing <u>City of Albuquerque v. United States Department of the Interior</u>, 379 F.3d 901, 907 (10th Cir.2004).  In this case, the Administrative Dispute Resolution Act of 1996 (the "ADRA") forbids the relief sought.  As explained by the Court in <u>Novell, Inc. v. United States</u>, 109 F.Supp.2d 22 (D.D.C. 2000),

> The selection of the APA standard of review adds credence to the argument that lawmakers believed they were codifying the <u>Scanwell</u>[3] jurisdiction with the enactment of Section 1491(b).[]  More importantly, and as plaintiffs concede, **the 1996 statute includes a sunset provision that will terminate district court jurisdiction over bid protest actions as of 2001**. See Pub.L. No. 104-320, § 12(d), 110 Stat. at 3875. Since the sunset provision terminates actions under Section 1491(b)(1) and makes no mention of terminating <u>Scanwell</u> jurisdiction, it would defeat the purpose of the sunset clause if these cases could still be brought in district court under the APA.

---

[3]  <u>Scanwell Laboratories Inc. v. Shaffer</u>, 424 F.2d 859 (D.C.Cir.1970).

Id. (footnote omitted; emphasis added), citing Brown v. General Services Admin., 425 U.S. 820, 834 (1976) (noting that "[i]n a variety of contexts, the Court has held that a precisely drawn, detailed statute pre-empts more general remedies.").

While some courts have held that residual jurisdiction remains for claims advanced by non-interested parties, see City of Albuquerque v. United States Department of the Interior, 379 F.3d 901, 909-910 (10th Cir.2004), even assuming arguendo the validity of this position, which view Defendant opposes, Plaintiffs still do not have standing generally to advance such claims in district court. The Constitution requires a plaintiff to establish three elements to demonstrate standing to sue the federal government for failure to carry out its executive functions. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982); see also National Wrestling Coaches Assoc. v. U.S. Department of Education, 263 F. Supp. 82, 105-106 (D.D.C. 2003). First, the plaintiff must show that he or she has suffered an "'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent' not 'conjectural' or 'hypothetical'." Lujan, 504 U.S. at 560; see also Bensenville v. FAA, 376 F.3d 1114, 1118-19 (D.C. Cir. 2004). Second, the alleged injury must be "traced to the challenged action." Lujan, 454 U.S. at 560 (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41-42 (1976); see also Florida Audubon Society v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996). Third, the alleged concrete injury must be "likely to be redressed by a favorable decision" of the court hearing the matter. Valley Forge, 454 U.S. at 472; see also Florida Audubon Society, 94 F.3d at 661.

Further, in order to demonstrate standing for a claim requesting declaratory or injunctive relief, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining

some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983) (citations omitted); see also Branton v. FCC, 993 F.2d 906, 908 (D.C. Cir. 1993). In Branton, a citizen challenged the FCC's ruling that a radio broadcast that contained profanity was not "indecent" because the tape was part of a "bona fide" news story. The court held the "possibility that the petitioner will again some day be exposed to broadcast indecency lacks the imminence required under Lyons…" Branton, 993 F. 2d at 909. Similarly, Plaintiffs have provided absolutely no evidence that they will suffer immediate harm if the Department of Defense is permitted to proceed with the sale of the surplus aircraft, and the possibility of some harm in the future is too attenuated to establish a genuine injury.

**Plaintiffs have not established "concrete and particularized" injury**

Plaintiffs utterly fail to allege or establish the existence of a "concrete and particularized" injury. In their complaint, Plaintiffs do not state that they have suffered any actual injury as a result of the Defendant's actions or inactions. Plaintiffs' alleged harm is speculative and contingent upon a successful bid for some future, hoped for, but non-existent offer. Moreover, none of the individual Plaintiffs in this action has provided an affidavit or declaration demonstrating the existence of any losses or harm of any type suffered – in the past or currently. In short, Plaintiffs have not provided a scintilla of evidence to show that they have suffered particularized harm as the result of the Department's alleged failure to properly demilitarize surplus aircraft.

Critically, mere alleged legal violations are not enough to establish harm. The Supreme Court has held that violations of law, even if true, are not sufficient to establish injury in fact. Without this key element of Lujan's standing analysis, Plaintiffs cannot show standing to sue. Allen

v. Wright, 468 U.S. 737, 754 (1984); see also Humane Society of United States v. Hodel, 840 F.2d 45, 52 (D.C. Cir. 1988).

The Supreme Court's analysis in Allen supports this argument. In Allen, respondents challenged IRS guidelines and procedures with respect to granting tax-exempt status to discriminatory private schools. The Court vacated a lower court judgment and stated that the first basis for standing alleged by respondents – that they were harmed directly by the mere fact of government financial aid to discriminatory private schools – did not constitute a judicially cognizable injury. The Court also rejected respondents' second argument – that their children were being deprived of an opportunity to receive an education in racially integrated schools – because that judicially cognizable injury was not fairly traceable to the government conduct that respondents challenged as unlawful. The Court concluded that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. at 754.

**Allegations of anticipated injury are not enough**

Plaintiffs cannot establish standing by merely pointing to a statutory or regulatory violation in the abstract. The controlling authorities require a more concrete invasion of a legally protected interest. Allegations of speculative future injury will not suffice. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Simon, 426 U.S. at 40 (1976); United Transportation Union v. ICC, 891 F.2d 908, 911 (D.C. Cir. 1989). Rather, a future injury satisfies the concept of "imminence" only if the injury is "'certainly impending.'" Lujan, 504 U.S. at 565 n.2. (original emphasis) (citation omitted). The Supreme Court has repeatedly reaffirmed the doctrine requiring that a showing of "future injury be particular and concrete." See, e.g., Steel Co. v. Citizens for a Better Environment,

523 U.S. 83, 108 (1998).  Plaintiffs have not demonstrated impending, particular or concrete future injury.

Thus, Plaintiffs' claim of an "anticipated injury" fails to meet the requirements of standing. An anticipated, unspecified injury at some unknown time in the future does not establish standing. In short, a plaintiff lacks standing where the court must accept speculative inferences and assumptions in order to connect the alleged injury with the challenged activity.  See, e.g., National Maritime Union of America v. Commander, Military Sealift Command, 824 F.2d 1228 (D.C. Cir. 1987).  For example, in Crete Carrier Corp. v. Environmental Protection Agency, 363 F. 3d 490 (D.C. Cir. 2004), operators of five large-haul truck fleets challenged the Environmental Protection Agency's refusal to reconsider the 2004 Standard for nitrous oxide and nonmethane hydrocarbon emissions from "'heavy heavy-duty'" diesel engines.  Because the trucking companies failed to show that their injury was fairly traceable to the 2004 Standard, the court dismissed their petition for lack of standing under Article III.  In reaching this conclusion, the court held:

> The Trucking Companies offer **only assertions**, not facts, to support their claims about the likely response of engine manufacturers to repeal of the 2004 Standard. That will not do. ***Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing. Without actual evidence*** of how engine manufacturers would respond to relaxation or rescission of the 2004 Standard - and the Trucking Companies have proffered none - we cannot 'wade into this morass of marketplace analysis,' and emerge with the conclusion the engine manufacturers would revert to producing pre-October 2002 engines.

Id. at 494 (internal citations omitted)  (emphasis added).

17

## ARGUMENT

**I.    Deference by Civilian Court to Exercise of Discretion by Military**

At the outset Defendant notes that, in the exercise of their discretion, Federal Courts are inclined to defer to the exercise of discretion by military agencies in cases such as these.   In fact, the Court in <u>Transatlantic Lines LLC v. United States</u>, 68 Fed.Cl. 48 (Fed. Cl. 2005), describes the federal statutory requirement for such deference, as follows:

> This court considers national security concerns where contracts involving military operations are implicated, irrespective of whether the parties raise the issue.  'In exercising jurisdiction [over procurement cases], the courts shall give due regard to the interests of national defense and national security ....' 28 U.S.C. § 1491(b)(3).

<u>Id</u>. at 57.   Moreover, generally, courts are inclined to defer to the judgment of the military. Particularly apropos here are the words of the Fourth Circuit in <u>Guerro v. Scruggs</u>, 942 F.2d 270 (4th Cir. 1991),

> Traditional trepidation over interfering with the military establishment has been strongly manifested in an unwillingness to second-guess judgments requiring military expertise and in a reluctance to substitute court orders for discretionary military decisions.   Concern has also been voiced that the courts would be inundated with servicemen's complaints should the doors of reviewability be opened.   But the greater reluctance to accord judicial review has stemmed from the proper concern that such review might stultify the military in the performance of its vital mission.

<u>Id</u>. at 276; <u>see</u> <u>National Federation of Federal Employees v. Greenberg</u>, 983 F.2d 286, 296-297 (D.C. Cir. 1993) (Sentelle, J., *concurring*) ("Without clear congressional authorization, courts traditionally have demonstrated a reluctance to encroach on Executive prerogative in the area of military and national security affairs.");[4] <u>Selland v. Aspin</u>, 832 F.Supp. 12 (D.D.C. 1993) (deference properly

---

[4] Citing <u>Chappell v. Wallace</u>, 462 U.S. 296 (1983);  <u>Schlesinger v. Councilman</u>, 420 U.S. 738, 757-58 (1975); <u>Gilligan v. Morgan</u>, 413 U.S. 1, 10 (1973);  <u>Burns v. Wilson</u>, 346 U.S. 137, 142, 144 (1953);  <u>Orloff v. Willoughby</u>, 345 U.S. 83, 93-94 (1953).

owed to military judgment by the judiciary); see also Water Keeper Alliance v. U.S. Department of Defense, 271 F.3d 21, 35 (1st Cir. 2001) (district court cautioned against substituting judicial judgment for agency judgment in considerations of how and where the Navy should train); Hodges v. Brown, 500 F.Supp. 25 (E.D. Pa. 1980) (Courts have been very reluctant to intervene in military matters.).[5]

## II.    Standards for Issuance of Temporary Restraining Orders and Preliminary Injunctions

It is well established that injunctive relief is an extraordinary remedy and that the party seeking it has a substantial burden of proof. American Coastal Line Joint Venture v. United States Lines, Inc., 580 F. Supp. 932, 935 (D.D.C. 1983).    The criteria that govern the issuance of temporary and preliminary injunctive relief in the District of Columbia are well-settled. In order for the Court to exercise its power to grant this extraordinary relief, the Plaintiffs must show:  (1) a strong likelihood of prevailing on the merits of their claims; (2) that without injunctive relief they will suffer irreparable harm; (3) that, balancing hardships, the issuance of an injunction will not substantially harm other interested parties; and (4) that the public interest favors the requested injunction. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); Washington Metropolitan Area Transportation Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-44 (D.C. Cir. 1977).  This balancing test is a flexible one, permitting a court to issue injunctive relief when the likelihood of success is high, although probability of irreparable harm may be low, and vice versa. See Population Institute v. McPherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986).  Nevertheless, although it is a flexible

---

[5] Citing Orloff v. Willoughby, 345 U.S. 83, 94 (1953); Hickey v. Commandant of the Fourth Naval District, 464 F.Supp. at 377.

standard, both elements of likelihood to prevail and irreparable harm must be shown. District 50, United Mine Workers of Am. v. International Union, United Mine Workers of Am., 412 F.2d 165, 167 (D.C. Cir. 1969) ("A party seeking injunctive relief must show both that it will suffer irreparable harm if an injunction is not issued and that there is a substantial likelihood it will prevail on the merits when the case is tried."). Preliminary relief is a drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party, Yakus v. United States, 321 U.S. 414 (1944); Kahane v. Secretary of State, 700 F.Supp. 1162, 1165 (D.D.C. 1988). This is an exacting standard that Plaintiff cannot meet. "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, to constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." Id.

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). Where the public interest may be affected, the Court may withhold issuance of an injunction even at the cost of hardship to the petitioner. Id.; see also, Marine Transport Lines, Inc. v. Lehman, 623 F. Supp. 330, 335 (D.D.C. 1985).

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, is not enough . . .. But injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925. "An injunction may be justified for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." CityFed Fin. Corp. v.

20

Office of Thrift Supervision, 58 F.3d 738, 747 (1995). Wisconsin Gas Co. v. FERC, 758 F.2d at 674, sets forth the guiding principles for determining whether irreparable harm exists that (1) the injury must be both certain and great, not something merely feared as likely to occur at some indefinite time; (2) the injury must be of such imminence that there is a "clear and present" need for relief to prevent it; and (3) economic loss is insufficient to constitute irreparable harm unless the plaintiff's very existence is threatened. See also Sampson v. Murray, 415 U.S. 61, 88-90 (1974). An essential prerequisite to injunctive relief is a sufficient showing by the plaintiffs that they will suffer irreparable harm if the injunctive relief is not granted. See, e.g., Davenport v. International Brotherhood of Teamsters, 166 F.3d 356, 360 (1999).

As we establish below, Plaintiffs have not met their burden to establish that injunctive relief is appropriate in this matter because they cannot show irreparable harm, they have little likelihood of success on the merits, and it is against the public interest for the Court to substitute its judgment for that of the military, particularly on national security matters.

A.    **Plaintiffs Cannot Show Irreparable Harm**

It is well accepted that "a temporary loss of income which can later be rectified, ordinarily does not constitute irreparable harm for purposes of preliminary injunctive relief." AFGE v. U.S., 104 F.Supp.2d 58, 75-76 (D.D.C. 2000). Some courts have held that "[t]he loss of opportunity to compete for a contract and secure any resulting profit has been recognized as constituting 'significant harm.' " CW Government Travel v. United States, 61 Fed. Cl. 559 (Fed. Cl. 2004). However, here Plaintiffs have not lost an opportunity to compete for a contract because they were not actual or prospective bidders on the government contract at issue in this case. As Defendant argues above,

any interest Plaintiffs may have in the government contracts at issue in this case is completely speculative.

Moreover, Plaintiffs can establish little more than potential economic harm, which, it is well-accepted, does not constitute irreparable harm. Plaintiffs attempt to stress the high-dollar loss of economic opportunity associated with the military's assignment of a demil D code to the aircraft at issue in this case. However, as stated by the Court in Sierra Military Health Services, Inc. v. United States, 58 Fed Cl. 573 (Fed. Cl. 2003), " '[w]hile these losses may be substantial, they are not irreparable.' " Id. at 582, citing OAO Corp. v. United States, 49 Fed.Cl. 478, 480 (Fed Cl. 2001); JWK Int'l Corp. v. United States, 49 Fed.Cl. 364, 369 (2001); Minor Metals, Inc. v. United States, 38 Fed.Cl. 379, 381-382 (Fed. Cl. 1997) ("However, economic loss without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed.Cir.1983)). Plaintiffs have estimated in their motion the potential profits associated with the sale of aircraft parts generally and, given their past experiences, the specific opportunities for profit associated with the sale of parts from the aircraft involved in the bid at issue in this case.

### B.    Plaintiffs Do Not Have A Strong Likelihood of Success on the Merits

Plaintiffs are not likely to prevail on the merits in this case. Even using the profitability of the sale of aircraft parts as a measure of the reasonableness of the military's decision to destroy the surplus aircraft, Plaintiffs have failed to consider the cost to the government associated with parts removal and failed to consider the actual profits associated with the sale of shredded, scrap aircraft following its total demolition. Comparing the profits associated with the sale of parts, and the costs associated with parts removal, no substantial economic marginal benefit can genuinely be associated with parts disposition.

Moreover, Plaintiffs' analysis is unreasonable to the extent that they rely on faulty assumptions about the military quality of the aircraft in issue and, thus, the need for demilitarization of the aircraft. Security concerns and the substantial risk that highly sought after military components could enter the public domain is a concern that Plaintiffs have simply failed to factor in to their cost-benefit analysis of the disposition of the aircraft equipment. Given those concerns, which Mr. Foley sets forth clearly in his declaration, as set forth above, the more reasoned approach is the one taken by the military. As Mr. Foley explains, AMARC at one time had permitted the sale of parts associated with demilitarization of aircraft. However, this method failed adequately to protect the military's security interests. So, here, Plaintiffs are not challenging the actions of government officials who, in the exercise of their discretion, have refused to even consider the alternative Plaintiffs suggest. To the contrary, the approach Plaintiffs continue to press has been implemented, but failed adequately to protect the security interests of the United States. Certainly this level of reasonableness is entitled to the kind of deference civilian courts accord military decision making.

**C.    The Public Interest and the Balance of Interests Suggest that an Injunction should not Issue in This Matter**

Given the military security concerns in this case, which is in the public interest, and the public's interest in maintaining the integrity of the process by which surplus military equipment is disposed of by the government, the public interest should weigh heavily in favor of permitting AMARC and DRMS to continue their efforts to maintain the integrity of the security components of the disposition of surplus military equipment. While, given the analysis reflected in the declaration of Robert Rohde, establishing the more advantageous cost-benefit ratio associated with

shredding or total destruction of aircraft versus sale of parts, there appears to be no need for a direct conflict between making profit off of the sale and maintaining security.  To the extent that there is an unavoidable conflict in deciding how to resolve differences between these interests, the public interest would appear to weigh in favor of deferring to government officials to make these decisions rather than permitting market forces to control the disposition of this sensitive military equipment. As stated by the Court in Golden Eagle Refining Co., Inc. v. United States, 4 Ct. Cl. 622 (Ct. Cl. 1984), "the public interest which does exist favors the denial of plaintiff's motion.  Such a denial would ensure that the government can arrange for . . . orderly [military] procurement . . . without court imposed disruption." Id. at 624.  "Given the uncertain time period which the . . . solicitation would be delayed in the event of an injunction . . ., it is reasonable to assume that both the government and the other bidders would probably suffer some harm as a result of such a delay. Although the exact quantum of harm which this delay would inflict is uncertain, it must be given some consideration when balancing the applicable factors. Id.

## CONCLUSION

WHEREFORE, Defendant submits that Plaintiffs's Applications for a Temporary Restraining Order or Preliminary Injunction should be denied.

Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 616-0739

25

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2006, I caused the foregoing Defendant's Motion to Dismiss and Combined Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendant's Motion to Dismiss to be served on Counsel for the Plaintiffs via the Electronic Case Filing System or, if this means fails, then by mail, postage prepaid, addressed as follows:

**Lisa V. Studtmann**
**Fausti & Associates, LLC**
**4301 Connecticut Avenue, N.W., Suite 453**
**Washington, D.C.  20008**

**Kevin R. Garden**
**THE GARDEN LAW FIRM, P.C.**
**901 N. Pitt Street, Suite 325**
**Alexandria, VA  22314**


_____
/s/
OLIVER W. MCDANIEL, D.C. BAR # 377360
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 616-0739