**Exhibit A**

Civil Action No. 06-0840 (JR)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRCIT OF COLUMBIA

BROWN HELICOPTER, INC., UNITED
AERONAUTICAL CORP., and ASSOCIATED
AIRCRAFT MFG. & SALES, INC.,

Plaintiffs,

v.

Civil Case No. 06-CV-840 (JR)

UNITED STATES DEPARTMENT OF DFENSE

Defendant.

## DECLARATION OF ROBERT FOLEY

1. I am currently employed as the Chief of the Resource Management Division at the Aerospace Maintenance and Regeneration Center (AMARC). AMARC (located at Davis-Monthan AFB, Arizona) is a joint service organization that provides for the storage, regeneration, reclamation, and disposal of aircraft and related aerospace items such as special tooling, special test equipment, engines, pylons, and miscellaneous airframe components. AMARC is responsible for preparing aerospace vehicles from storage for surface shipment or flight withdrawal. We also reclaim aerospace vehicles, engines, and critical aerospace parts for inventory replenishment or to satisfy urgent requirements. AMARC operates as a working capital fund activity. As such, AMARC charges their "customers" an hourly rate for services performed to offset cost of operations.

2. AMARC receives excess military aircraft from the Air Force, Army, Navy and Coast Guard. Upon receipt the aircraft will be placed in one of three storage categories; long term storage, reclamation for parts or full reclamation "excess."

3. AMARC receives final disposition instructions for each aircraft from the owning service. When AMARC is required to "dispose" of an aircraft various options are available. These include release through the General Services Administration (GSA), sale, donation, static display or destruction. (See DoD 4160.21-M-1 page A2-3)

4. Upon approval for disposal, all excess aircraft are first reviewed by GSA for possible donation to another agency. If GSA does not donate the aircraft it is released to AMARC for destruction.

5. AMARC is required to produce demilitarization instructions for each aircraft programmed for destruction. These instructions must be in compliance with applicable DoD directives and manuals to ensure compliance with DoD Directive 4160.21-M, "DoD Personal Property Utilization and Disposal Program" and DoD 4160.21-M-1 "Defense Demilitarization Manual." These manuals set forth DoD demilitarization policy, prescribe uniform procedures for assigning demilitarization codes to DoD property and direct methods for completing demilitarization.

6. "Demilitarization" refers to the act of destroying the military offensive or defensive advantages inherent in the equipment or material. It can be accomplished by several

means including mutilation, dumping at sea, melting or other methods designed to prevent further use of the equipment or material for its originally intended military purpose. (See DoD 4160.21-M-1 page A2-3)

7. Demilitarization codes are assigned to the aircraft and or the aircraft components. For example, when a component is given a code "A" or "B" demilitarization is not required. Code "C" requires the removal and demilitarization of the "key points", or lethal parts, components and accessories. Code "D" requires total destruction of the item. (See DoD 4160.21-M-1 page A3-1)

8. Demilitarization codes for aircraft received from the Air Force are typically assigned within AMARC. This is because the aircraft has military modifications distinguishing it from a strict commercial salable aircraft. (See DoD 4160.21-M Chapter 4, attachment 1) However, the Navy instructs AMARC to completely destroy the F-14 aircraft and any all tooling related to the aircraft.

9. Concerning C-141 aircraft. Prior to the March – April time frame of 2003 AMARC would review the aircraft components against various technical manuals and instructions to determine and prepare appropriate demilitarization instructions. Items marked "C" or "D" would be removed and effectively destroyed. Hazardous material was also removed including taking approximately 500 pounds of depleted uranium from each aircraft. Once this was accomplished the aircraft was sent to a contractor who cut the wings, tails and other sections of the aircraft in accordance with the demilitarization instructions. At

that point the aircraft was released to the Defense Reutilization and Marketing Service's facility in Tucson, Arizona as a commercial aircraft available for sale.

10. I have been made aware that internal government reviews were conducted of AMARC's demilitarization of several C-141 aircraft in 2002. The findings revealed errors in some of the demilitarization instructions. Portions of the instructions were incomplete and others were simply incorrect.

11. These findings prompted AMARC to review and analyze their demilitarization process for the C-141. Distinct from the deviations noted in the demilitarization instructions was the glaring discovery of the high cost associated with the current process. See Declaration of Robert Rohde.

12. As noted in paragraph 9, the C-141 aircraft components were assigned a demilitarization code. Approximately 130 components were code "C" or "D". A far smaller number (approximately 70 or less) were assigned "A" or "B" codes. Prior to releasing the aircraft from AMARC all "C" and "D" items were removed along with any hazardous material. This is an incredibly labor intense process and costly process. See Declaration of Robert Rohde.

13. In an effort to implement a more cost effective demilitarization process in the spring of 2003 AMARC started requiring the "shredding" of C-141s programmed for destruction. "Shredding" is a process performed by government contractors that reduce

the aircraft to very small pieces of metal. AMARC is simply required to remove hazardous materials prior to release for shredding.

14. Shredding accomplished the demilitarization requirements of DoD 4160.21-M-1 page A2-3 while gaining a cost advantage. In addition, this method eliminated the possibility of incomplete or inaccurate demilitarization instructions. Given obvious national security concerns AMARC was and is reluctant to risk an inadvertent release of sensitive military components. I have been made aware of two specific incidents that illustrate this concern. First, an F-18, F-4 and F-14 were listed for sale on E-Bay. It was originally reported the F-4 was from AMARC as the tail number matched an aircraft previously held at our facitlity. It was later discovered the F-4 was not received from AMARC and not in the condition as advertised on E-Bay. A separate event was the discovery of several A-4s in a private contractor's possession. Upon review it was noted the contractor should not have had these aircraft. Understandably AMARC was questioned by our higher headquarters concerning these events. As a result AMARC developed an increased level of concern for the proper release of military parts and equipment. Especially since these events was approximately 18 months after the terrorist attack on the World Trade Center.

15. The decision to shred C-141 aircraft is consistent with DoD 4160.21-M-1, Chapter 1 (General and Administrative) paragraph C.4 (Policy). In part the paragraph states:

> Defense Reutilization and Marketing Offices (DRMOs) on an individual basis can determine, in coordination with generating activities, the most appropriate and economical means for the disposal organization to properly demilitarize Munitions List Items. Demilitarization should be

accomplished by the most cost-effective method consistent with adequate security and surveillance by one of the following methods: ...(b) by the DRMO ... (d) under a service contractor, ....

16. The decision to shred C-141 aircraft is also consistent with DoD 4160.21-M Chapter 4 (Property Requiring Special Processing) That Chapter states in part:

> A. GENERAL. Some property, because of its peculiar nature, its potential influence on public health, safety, the environment, security, or private industry must be disposed of in other than normal fashion...
>
> B. LIST OF ITEMS REQUIRING SPECIAL PROCESSING. Applicable to excess, surplus ...
>   2. Aircraft
>      (2) This policy applies to all aircraft; however, processing procedures may vary for aircraft located at AMARC, Davis Monthan AFB, Arizona.

This chapter continues by defining "Category C" aircraft as those configured for combat and deferring to the Military Service's internal procedures for processing complete aircraft for disposal. (See DoD 4160.21-M page 4-8)

17. AMARC shreds C-130 aircraft programmed for disposal. The authority and justification for this decision is the same as outlined above.

18. AMARC also processes "tactical aircraft" for disposal. Tactical aircraft include the S3, A4, F14, and H53J. Each of these "weapon systems" all have the following sub-systems: military communications systems; weapons systems; offensive and or defensive capabilities. In addition, each aircraft is recognized by a mission design series "MDS" designator. For example, the F-14 connotes a fighter aircraft; "S" signifies surveillance, "A" is attack. It is common knowledge within the military community all fighter, attack

and surveillance weapon systems have combat capabilities. When programmed for disposal these aircraft are issued a demilitarization code "D" and shredded. Any alternative would require the removal of numerous code "C" and "D" components along with wing and tail cuts. Within tactical aircraft approximately 80 percent of all avionics components are coded "C" or "D". Examples even include the air speed and altitude indicators on fighter aircraft. These examples represent components that would not appear to be obviously military specific and show the depth of military sensitivity of the aircraft. Obvious military subsystems on these aircraft include target designators, missile guidance systems, crypto coded radio communication devices, and identification friend or foe capabilities. Coding these items as "C" and "D" prevents individuals outside the military from learning the specific capabilities of the aircraft. The "C" and "D" code of these particular components are required by DoD 4160.21-M-1. Shredding is the most cost effective way to dispose of tactical aircraft. For example, on fighter aircraft some wiring connector harnesses and component brackets are coded "C" and "D". To remove these items aircraft mechanics must remove several other components, panels or parts to simply reach the "C" or "D" item. In addition to the actual removal, AMARC personnel must document each part removal process, all of which consumes valuable skills and resources. Additional expenses were incurred for the services of the defense contractor who accomplished the wing, tail and other required cuts of the aircraft.
See the Declaration of Robert Rohde.


19. Plaintiff's have submitted Declarations by Mr. John H. Lane and Mr. Brian G. Cole. In paragraph 14 of Mr. Lane's declaration he references C-130, C-141, T-34 and H53

aircraft and states "Given their specific uses by the military, these aircraft are rarely modified for combat purposes. In the event they are, such modifications are easily removed so that the aircraft can be sold for commercial use." Mr. Cole makes a similar statement in paragraph 19 of his declaration: "Specifically, the C-130 aircraft are rarely if ever modified for combat purposes ..." Mr. Cole and Mr. Lane are simply incorrect as these aircraft do contain demilitarization code "C" and "D" items and therefore are configured to support combat operations. All of these aircraft types at AMARC have combat modifications. The C-130 and C-141 have chaff dispensers and military radio communications along with classified encoders all of which are combat modifications. The H53J also has chaff dispensing equipment and aircraft warning indicators for combat support. As such, and due to the inaccuracies in demilitarization code source information, AMARC has elected to require entire aircraft be coded demilitarization "D" to ensure thorough and complete destruction of potentially sensitive equipment and material. In accordance with DoD 4160.21-M, and DoD 4160.21-M-1, AMARC is obligated to ensure all demilitarization "C" and "D" items are demilitarized and or destroyed.

I swear under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

ROBERT RODEY
Aerospace Maintenance and Regeneration Center
Chief, Resource Management Division
30 May 2006