IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| BROWN HELICOPTER, INC., UNITED AERONAUTICAL CORP., ASSOCIATED AIRCRAFT MFG. & SALES, INC., DIXIE AIR PARTS SUPPLY, INC., FIREHAWK HELICOPTERS , INC., d/b/a BRAINERD HELICOPTERS, and ALAMO AIRCRAFT, LTD., | ) ) ) ) ) |
| Plaintiffs, | ) Case No.  06CV00840 (JR) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF DEFENSE, | ) ) |
| Defendant. | ) |

---

**PLAINTIFFS' REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Contrary to defendant's arguments, plaintiffs in this case have satisfied all of the elements regarding the issuance of a preliminary injunction.  As set forth in its initial memorandum and as supplemented below, plaintiffs have demonstrated a likelihood of success on the merits as well as irreparable harm.  In addition, defendant has not set forth any facts showing any prejudice or harm to the public interest if in fact the *status quo* is maintained pursuant to a preliminary injunction.

With regard to preliminary injunctions, the Court of Appeals held in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977):

> Generally, [preliminary injunctive] relief is preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit. An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.  There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.

In addition to the other issues addressed herein, given that the absence of a preliminary

injunction will result in the irreparable destruction of the very items at issue and that defendant will not incur any harm or prejudice from an injunction, a temporary injunction is not only necessary, but entirely appropriate in the present matter.

**A.     The Tucker Act does not apply to this action and venue is properly in this Court.**

At the outset, defendant argues that plaintiffs' action is improperly before this Court because the action is subject to the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491.  Opp. at 12.  Defendant's assertion is based on its allegation that plaintiffs are essentially challenging the solicitation for the sale of military surplus property. *Id.* (defendant argues that plaintiffs are "advancing what is more in the nature of a bid protest, which is within the exclusive jurisdiction of the Court of Federal Claims").  However, defendant's allegation is patently wrong because the Tucker Act explicitly applies only to solicitations issued "by a Federal agency," and the solicitation related to the issues in this matter was issued by a private party.  28 U.S.C. § 1491(b)(1); *Blue Water Environmental, Inc. v. United States*, 60 Fed. Cl. 48, 51 (2004)("to bring a bid protest in [the Court of Federal Claims], the plaintiff must have competed in a government-sponsored solicitation, which was issued by a federal agency and not a private party" and the Court of Federal Claims "has 'no authority over non-Federal entities'").

As defendant states, the solicitation at issue in the present matter was not issued by the federal government, but by a private company, Government Liquidation LLC ("GL").  Opp. at 9-10 (while the federal government retains title to the aircraft, it issued the aircraft to GL "with instructions to sell the airplanes" and GL is described as the entity "reselling the aircraft"); Opp. at 8-9 (in this matter, DOD Surplus LLC was awarded a contract "for the sale of all scrap property"); *see* Att. A to Exh. 1 (attached hereto)(pursuant to clause 18 of the Terms and

Conditions of the sale, "GL reserves the right to determine at its sole discretion which bid best meets the stated conditions of sale").  In addition, as the terms of the proposed sales contract explicitly state, the contract that will result from the sale of 27,000,000 pounds of aircraft will not be a contract with the federal government, but a contract between the buyer and GL.  *See* Att. A to Exh. 1 (attached hereto)(the Terms and Conditions of bidding provide at clause 1 require that the bidder agrees that the bidder and GL "are the only two parties to this contract").[1] Furthermore, as GL's advertisement of the sale on its website noted, the deposit which was required by bidders and the payment for the property is paid to DOD Surplus, LLC (GL's affiliate), not the federal government.  *See* Att. A to Exh. 2 (attached to Plaintiffs' Memorandum In Support of its Motion for a Preliminary Injunction)("Pl. Memo.").

In addition, GL is not acting as an agent for the federal government and thus a solicitation issued by GL is not tantamount to a solicitation issued by the federal government.  "It is well settled that for purposes of determining Tucker Act jurisdiction, the definition of 'agency' in 28 U.S.C. § 451 is controlling."  *Blue Water Environmental*, 60 Fed. Cl. at 51-52, *citing Emery Worldwide Airlines, inc. v. United States*, 264 F.3d 1071, 1080 (Fed. Cir. 2001).   Section 451 of Title 28 states that, "for purposes of the judiciary, 'agency,' 'includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless context shows that such term was intended to be used in a more limited sense.'"  *Blue Water Network*, 60 Fed. Cl. at 51-52, *quoting* 28 U.S.C. § 451.  Privates entities such as GL are plainly not included within the definition of "agency" under 28 U.S.C. § 451.  *See Blue Water Network,* 60 Fed. Cl. at

---

[1] In addition, clause 86 of the Terms and Conditions related to the sales contract state that the buyer agrees that "any dispute between the parties must be resolved under Arizona law and in a court located in Maricopa County, Arizona."  *See* Att. A to Exh. 1 (attached hereto).

52. Moreover, defendant does not even assert that it assumes day-to-day supervision over GL which would potentially convert GL to a government agency. *See id.*

Similarly, GL cannot be viewed as the equivalent of a purchasing or selling agent for the government for purposes of establishing Tucker Act jurisdiction. *See Blue Water Network*, 60 Fed. Cl. at 53. In order to qualify as a purchasing or selling agent for purposes of Tucker Act jurisdiction, (1) GL would have to be acting as a purchasing or selling agent for the government, (2) the agency relationship between the government and GL must be established by clear contractual consent, and (3) the contract at issue must state that the government would be directly liable to the purchaser/seller for the purchase price. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983)(addressing argument that private party was purchasing agent for the government), *cited in Blue Water Network*, 60 Fed. Cl. at 53. None of the above three factors are met in this case, even if the court's analysis in *Johnson Controls*, which addressed purchasing agents, were presumed to apply equally to selling agents. Nor does the government even attempt to qualify GL as its agent for purposes of this lawsuit. Most significantly, the sales contract to be entered into by GL and the buyer of the items at issue explicitly excludes the government as a party to the contract. *See* Att. A to Exh. 1 (attached hereto)(clause 1 of the Terms and Conditions of the sale).

Thus, because the proposed sale by GL did not involve a solicitation by the federal government nor would it result in a contract with the federal government, the Tucker Act is inapplicable and defendant's attempt to avoid this Court's review fails. The government also asserts that the APA does not grant jurisdiction to this Court based on its allegation that the government has granted "consent to suit" through the Tucker Act. Opp. at 13. However, because the Tucker Act is not applicable to this matter and the government has not granted

consent to be sued under any other statute, the APA does provide this Court with jurisdiction over this matter.

**B.    Plaintiffs have standing under the APA to bring this suit.**

Defendant also asserts that plaintiffs do not have standing under Article III of the Constitution because they have not shown a sufficient injury in fact. Opp. at 14-17.  To support its assertion, defendant argues that plaintiffs have not provided any evidence that they will suffer the requisite imminent and concrete harm from the defendant's conduct. *Id.* As demonstrated below, defendant is wholly incorrect in its allegations.

Plaintiffs are entities which purchase surplus military aircraft parts for resale to other entities. *See, e.g.*, Exh. 1 at ¶ 3; Exh. 2 at ¶ 4.  The defendant's actions at issue, which involve the imminent sale and destruction of a substantial quantity of specific military surplus aircraft parts, have precluded plaintiffs from the opportunity of purchasing the property at issue because defendant has prohibited the resale of the aircraft parts at issue and instead required the destruction of the very type of parts which are crucial to plaintiffs' operations.  This type of action constitutes a sufficient injury in fact.  As the U.S. Supreme Court held in *Northeastern Florida Chapter of Associated and General Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993), which also involved a barrier created by the government to an entity being able to bid for a federal contract:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier to establish standing.

*See AFGE v. United States*, 104 F. Supp.2d 58, 68-69 (D.D.C. 2000)(applying the Supreme Court's analysis to standard government contract arena); *Cortez III Service Corp. v. NASA*, 950 F. Supp. 357, 360 (D.D.C. 1996)(commercial entity had standing to challenge agency action that

prevented it from bidding on sale).

Defendant's actions have also required plaintiffs to revise their business plans given the significant impact which defendant's actions will have on the military surplus aircraft market. Exh. 1 at ¶ 7; Exh. 3 at ¶ 4.  In addition, defendant's revelation of its internal blanket decision to require the wholesale destruction of such commercially useable aircraft such as C-130s, H-53s and T-34s, which otherwise can be sold for commercial use with proper demilitarization of any combat-related components, will be a substantial blow to plaintiffs' ability to continue operating given that these aircraft are crucial to plaintiffs' existence as surplus parts dealers.  Exh. 1 at ¶¶ 7-10; Exh.  2 at ¶¶ 17-18; Exh. 3 at ¶ 5. [2]

As the Court of Appeals has held, "the loss of the opportunity to purchase a desired product is a legally cognizable injury" and therefore constitutes an injury in fact for purposes of establishing standing.  *Chamber of Commerce v. SEC*, 412 F.3d 133, 138 (D.C. Cir. 2005), *citing Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003); *see Competitive Enter. Inst. v. NHTSA.*, 901 F.2d 107, 112-13 (D.C. Cir. 1990).  Even though defendant is technically still selling these aircraft, items which can be resold and items which must be shredded for reclamation value are two entirely different products.  Further, the Court of Appeals has held that "the inability of consumers to buy a desired product … constitute[d] injury-in-fact even if they could ameliorate the injury by purchasing some alternative product."  *Chamber of Commerce*, 412 F.3d at 138, *citing Consumer Federation,* 348 F.3d at 1012.  Finally, the Court of Appeals has held that "[w]hen an agency order permits a third-party to engage in conduct that

---

[2]For example, there are approximately 1,000 C-130 aircraft currently in use and being operated by private entities as well as friendly foreign nations. Exh. 2 at ¶ 11.  Defendant's actions in requiring the wholesale destruction of C-130 aircraft will have a significant impact on the spare parts market for these aircraft, as well as having a detrimental impact on the ability of these other entities to keep these aircraft in operation.  *Id.*

allegedly injures a person, the person has satisfied the causation aspect of the standing analysis."
*Consumer Federation,* 348 F.3d at 1012, *citing America's Cmty. Bankers v. FDIC,* 200 F.3d 822, 827-28 (D.C.Cir.2000); *Animal Legal Def. Fund v. Glickman,* 154 F.3d 426, 440-43 (D.C.Cir.1998) (en banc).  Thus, defendant's direction to GL to require purchasers to destroy the aircraft and components at issue is similarly the type of harm that demonstrates standing.[3]

While defendant does not challenge plaintiffs' establishment of the remaining two elements for standing other than injury in fact, plaintiffs' harm is directly traceable to defendant's actions and these harms will be redressed by this Court's Order determining that defendant has improperly required the destruction of surplus military aircraft parts in violation of federal regulations.  *See Sabre, Inc.,* 429 F.3d at 1117 (D.C. Cir. 2005); *American Library Association v. Federal Communication Commission*, 406 F.3d 689, 696 (D.C. Cir. 2005)(addressing case where "causation and redressability are obvious if petitioners can establish injury").[4]  Thus, plaintiffs have met all the elements of standing under Article III.

---

[3] In addition, defendant's decision to require the destruction of C-130, H-53 and T-34 aircraft in all future sales also constitutes sufficient harm to establish standing over this issue as well given the impact of that decision on plaintiff's planning and operations.  *See* Exh. 1 at ¶ 7; *Sabre, Inc. v. Department of Transportation*, 429 F.3d 1113, 1117 (D.C. Cir. 2005)(where agency action has an immediate impact on a company's business plans, that action constitutes concrete and immediate injury in fact).

[4]GL has stated that, if allowed by defendant, it would be willing to sell the aircraft and components at issue without requiring that they be shredded, thus demonstrating that this Court's order will result in redressing plaintiffs' harm.  Exh. 3 attached to Exh. B attached to Opp. (letter from GL to DRMS dated May 10, 2006)("GL has the expertise and experience to resolve this issue to the satisfaction of the [plaintiffs] while protecting DRMS from unverified components leaving government custody. . . .  In any case, [DRMS counsel] Mr. Gusching indicated that he expects prompt resolution of some or all of the issues involved, resulting in the release of the property for sale as scrap or both scrap and useable components").

**C.** **Plaintiffs have shown a likelihood of success on the merits given that defendant has failed to comply with clear, legally-mandated regulations and, even if those regulations provided defendant with discretion on how to demilitarize the items at issue, defendant has no reasonable basis for its actions.**

The merits in the present case are straightforward. The issue involves the determination of whether defendant complied with the legally mandated procedure as set forth in the Defense Demilitarization Manual and Defense Materiel Disposition Manual.[5] As demonstrated below, those manual provisions are clear and the facts show that defendant has improperly required that the aircraft at issue be destroyed. Defendant's defense is essentially that, because it could not be certain that it would comply with the law by properly implementing these manual provisions, it was legal for defendant simply to ignore the specific coding requirements under the manual and destroy aircraft wholesale under a blanket policy. Opp. at 4, 23.

Defendant also cites to its desire to proceed in a more cost efficient and overly cautious manner as the justification for its actions. Opp. at 4-5. Notwithstanding defendant's purported claim that its actions are being driven by a desire to reduce its costs and avoid problems which might be caused by its inability to comply with its own manual provisions, defendant has no discretion to ignore the legal procedure applicable to disposal of military surplus aircraft. Even assuming *arguendo* that such discretion did exist, defendant's purported cost efficiency analyses are wholly lacking in any specificity and do not constitute a reasonable basis for defendant to deviate from the manual provisions. Similarly, defendant's secondary references to national security concerns are similarly not a basis for defendant to ignore the applicable law. Thus, plaintiffs have demonstrated that they are likely to prevail on the merits.

---

[5] The legally-binding nature of these manuals is not at issue given defendant's admission that it is in fact legally bound to comply with the directions set forth in these manuals. Opp. at 2.

**1.**     **The legally-binding manuals do not give defendant discretion to deviate from proper demilitarization procedure.**

Defendant claims that it has discretion to designate entire C-130, C-141, H-53 and T-34 aircraft for destruction as a matter of blanket policy if it determines that it is too costly to properly code those aircraft pursuant to the provisions of DoD 4160.21-M and 4160.21-M-1. Opp. at 5-6, 22.[6]  However, defendant's assertion that it has discretion to require the *total* destruction of these particular types of aircraft is contrary to the explicit provisions in these manuals.   The provision cited by defendant as providing it with the authority to engage in this wholesale destruction of surplus aircraft actually states that "Defense Reutilization and Marketing Offices (DRMOs) on an individual basis can determine, in coordination with generating activities, the most appropriate and economical means for the disposal organization to **properly** demilitarize Munitions List items."  4160.21-M-1, Chapter 1, paragraph C.4; Opp. at 5 (emphasis added).  However, the key phrase is that defendant "properly" demilitarize the items. As demonstrated below and as specifically set forth in the manual, total destruction of the C-130, C-141, H-53 and T-34 aircraft at issue does not constitute "proper" demilitarization of those aircraft.

The manual contains a specific list of aircraft which can be sold for commercial resale when not specifically modified for military purposes.  *See* Exh. 3, Att. A at 11-12.  This list, entitled "AIRCRAFT AUTHORIZED FOR SALE FOR COMMERCIAL USE," includes C-130, C-141, T-34 and H-53 aircraft, which are being sold as part of the sale at issue.  *Id.*  Defendant has asserted that all of these aircraft for sale in the present matter have been modified for military purposes.  Opp. at 8.  However, plaintiffs have demonstrated that they have routinely purchased

---

[6] While the sale included F-14 aircraft, solely for purposes of the present lawsuit and without waiving their rights to object to such actions in future sales, plaintiffs do not contest that these aircraft may be sold as scrap.

these aircraft, even if they had been modified for combat purposes, in tact with only the modified components removed. *See, e.g.*, Exh. 1 at ¶¶ 4-6 (attached to Pl. Memo.). Thus, even if these aircraft have been modified for military purposes, that modification does not justify destruction of the entire aircraft.

Proper methods for assigning demilitarization codes to C-130, C-141, H-53 and T-34 aircraft designated for disposal, even when they have been specifically modified for military purposes, are set forth in DoD 4160.21-M, which states that such aircraft are to be sold for commercial resale even when the aircraft have been "subsequently modified for military use." DoD 4160.21-M, Chapter 4, Att. 1 (Exh. 3, Att. A at 11). Specifically, that section states "[t]he following is a list of aircraft types which, when not specifically modified for combat purposes, may be sold or exchanged for commercial use." *Id.* That manual then directs that in such situations where the aircraft has been subsequently modified for combat purposes (*i.e.*, certain discrete parts have been added to the basic aircraft for combat purposes), when those aircraft are "authorized to be sold or exchanged, the releasing Military Service **shall** indicate the **military design characteristics, if any, which must be removed or demilitarized** and, in the latter instance, the method of demilitarization." (Emphasis added.) This manual clearly requires the removal and destruction of the specific combat modification, not the entire aircraft.

Furthermore, the C-130, C-141 and H-53 are not aircraft which are properly assigned Code D under the DEMIL Code, which is the code designation that requires destruction of the entire item. Exh. 2 at ¶ 15. Rather, upon being supplied to the federal government by their manufacturers, these aircraft are assigned Code B under the DEMIL Code. *Id.* If the C-130, C-141, T-34 and H-53 are subsequently modified by the government through the addition of items which are given Code C and/or D under the DEMIL Code, the overall aircraft would be given

10

Code C, thus requiring the removal and destruction of just those added items upon any subsequent sale or disposal of the aircraft. *Id.* Once these items have been removed, the aircraft revert to their original Code B. *Id.*[7]

As to these aircraft which have been allegedly "modified" for military use, but are otherwise not deemed to be for military use for purposes of any demilitarization and available for commercial use, the manuals clearly require only that the modified military aspects of the aircraft be removed or destroyed. *See* Exh. 3, Att. A at 11-12. The manuals do not authorize or allow entire C-130, C-141, H-53 and T-34 aircraft to be destroyed given that these aircraft, but for their specific military modifications, do no constitute military materiel for purposes of the DEMIL codes. Rather than direct or authorize the wholesale destruction of aircraft, these manuals instead direct defendant to indicate the specific "military design characteristics" of the aircraft which are to be "removed or demilitarized." DoD 4160.21-M, Chapter 4, Att. 1 (Exh. 3, Att. A at 11). Defendant's interpretation of these provisions as providing it authority to destroy the whole aircraft is contrary to these explicit directions.[8]

Defendant also cites to other language in DoD 4160.21-M, Chapter 4, and claims that it authorizes defendant to shred C-130, C-141, H-53 and T-34 aircraft in their entirety. Opp. at 5-6. However, this language merely states that "[s]ome property, because of its peculiar nature, its potential influence on public health, safety, the environment, security, or private industry, must be disposed of in other than normal fashion." DoD 4160.21-M, Chapter 4 (4-1)(Opp. at 6). As defendant notes, this portion of the manual then describes certain categories of aircraft under

---

[7]As defendant admits, "[d]emilitarization codes are assigned to the aircraft and or the aircraft components." Opp. at 3.

[8]In addition, given the revenue loss which it creates, unnecessarily requiring the destruction of these aircraft is tantamount to illegal destruction of federal property in violation of 18 U.S.C. §§ 641, 1361.

Category C.  Opp. at 6.  However, Category C applies explicitly to aircraft "that have **no commercial flight application** based upon their Military design characteristics, *e.g.*, combat/tactical application."  DoD 4160.21-M, Chapter 4 (4-7)(emphasis added)(Exh. 3, Att. A at 7).  That very same chapter in the manual reveals that C-130, C-141, H-53 and T-34 aircraft do have commercial flight application once their military design characteristics, if any, are removed.  *See* DoD 4160.21-M, Chapter 4, Att. 1 (setting forth a list entitled "AIRCRAFT AUTHORIZED FOR SALE FOR COMMERCIAL USE" that includes C-130, C-141, H-53 and T-34 aircraft)(Exh. 3, Att. A at 10-12).  Thus, the general language in the manual cannot be viewed as authorizing the wholesale destruction of C-130, C-141, H-53 and T-34 aircraft given the specific direction in Attachment 1, Chapter 4, as to the coding and disposal methods for these particular aircraft types.[9]

DoD 4160.21-M (4-3) also states that "processing procedures" related to aircraft located at AMARC, Davis-Monthan AFB, may vary.  Opp. at 6.  The aircraft at issue are in fact located at Davis-Monthan AFB.  However, the manual only refers to variations in "processing procedures" that are to be followed, and in no way alters or provides a different direction in how the aircraft located at Davis-Monthan AFB are to be coded and disposed of.

**2.    Defendant is not entitled to any deference in the present matter given that its actions are in clear violation of applicable law and defendant has explicitly determined that the property at issue is no longer needed to fulfill any military mission.**

Defendant asserts that this Court should "defer" to the military in the matter at hand.  Opp. at 18.  However, the cases cited by defendant do not support the proposition that this Court should "defer" its responsibility as the adjudicator of cases and controversies to the military, and

___

[9]It is readily evident, even from defendant's own assertions, that defendant is not requiring the destruction of these aircraft for health or safety reasons.

in fact defendant includes cases where the courts issued injunctions against the military.  *See Selland v. Aspin*, 832 F.Supp. 12 (D.D.C. 1993)(granting injunction prohibiting discharge of servicemember related to his homosexuality); *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48 (2005)(granting injunction against Army preventing performance of contract supplying Guantanamo Bay).  In addition, to the extent the courts have granted deference to certain specific types of military decisions involving discretion that depends upon military expertise and directly affects the military's ability to complete its "vital mission," the present case, which involves outdated surplus equipment and clear violations of binding procedure, is not the type of matter which the courts have deferred to the military.

At the outset of its argument, defendant refers to the "federal statutory requirement" that courts give deference to the military in matters such as that presented in this case. Opp. at 18.  However, the statute which defendant cites to is the Tucker Act, which applies to bid protests actions brought before the Court of Federal Claims.  *See* Opp. at 18 (*quoting Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57)(Court of Federal Claims cited to 28 U.S.C. § 1491(b)(3), which applies solely to that court).[10]  There is no "federal statutory requirement" that this Court defer to defendant's decision in this case to ignore applicable and mandatory federal procedure.[11]

---

[10] Pursuant to its own provisions as enacted by Congress, as of 2001, the Tucker Act bid protest provisions no longer applied to the U.S. District Courts.  *Labat-Anderson, Inc. v. United States,* 346 F. Supp. 2d 145 (D.D.C. 2004).  Thus, the provision cited by defendant, in addition to being solely applicable to bid protests, is simply inapplicable to this Court in any event.

[11]Notwithstanding the statutory deference that applies to that court, the Court of Federal Claims in *Transatlantic Lines* reversed the military's decision to award a contract and granted injunctive relief to the plaintiff.  68 Fed. Cl. at 58.  In addition, as to irreparable harm, the court in *Transatlantic Lines* (which defendant asserts is applicable) also concluded that "[t]he potential loss of business on [a] contract … has been found sufficient to prove irreparable harm." 68 Fed. Cl. at 57, quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993).

While defendant states that courts are "inclined" to "defer" to the judgment of the military for "discretionary military decisions," defendant cites cases which specifically pertain to decisions which involve "military expertise," such as matters related to military personnel discharges, security clearances and how and where the military should train its personnel. Opp. at 18; *Guerra*, 942 F.2d 270, 275 (servicemember asked Court to retain him in the military after drug conviction and Court did not want to engage in "judicial second-guessing" and encourage routine requests for injunctions by servicemembers for such decisions in drug discharge cases); *Selland*, 832 F.Supp. 12 (D.D.C. 1993)(granting injunction prohibiting discharge of servicemember related to his homosexuality);[12] *National Federation of Federal Employees v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993)(case involved appropriate questions that could asked individuals holding security clearances); *Water Keeper Alliance v. Department of Defense*, 271 F.3d 21, 35 (1st Cir. 2001)(where plaintiff challenged effectiveness of military's training methods at Vieques, Puerto Rico, court declined to make decision on how and where the Navy should train); *Hodges v. Brown*, 500 F. Supp. 25 (E.D. Pa. 1980)(involving servicemember's challenge to court martial for absence from military service).

For example, in *Guerra*, the discharged servicemember wanted the military to refrain from discharging him by invoking its explicit discretion under Army regulations to decide how to proceed, and the Court held that "[t]his is the type of discretionary decision best left to the military." *Id.* at 275. The Court further stated that "[w]e cannot predict the effect on the Army of retaining admitted drug users in specific Army units. To start second-guessing the military under these circumstances 'would be a disruptive force as the affairs peculiarly within the

---

[12] In *Selland*, the District Court granted an injunction to maintain the status quo, even though the matter involved the discharge of a servicemember. *Selland*, 832 F. Supp. at 14-15, 16-17.

jurisdiction of the military authorities.'" *Id.*

The cases cited by defendant refer to the need for the military to be able to meet its "vital mission." *See Guerra*, 942 F.2d at 276. On the other hand, the cases also specifically note the responsibility of the Courts to adjudicate clear questions of whether or not the law has been complied with. *See National Association of Federal Employees,* 983 F.2d at 296 (the constitutional scheme places the responsibility on the courts to adjudicate cases and controversies even in military context). The issue at hand does not involve military discretion given the clear provisions of the manuals which apply, and also involves equipment which the military has decided is no longer necessary to perform its vital mission. Moreover, plaintiffs are not seeking to force the military to continue using this equipment as part of its mission, as was the case in the various discharge cases cited by defendant, so no disruptive force to the military's affairs would occur. Thus, the only issue presented by defendant is whether or not the equipment designated for release has been properly assigned the codes which apply to it under the applicable manuals and federal regulations related to its sale. This type of decision does not involve the "military expertise" which the courts have deferred to and deference to the military in matters such as the present issue would essentially give the military *carte blanche* to act contrary to federal regulations.

3.    **Even if defendant were authorized to determine that the entire non-military aircraft should be destroyed as opposed to removing only its military components, defendant's purported basis for doing so as a matter of cost efficiency or in the interest of national security has no rational basis.**

Notwithstanding that defendant does not have authorization to simply destroy surplus C-130, C-141, H-53 and T-34 aircraft as a discretionary choice, defendant has in no way demonstrated the validity of its purported cost efficiency analysis which it cited to as the

justification for its actions.  The analyses offered by defendant in this matter are too vague to provide any type of sufficient basis to arrive at the conclusions which defendant has set forth. Given that the analyses provided by defendant simply do not provide adequate justification for the wholesale destruction of aircraft, it appears that defendant's true motive is the desire to avoid bad publicity and political pressure in the event it fails to properly follow its own manual provisions.  As defendant admits, it is destroying aircraft wholesale in an effort to "eliminate[] the possibility of incomplete or inaccurate demilitarization instructions."  Opp. at 4.  While defendant never clearly explains exactly what its means by "incomplete or inaccurate demilitarization instructions" or the cause of such deficiencies, it appears evident that this phrase is being used as a bureaucratic euphemism for agency error.[13]  However, error, even where candidly recognized by the agency with regard to its own inability to follow its procedure, is not a justification to ignore legally mandated procedures.  If so, agencies would be routinely justified in simply tossing aside applicable procedure and proceeding in whatever fashion they deemed most expedient for their own purposes.

> **a.**     **Defendant's purported cost efficiency analyses are vague and allow for no reasonable conclusions to be drawn from them.**

Up until March 2003, defendant reviewed aircraft designated for disposal such as C-130s that were of the type that could be sold for commercial use to identify the appropriate demilitarization codes that applied to the various components on the aircraft and, after appropriate demilitarization was completed, the aircraft were sold for commercial sale.  Opp. at

---

[13] Defendant states that "AMARC is required to produce demilitarization instructions for each aircraft programmed for destruction" and that these instructions "must be in compliance with DoD Directive 4160.21-M [] and DoD 4160.21-M-1."  Opp. at 2.  Defendant later admits that, in certain cases in the past, "findings revealed errors in some of the demilitarization instructions" and that "portions of the instructions were incomplete and others were simply incorrect."  Opp. at 4.   In other words, the mistakes which defendant refers to were that instructions produced by AMARC were not in compliance with applicable DoD manuals.

3, 6.[14]  However, in 2002 defendant realized that it was making mistakes in its identification of the proper codes. Opp. at 4.  At the same time, it also claims to have realized, for the first time, that there was "a high cost associated with" the demilitarization process set forth under the applicable manuals.  *Id.*  As a result, in the Spring of 2003, defendant started shredding C-130 and C-141 aircraft in their entirety, regardless of whether components on those aircraft could be removed and the aircraft could otherwise be sold for commercial use.  *Id.*  This decision was allegedly made "in an effort to implement a more cost effective demilitarization process."  *Id.*  However, a review of the purported analyses conducted by defendant to support its conclusion that shredding aircraft and selling them for junk value, rather than properly removing any combat-specific components and selling them for commercial use, shows that defendant's analyses are completely incapable of providing any reasonable basis for defendant's conclusions. As such, this purported decision is entirely arbitrary.

First, defendant's claim that its decision was driven by its need to reduce its costs and the demands on its workforce due to the purported "labor intensive" efforts to identify components that need to be removed from aircraft is false because defendant does not need to incur this cost or investment of time.  Defendant allows demilitarization to occur off site by private parties where the demilitarization requires removal of only certain components and not total destruction of the aircraft.[15]  Moreover, military surplus dealers would be willing to assume the cost of this process as a condition of sale.  *See* Exh. 1 at ¶ 4; Exh. 2 at ¶ 20; Exh. 3 at ¶ 9.  Proceeding in this

---

[14]Defendant asserts that the same situation occurred with respect to C-130 aircraft as with C-141 aircraft.  Opp. at 6.

[15] In fact, GL's Terms and Conditions of sale allow purchasers of property which must be demilitarized 30 days in which to demilitarize the property after it was purchased.  Att. A to Exh. 1 (clause 45).  In addition, defendant allowed the purchaser of the sale at issue to remove all of the aircraft (even the F-14s) off-site and arrange for their demilitarization.  Opp. at 9.

17

manner will result in no out-of-pocket costs to defendant, thus completely eliminating its concern about the costs and purported intensive labor commitment associated with this process. In addition, defendant offers no analysis under which it assessed the cost efficiency of requiring purchasers to accomplish all appropriate demilitarization and parts removal, which is an adequate and allowable method to accomplish this task as demonstrated by the fact that the demilitarization required under the sale at issue was required to be completed off of government premises. Opp. at 9. Notwithstanding these facts, proceeding in this manner was not even evaluated by defendant.

Second, while defendant provides no specifics as to its cost analyses in its argument and simply relays the conclusions arrived at by Mr. Robert Rohde, a review of the analyses which Mr. Rohde relied upon shows that they are so incomplete and vague as to provide no legitimate or reasonable basis for defendant's conclusions. *See* Exhibit B to Opp.[16] For example, Mr. Rohde compares defendant's cost for shredding aircraft to defendant's cost of properly removing components from the aircraft that would allow for its sale and commercial use. Exh. B to Opp. at ¶ 2. While contractors can and are allowed to remove components from aircraft pursuant to appropriate oversight and supervision, and can likely do so at much less cost than the government, Mr. Rohde never bothers to take this reduced cost into account in his analyses.[17]

---

[16]Mr. Rohde states that he directed personnel to compare his agency's costs for shredding aircraft with the costs for removing pertinent components, but he does not identify when he made such a request. Exh. B to Opp. at ¶ 2. If in fact this request was made after this lawsuit was filed, the results are clearly after-the-fact rationalizations for a prior decision made on other bases. Plaintiffs will be able to pursue this issue pursuant to production of the administrative record and discovery, if necessary, in this matter.

[17]Mr. Rohde's estimates that demilitarization requires anywhere from 100-580 hours of time by AMARC personnel, and AMARC bills the military branch that issued it the aircraft for its services on an hourly basis. Opp. at 2; Exh. 3 to Exh. B attached to Opp. This compares starkly with plaintiffs' experience in conducting the same services which only required 8-20 hours. *See* Exh. 1 at ¶ 6; Exh. 2 at ¶ 18; Exh. 3 at ¶ 7.

Thus, Mr. Rohde's costs are clearly inflated above what otherwise would be required.  In addition, the costs of demilitarization can be incurred by the purchasers, which means defendant incurs no costs associated with this effort.  Mr. Rohde ignores that point in his analysis.

Furthermore, figures provided by Mr. Rohde indicate that defendant has concluded that the average difference between the cost of shredding the aircraft at issue compared to the cost of removing components for commercial sale is approximately $11,500 per aircraft.  Exh. B at ¶¶ 3-9.  Given that, for example, the price paid for C-130 aircraft inclusive of its standard engines and propellers (which are not part of any modification for military purposes) is between $250,000 and $500,000 and aircraft comparable to the H-53 have sold for as much as $1 million, this cost difference is inconsequential.  *See* Exh. 3 at ¶¶ 8-9.

In addition, defendant provides no analysis which compares the increased prices which are received for items which can be resold for commercial use as compared to the scrap-value prices.[18]  Without this type of key analyses, defendant's conclusions as to the cost-efficiency of shredding the aircraft are completely arbitrary.  Where defendant receives more revenue for selling items for commercial use, that increase can easily surpass the difference in cost between shredding the aircraft or removing pertinent components.

Moreover, defendant's cost efficiency analysis is misleading because of its arbitrarily narrow scope.  While allegedly concerned about the costs to the government, defendant fails to

---

[18] While defendant makes a reference in its argument to comparing profits of various sales, it provides no cites or any details whatsoever related to these comparisons.  Opp. at 22.  As such, plaintiffs have no ability to evaluate defendant's conclusions.  In addition, while defendant also includes an apparent list of prices received by GL for aircraft sales at Exhibit 4 attached to Exhibit B, it is simply impossible to draw any conclusions from the list as to the reasons for the different prices set forth.  Among other factors, the condition code assigned to the items was "HX," which indicates that it is "[m]aterial which has been determined to be unserviceable and does not meet repair criteria; includes condemned items which are radioactivity contaminated."  *See* Att. A to Exh. 1 (attached hereto)(clause 39 of Terms and Conditions of sales by GL).

take into account the costs to the government caused by its decision to destroy these aircraft, such as lost taxes and other ripple impacts which are caused by detrimental impact on the military surplus dealers and that industry overall.  *See* Exh. 1 at ¶¶ 7-10; Exh.  2 at ¶¶ 17-18; Exh. 3 at ¶ 5.  Defendant's recent shift to wholesale destruction of aircraft which the dealers such as plaintiffs have traditionally relied upon, not to mention their customers, will have significant financial repercussions on the government that defendant ignores notwithstanding its purported concern over the public fisc.

>    b.    **Defendant's purported concern that its inability to comply with applicable requirements for disposal of surplus material will create national security issues is not a justification for its failure to comply with those applicable requirements.**

In addition to claiming that its actions were motivated by a desire to proceed in a more cost effective manner, defendant also states that its shift to requiring the wholesale shredding of aircraft otherwise capable of being prepared for commercial use "eliminates the possibility of incomplete or inaccurate demilitarization instructions" which otherwise would raise national security concerns.  Opp. at 4.[19]  As defendant admits, "[s]ince AMARC cannot completely guarantee 100% removal of Demil C and D items off weapon systems, AMARC will code all aircraft D Demil."  Opp. at 10.  However, defendant's reference to concerns related to national

---

[19] To illustrate its argument, defendant raises two examples.  The first was a situation where it appeared that an individual was selling F-18, F-14 and F-4 aircraft on eBay that had originated from defendant.  Opp. at 5.  This apparently resulted in bad publicity for defendant.  However, it was later determined that the aircraft were not from defendant and simply consisted of old, useless fuselages.  Exh. 3 at ¶ 10.  The other illustration raised by defendant was the contemporaneous discovery of several A-4 aircraft in the possession of a private contractor.  Opp. at 5.  This situation also apparently resulted in bad publicity for defendant and "high level official inquiries" that found the agency had failed to comply with applicable requirements.  *Id.*  However, other than the obvious bad publicity generated by these two events, which placed "pressure" on the agency (*id.*), defendant fails to demonstrate the actual national security concerns which occurred.  In actuality, the Department of Defense appears to be using world events as a convenient and handy justification for simply tossing aside applicable legal requirements.

security as an additional justification for its decision to ignore the specific provisions of the applicable manuals and require the wholesale shredding of aircraft which otherwise are listed as available for commercial use is a flawed justification.  The very same coding requirements which defendant is now ignoring were specifically established to protect the national security.  If defendant complied with these requirements, there would be no threat to national security.  In fact, GL itself has stated in response to this very lawsuit that "GL has the expertise and experience to resolve this issue to the satisfaction of the aircraft parts dealers while protecting DRMS from unverified components leaving government custody."  Exh. 3 attached to Exh. B attached to Opp. (letter from GL to DRMS dated May 10, 2006).

Defendant's argument for ignoring these requirements is essentially that defendant is not confident that it actually will be able to follow these requirements.  However, the rational response to defendant's concern about its own competency to properly follow the manual is for defendant to implement additional safeguards in its process.  Defendant's decision to instead simply shred the aircraft in their entirety is an unjustified and inappropriate means of avoiding its legal obligations.  Moreover, nowhere in the manual provisions, which defendant admits contain the binding requirements for disposal, is defendant authorized to scrap those same requirements if it concludes that it is simply unable to comply with them.  In other words, defendant has no discretion under the manual to ignore otherwise specific manual guidance where defendant is concerned that it may not be able to comply with that guidance.

**D.    Plaintiffs will incur irreparable harm in the absence of an injunction.**

Defendant asserts that the harm which plaintiffs will incur is limited to merely a "temporary loss of income" which later can be rectified, and thus does not constitute irreparable harm necessary for issuance of an injunction.  Opp. at 21.  However, the case cited by defendant

for this principle also notes that a permanent loss of income can in fact constitute irreparable harm. *AFGE v. United States*, 104 Supp. 2d 58, 76 (D.D.C. 2000)(noting that inability to later recover economic loss can constitute irreparable harm), *citing Haley v. Pataki*, 883 F. Supp. 816, 823 (N.D.N.Y.), *app. dis.*, 60 F.3d 137, 139 (2d Cir. 1995); *see World Duty Free Americas, Inc. v. Summers,* 94 F. Supp. 2d 61, 67 (D.D.C. 2000); *Bracco Diagnotics, Inc. v. Shalala*, 963 F.Supp. 20, 28-29 (D.D.C. 1997); *Mova Pharmaceutical Corp. v. Shalala,* 955 F. Supp. 128, 131 (D.D.C. 1997); *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)(irretrievable monetary losses that have a serious effect can constitute irreparable harm); *Hoffman-Laroche, Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978)(loss of sales for which plaintiff would have no recourse is irreparable).

In the present case, while defendant asserts that plaintiffs' economic harm is "temporary," defendant does not state how such loss can later be recovered. *See* Opp. at 21-22. In fact, it cannot. Once the sale at issue is completed and unless the terms of the sale are modified, the property at issue will be permanently destroyed and plaintiffs will never be given the opportunity to bid on and resell that property. Given that it involves 27,000,000 pounds of surplus military aircraft, the sale constitutes a significant portion of the available surplus components for the aircraft at issue. Exh. 1 at ¶ 8; Exh. 2 at ¶ 17; Exh. 3 at ¶¶ 4-5. In addition, the military surplus at issue is of a finite quantity, thus the destruction of these parts is a permanent loss. *See* Exh. 2 at ¶ 12. Moreover, plaintiffs will have no cause of action against defendant for this harm once these aircraft are destroyed.

The holdings set forth above by this Court are consistent with the holdings of various judges at the Court of Federal Claims. While defendant acknowledges this fact (Opp. at 21) and in other portions of its brief refers this Court to Court of Federal Claims' decisions as being

persuasive, defendant asserts that plaintiffs have not shown this type of harm in the present case because they did not actually bid on the sale at issue.  Opp. at 21.  This assertion is patently disingenuous.  First, the sale process has not been completed. Opp. at 9.   Thus, all eligible bidders have not been finally established.  Second, and as defendant is aware, plaintiffs buy and sell useable military surplus property and are not scrap dealers.  Therefore, because the purchaser of the property at issue must destroy it upon purchase under the terms of the sale, the sale has no value to plaintiffs under that requirement.  However, had defendant not violated the law by requiring the destruction of the property at issue, plaintiffs would have been in a position to bid on the sale.

        While the present case does not qualify as a bid protest presentable to the Court of Federal Claims because it does not involve a government solicitation or contract, that court has routinely held that where the government's actions prevented an entity from bidding on a sale it otherwise would bid upon, those actions constitute irreparable harm even though no bid was made.  *See, e.g., Advance Systems Technology, Inc. v. United States*, 69 Fed. Cl. 464 (2006).  This determination is inherently logical given that, but for the government's actions which are being challenged, the entity would have bid upon the contract at issue.

        Furthermore, the issues involved in this matter extend far beyond the specific sale at issue and threaten the continued viability not only of plaintiffs, but of the entire military surplus aircraft dealers industry.  Defendant has acknowledged that it has adopted a blanket policy to require the destruction of all C-130, C-141, T-34 and H-53 aircraft.  While of varying individual significance, overall these aircraft constitute a substantial portion of the military surplus aircraft resale industry.  Exh. 1 at ¶¶ 7-10; Exh. 2 at ¶¶ 8-9, 12, 17; Exh. 3 at ¶¶ 4-5.  By effectively cutting off the supply of the components from such aircraft, defendant has permanently closed

down the key supply market for these parts. *Id.* This closure will have significant and

detrimental harm on plaintiffs as well as other similar resellers. *Id.* Defendant's action also will

cause substantial harm to those entities which rely upon the parts provided by plaintiffs to keep

aircraft in active operation in the various civilian industries in which they are used. *Id.* As such,

plaintiffs will suffer irreparable harm. *See Washington Metropolitan Area Transit Commission*

*v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)(destruction of a business constitutes

irreparable harm notwithstanding that it is an essentially economic injury); *World Duty Free*

*Americas, Inc.,* 94 F. Supp. 2d at 67; *Cf. Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019,

1026 (D.D.C. 1981)(irretrievable monetary losses that have a serious effect can constitute

irreparable harm and plaintiff need not demonstrate that its business will be destroyed).

       As defendant itself notes, an injunction can be issued "even if there is a relatively slight

showing of irreparable harm." Opp. at 20 . Given plaintiffs' likelihood of prevailing on the

merits and the undeniable fact that the status quo will be unalterably affected upon destruction of

the aircraft at issue, plaintiffs have shown sufficient irreparable harm to meet this element of the

test for a preliminary injunction.

**E.     The issuance of injunctive relief will not substantially harm any other parties and
       awarding injunctive relief is in the public interest.**

       The Court's issuance of an injunction preventing DRMS with destroying the aircraft at

issue will not cause any substantial harm to any other parties. Preserving the aircraft in their

current condition poses no health or safety risks. Nor are plaintiffs aware of any critical need by

any parties of the scrap material from the aircraft. Furthermore, delaying the currently scheduled

sale and destruction of the aircraft will not cause any irreparable harm to the government. In

addition, awarding injunctive relief will preserve the government's ability (as well as GL's

ability) to obtain significantly greater prices for the aircraft at issue as compared to the aircraft's

scrap value.[20]  Also, injunctive relief will protect the interests of the government itself which

often re-purchases parts from plaintiffs when it is in need of parts for its currently flying aircraft.

For these reasons, injunctive relief is clearly in the public interest.

**F.     Conclusion**

For the reasons set forth above, plaintiffs Brown Helicopter, Inc., United Aeronautical

Corp., Associated Aircraft Mfg. & Sales, Inc., Dixie Air Parts Supply, Inc., Firehawk

Helicopters, Inc. (d/b/a Brainerd Helicopters) and Alamo Aircraft Ltd. respectfully request that

the Court grant their motion for a preliminary injunction and issue an injunction prohibiting the

government from proceeding with the sale, transfer and destruction of the aircraft at issue in this

matter until such time as the aircraft have been offered for sale pursuant to the condition that

they may be sold for resale.

Respectfully submitted,

_____/s/_____

John J. Fausti
D.C. Bar No. 349811
Fausti & Associates, LLC
4301 Connecticut Avenue, NW, Ste. 453
Washington, DC  20008
(202) 237-0505 (phone)
(202) 237-7566 (fax)
*jfausti@faustilaw.com*

Of counsel:

Lisa V. Studtmann                      Kevin R. Garden
D.C. Bar No. 494632                    DC Bar No. 426745
Fausti & Associates, LLC               THE GARDEN LAW FIRM, P.C.
4301 Connecticut Avenue, NW            901 N. Pitt Street, Ste, 325
Suite 453                              Alexandria, VA 22314
Washington, DC 20008                   Telephone:  (703) 535-5565
(202) 237-0505 (phone)                 Facsimile:  (703) 997-1330
(202) 237-7566 (fax)                   *kevin@gardenlawfirm.com*
*lstudtmann@faustilaw.com*

Dated: June 7, 2006

---

[20]GL has stated that it is willing to sell the aircraft at issue for useable parts.  Exh. 3 attached to Exh. B attached to Opp. (letter dated May 10, 2006 from GL to DRMS).